**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

TOMAS ALFREDO MOLINA OCHOA,

    Petitioner,

vs.                                                                                    No. CIV 25-0881 JB/LF

KRISTI NOEM, in her official capacity as
Secretary of the U.S. Department of Homeland
Security; PAMELA BONDI, in her official
capacity as Attorney General of the United
States; TODD LYONS, in his official
capacity as Acting Director and Senior
Official Performing the Duties of the
Director of U.S. Immigration and Customs
Enforcement; MARY DE ANDA-YBARRA,
in her official capacity as Field
Office Director of the El Paso Field Office
of U.S. Immigration and Customs
Enforcement, Enforcement and Removal
Operations; GEORGE DEDOS, in his
official capacity as Warden of the Cibola County
Correctional Center,

    Respondents.

**MEMORANDUM OPINION AND ORDER ADOPTING THE MAGISTRATE JUDGE'S PROPOSED FINDINGS AND RECOMMENDED DISPOSITION**

**THIS MATTER** comes before the Court on the Respondents' Objections to the Proposed Findings & Recommendation Disposition, filed November 21, 2025 (Doc. 22)("Objections"). The Honorable Laura Fashing, United States Magistrate Judge for the United States District Court for the District of New Mexico, files the Proposed Findings and Recommendation Disposition on November 7, 2025 (Doc. 21)("PFRD"). The PFRD notifies the parties of their ability to file Objections within fourteen days and that the failure to file objections waives appellate review.

PFRD at 36.   On November 21, 2025, Respondents Kristi Noem[1], in her official capacity as Secretary of the U.S. Department of Homeland Security ("DHS"); Pamela Bondi[2], in her official capacity as Attorney General of the United States; Todd Lyons, in his official capacity as Acting Director and Senior Official Performing the Duties of the Director of U.S. Immigration and Customs Enforcement; Mary De Anda-Ybarra, in her official capacity as Field Office Director of the El Paso Field Office of U.S. Immigration and Customs Enforcement, Enforcement and Removal (collectively "Federal Respondents"),[3] file the Objections.   See Objections at 1. Petitioner Tomas Alfredo Molina Ochoa does not file objections to the PFRD.   The primary issues are: (i) whether the court has subject-matter jurisdiction to hear Ochoa's habeas petition, where the Federal Respondents argue § 1252 strips the Court of jurisdiction in three provisions; (ii) whether the Federal Respondents consent to jurisdiction, where the Federal Respondents make statements "for the sake of argument"; (iii) whether the Federal Respondents may properly detain Ochoa under § 1225, where he enters the United States without inspection two decades ago; (iv) whether the Federal Respondents violate Due Process, where the Federal Respondents do not provide Ochoa a bond hearing while detaining him for removal proceedings; (v) whether the Court

---

[1] As of March 31, 2026, Noem is no longer the Secretary of Homeland Security.   See Trump Ousts Noem as Homeland Security Secretary, https://www.nytimes.com/live/2026/03/05/us/trump-news (last visited April 9, 2026).

[2] As of April 2, 2026, Bondi is no longer the U.S. Attorney General.   See Pam Bondi Out As Attorney General, https://www.politico.com/news/2026/04/02/pam-bondi-attorney-general-justice-department-00855413 (last visited April 9, 2026).

[3] The Federal Respondents' counsel notes that they "do not represent George Dedos, Warden, Cibola County Correctional Center, as that is a private facility, and Warden Dedos is not a federal employee."   Objections at 1 n.1.   The Federal Respondents' counsel does state, however, that all arguments made on the Federal Respondents behalf "apply with equal force to Warden Dedos," because he is detaining Petitioner Tomas Alfred Molina Ochoa at the United States of America's request.   Objections at 1 n.1.

should dismiss Ochoa's habeas petition for failing to exhaustion his administrative remedies, where the exhaustion requirement is discretionary or where the futility exception applies; (vi) whether the Court should shift the burden to the Federal Respondents to prove continued detention is appropriate for Ochoa, if the Court determines a bond hearing is necessary; (vii) whether the Court should adopt the results that Magistrate Judge Fashing recommends in the PFRD that the Court deny the MTD, and (viii) whether the Court should grant in part and deny in part the Verified Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241, filed September 11, 2025 (Doc. 1)("Petition").  Pursuant to rule 72(b) of the Federal Rules of Civil Procedure, the Court conducts a de novo review of the record to which the Federal Respondents properly object, and has "given fresh consideration to" all parts of the PFRD to which the Respondents properly objects.  United States v. Raddatz, 447 U.S. 667, 675 (1980)("Raddatz").  Accordingly the Court adopts the PFRD's recommendations to which the Federal Respondents do not object and conclude as following, with respect to the Objections: (i) the Court has subject-matter jurisdiction to hear Ochoa's habeas petition, where the Federal Respondents argue § 1252 strips the Court of jurisdiction, because Ochoa challenges his detention as unlawful without a final order of removal; (ii) the Federal Respondents do not consent to jurisdiction, where the Federal Respondents make statements "for the sake of argument," because the Court independently determines it retains jurisdiction and the Petition is not moot; (iii) the Federal Respondents may not detain Ochoa under § 1225, where he enters the United States without inspection two decades ago, because he is not an "arriving alien," nor is he "seeking admission"; (iv) the Federal Respondents do not violate Due Process, where the Federal Respondents do not provide Ochoa a bond hearing while detaining him for removal proceedings, because the Court determines the Federal Respondents' conduct is a statutory violation and does not amount to a Constitutional violation; (v) the Court does not dismiss

Ochoa's habeas petition for failing to exhaustion his administrative remedies, where the exhaustion requirement is prudential, because requiring exhaustion goes against sound judicial discretion; and (vi) the Court does not shift the burden to the Federal Respondents to prove continued detention is appropriate for Ochoa, because the writ of habeas corpus is for securing a petitioner's release from unlawful detention and because Ochoa does not make the showing necessary to extend the writ at this time.

## FACTUAL BACKGROUND

In the Objections, the Federal Respondents do not address specifically or meaningfully the PFRD's factual background. See Objections at 1-12. See One Parcel of Real Prop., With Bldgs., Appurtenances, Improvements, and Contents, 73 F.3d 1057, 1060 (10th Cir.1996)("One Parcel")(observing "that a party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review"). Accordingly, the Court adopts the factual background as Magistrate Judge Fashing reports in the PFRD, noting where Respondents do raise objects.

Here, the Court briefly reiterates the pertinent details. Around 2006, or roughly nineteen years ago, Ochoa enters the United States of America from Guatemala. See PFRD at 2 (citing the Petition ¶ 1, at 1). On June 24, 2025, an unmarked vehicle detains Ochoa and takes him into immigration custody from private property in Sylmar, California. See PFRD at 2 (citing the Petition ¶ 2, at 2). The United States charges Ochoa with entering the United States without inspection under 8 U.S.C. § 1182(a)(6)(A)(i), serves Ochoa with an arrest warrant, and places him in removal proceedings. See PFRD at 2 (citing the Petition ¶ 2, at 2).

While in removal proceeding, an immigration law judge ("ILJ") from the Otero Immigration Court determines Ochoa is ineligible for a bond hearing and is subject to mandatory

detention.  PFRD at 2 (citing the Petition ¶¶ 3-5, at 2-2).  At the hearing, the ILJ makes "no factual findings" that Ochoa is a flight risk or danger to the community.  PFRD at 2 (citing the Petition ¶ 5, at 2-3).  Instead, the ILJ concludes Ochoa is an "applicant "who is "seeking admission" under 8 U.S.C. § 1225(b)(2)(A).  PFRD at 2 (citing the Petition ¶ 5, at 2-3).  On July 30, 2025, the ILJ issues an order, and Ochoa has thirty days to file an appeal with the Board of Immigration Appeals ("BIA").  See PFRD at 20 (citing the MTD at 15).

## PROCEDURAL BACKGROUND

On November 7, 2025, Magistrate Judge Fashing files the PFRD.  See PFRD at 1. Respondents file the Objections on November 21, 2025.  See Objections at 1.  In the Objections, the Respondents make five objections to the PFRD.  See Objection at 1-12.  First, the Federal Respondents Object to the PFRD's recommendation that the Court has subject-matter jurisdiction. See Objections at 2.  Second, the Federal Respondents Object to the PFRD's implication that the Federal Respondents concede jurisdiction.  See Objections at 7.  Third, the Federal Respondents Object to the PFRD's recommendation that § 1226 applies.  See Objections at 8.  Fourth, the Federal Respondents Object to the PFRD's recommendation that Ochoa need not exhaust administrative remedies.  See Objections at 8.  Finally, the Federal Respondents Object to the PFRD's recommendation that burden shifting is appropriate should the Court require a bond hearing.  See Objections at 11.

### 1.    The First Objection: Subject-Matter Jurisdiction.

The Federal Respondents argue that "at least three provisions" of § 1252 bar the Court's review of Ochoa's claims.  Objections at 2.  The first bar, the Federal Respondents argue, is § 1252(e)(3).  See Objections at 2.  According to the Federal Respondents, § 1252(e)(3) "limits judicial review of 'determinations under § 1225(b) of this title and its implementation' to only the

District Court for the District of Columbia." Objections at 2 (quoting §1252(e)(3)). The Federal Respondents assert that § 1252(e)(3) "applies broadly to judicial review of § 1225(b), not just determination under § 1225(b)(1)." Objections at 2 (citing Russell v. United States, 464 U.S. 16, 23 (1983). Section 1252(e)(3) is relevant, according to Respondents, because the "Petitioner challenges the determination . . . that aliens who entered the United States without inspection are subject to mandatory detention under § 1225(b)(2)." Objections at 3. The Federal Respondents argue that the challenge, therefore, "seeks judicial review of a written policy or guidelines implementing § 1225(b)." Objections at 3.

The Federal Respondents argue that § 1252(g) "categorically bars jurisdiction over '*any* cause or claim by or on behalf of any alien *arising from* the decision or action by the [Secretary of Homeland Security] to *commence proceedings*, adjudicate cases or execute removal orders against any aliens." Objections at 3 (emphasis and alterations in the original). The Federal Respondents argue that detention arises from the decision to commence removal proceedings. See Objections at 3. The detention pending removal, the Federal Respondents argue, is a "'specification'" of the decision to commence proceedings. Objections at 4 (quoting Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 485 n.9 (1999)("Reno")). The Federal Respondents conclude that § 1252(g) prohibits judicial review. See Objections at 4.

The Federal Respondents argue that § 1252(b)(9) limits judicial review to Courts of Appeals. See Objections at 4. According to the Federal Respondents, § 1252(b)(9) limits "'judicial review of all questions of law . . . including interpretation and application of statutory provisions . . . arising from any action taken . . . to remove an alien from the United States'. . . [to] the appropriate court of apples in the form of a petition for review of final removal order." Objections at 4 (citing 8 U.S.C. § 1252(b)(9) and Reno, 525 U.S. at 483). According to the Federal

Respondents, § 1252(b)(9), along with § 1252(a)(5), mean that a court can only review any legal or factual issue arising from any removal-related activity through the petition-for-review process. See Objections at 5.  The Federal Respondents assert that these provisions "divest district courts of jurisdiction to review both direct and indirect challenges to removal orders, including decisions to detain for purposes of removal or for proceedings."  Objections at 6 (citing Jennings v. Rodriguez, 583 U.S. 281, 294-95 (2018)("Jennings")).  The Federal Respondents argue that Ochoa "challenges the decision and action to detain him," and is "thus an 'action taken . . . to remove [him] from the United States.'"  Objections at 6 (quoting 8 U.S.C. § 1252(b)(9)).

    **2.**        **Second Objection: No Concessions to Jurisdiction.**

The Federal Respondents Object to the PFRD's interpretation of their statements concerning jurisdiction.  See Objections at 7.  The Federal Respondents state that "the PFRD asserts that the Court retains jurisdiction over the case until the order of removal becomes administratively final and notes that the parties acknowledged this continuing jurisdiction during the hearing." Objections at 7 (citing the PFRD at 12).  In the Objections, the Federal Respondents assert that their "statement about jurisdiction assumed, for the sake of argument, that the Court had jurisdiction to review the petition."  Objections at 7.  Accordingly, the Federal Respondents conclude, the Court lacks jurisdiction to review the petition.  See Objections at 7.

    **3.**        **Third Objection: Detention Under § 1225 and Due Process.**

In the third Objection, the Federal Respondents contend that Ochoa's detention does not violate due process, because § 1225, rather than § 1226, governs his detention.  See Objections at 8.  The Federal Respondents cite Peña v. Hyde, No. CIV 25-11983 NMG, 2025 WL 2108913 (D. Mass. July 28, 2025)(Gorton, J.), where the court finds an "unlawfully present alien, who had been in the country for approximately twenty years, was nonetheless an 'applicant for admission' upon

plain language reading of the statute." Objections at 8. The Federal Respondents cite Chavez v. Noem, No. 3:25-CV-02325-CAB-SBC, 2025 WL 2730228 (S.D. Cal. Sept. 24, 2025)(Bencivengo, J.), for a similar proposition, stating that the Honorable Judge Cathy A. Bencivengo, United States District Judge for the United States District Court for the Southern District of California, finds "under plain language reading of § 1225 that petitioners remained applicants for admission." Objections at 8. Finally, the Federal Respondents argue that due process prohibits only the "unduly prolonged" detention of a noncitizen, and they assert that no Constitutional violation exists here, because Ochoa's detention lasts fewer than six months. Objections at 8.

### 4. Fourth Objection: Exhaustion Requirement.

The Federal Respondents argue that the PFRD minimizes the significance of the exhaustion requirement. See Objections at 9. The Federal Respondents assert that the United States Court of Appeals for the Tenth Circuit applies the exhaustion requirement "more strictly." Objections at 9 (citing Garza v. Davis, 596 F.3d 1198, 1203 (10th Cir. 2010)). The Federal Respondents argue that, in addition to the Tenth Circuit's approach to the exhaustion requirement, policy considerations "underscore the importance of exhaustion." Objections at 9 (citing Puga v. Chertoff, 488 F.3d 812, 815 (9th Cir. 2007)). Finally, the Federal Respondents argue that the futility exception does not excuse Ochoa's failure to exhaust his administrative remedies. See Objections at 9.

### 5. Fifth Objection: Burden Shifting.

Finally, the Federal Respondents Object to the PFRD's recommendation of burden shifting at the bond hearing. See Objections at 11. The Federal Respondents assert that neither Matthews v. Eldridge, 424 U.S. 319 (1976)("Matthews"), nor the "more general balancing test" from Diaz-

Ceja v. McAleenan, No. 19-cv-00824-NYW, 2019 WL 2774211, at *9 (D. Colo. 2019)(Wang, M.J.) justify burden shifting.  Objections at 11.  First, the Federal Respondents assert that Matthews does not favor burden shifting.  As to the first factor, the Federal Respondents assert that Ochoa's "case is moving quickly," so the facts does not favor burden shifting.  Objections at 11.  The second factor also does not favor burden shifting, the Federal Respondents argue, because Ochoa "is represented by counsel in a fast-moving immigration case."  Objections at 12.  Finally, the Federal Respondents state that the third factor does not favor burden shifting, because the "government should not be tasked with higher burdens of proof then those proscribed by statute in the absence of a prolonged detention."  Objections at 12.  As for the "alternative dual balancing test," the Federal Respondents assert, "there is a statutory process for a bond hearing, and absent specific facts . . . Petitioner is not entitled to burden shifting."  Objections at 12.

## LAW REGARDING OBJECTIONS TO PROPOSED FINDINGS AND RECOMMENDATIONS

District courts may refer dispositive motions to a Magistrate Judge for a recommended disposition.  See Fed. R. Civ. P. 72(b)(1) ("A magistrate judge must promptly conduct the required proceedings when assigned, without the parties' consent, to hear a pretrial matter dispositive of a claim or defense. . . .").  Rule 72(b)(2) governs objections: "Within 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations."  Fed. R. Civ. P. 72(b)(2).  Finally, when resolving objections to a Magistrate Judge's proposal, "[t]he district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions."  Fed. R. Civ. P. 72(b)(3).  Similarly, 28 U.S.C. § 636 provides:

> A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1).

"The filing of objections to a magistrate's report enables the district judge to focus attention on those issues -- factual and legal -- that are at the heart of the parties' dispute." United States v. One Parcel of Real Prop., With Bldgs., Appurtenances, Improvements, and Contents, 73 F.3d 1057, 1059 (10th Cir. 1996)("One Parcel")(quoting Thomas v. Arn, 474 U.S. 140, 147 (1985)). As the United States Court of Appeals for the Tenth Circuit notes, "the filing of objections advances the interests that underlie the Magistrate's Act, including judicial efficiency." One Parcel, 73 F.3d at 1059 (citing Niehaus v. Kan. Bar Ass'n, 793 F.2d 1159, 1165 (10th Cir.1986); United States v. Walters, 638 F.2d 947, 950 (6th Cir. 1981)).

The Tenth Circuit holds "that a party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." One Parcel, 73 F.3d at 1060. "To further advance the policies behind the Magistrate's Act, [the Tenth Circuit], like numerous other circuits, have adopted 'a firm waiver rule' that 'provides that the failure to make timely objections to the magistrate's findings or recommendations waives appellate review of both factual and legal questions.'" One Parcel, 73 F.3d at 1059. In addition to requiring specificity in objections, the Tenth Circuit states that "[i]ssues raised for the first time in objections to the magistrate judge's recommendation are deemed waived." Marshall v. Chater, 75 F.3d 1421, 1426 (10th Cir. 1996). See United States v. Garfinkle, 261 F.3d 1030, 1031 (10th Cir. 2001)("In this circuit, theories raised for the first time in objections to the magistrate judge's report are deemed waived."). In an

unpublished opinion, the Tenth Circuit states that "the district court correctly held that [a petitioner] had waived [an] argument by failing to raise it before the magistrate." Pevehouse v. Scibana, 229 Fed. Appx. 795, 796 (10th Cir. 2007).[4]

In One Parcel, the Tenth Circuit, in accord with other Courts of Appeals, expands the waiver rule to cover objections that are timely but too general.  See One Parcel, 73 F.3d at 1060. The Supreme Court of the United States -- in the course of approving the United States Court of Appeals for the Sixth Circuit's use of the waiver rule -- notes:

> It does not appear that Congress intended to require district court review of a magistrate's factual or legal conclusions, under a *de novo* or any other standard, when neither party objects to those findings. The House and Senate Reports accompanying the 1976 amendments do not expressly consider what sort of review the district court should perform when no party objects to the magistrate's report. *See* S.Rep. No. 94-625, pp. 9-10 (1976)(hereafter Senate Report); H.R.Rep. No. 94-1609, p. 11 (1976), U.S.Code Cong. & Admin. News 1976, p. 6162 (hereafter House Report).  There is nothing in those Reports, however, that demonstrates an intent to require the district court to give any more consideration to the magistrate's report than the court considers appropriate. Moreover, the Subcommittee that

---

[4] Pevehouse v. Scibana is an unpublished opinion, but the Court can rely on an unpublished Tenth Circuit opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citing In re Citation of Unpublished Opinions/Orders & Judgments, 151 F.R.D. 470 (10th Cir. 1993)).  The Court concludes that Pevehouse v. Scibana, Vaupel v. Ortiz, 244 F. App'x 892 (10th Cir. 2007), Aguilar-Alvarez v. Holder, 528 F. App'x 862 (10th Cir. 2013), Namgyal Tsering v. U.S. Immigr. & Customs Enf't, 403 F. App'x 339 (10th Cir. 2010), Awe v. Napolitano, 494 F. App'x 860 (10th Cir. 2012), Dawson v. Bd. of Cty. Comm'rs, 732 F. App'x 624 (10th Cir. 2018), and James v. Chavez,511 F. App'x 742 (10th Cir. 2013), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

drafted and held hearings on the 1976 amendments had before it the guidelines of the Administrative Office of the United States Courts concerning the efficient use of magistrates. Those guidelines recommended to the district courts that "[w]here a magistrate makes a finding or *ruling* on a motion or an issue, his determination should become that of the district court, unless specific objection is filed within a reasonable time." *See* Jurisdiction of United States Magistrates, Hearings on S. 1283 before the Subcommittee on Improvements in Judicial Machinery of the Senate Committee on the Judiciary, 94th Cong., 1st Sess., 24 (1975)(emphasis added)(hereafter Senate Hearings). The Committee also heard Judge Metzner of the Southern District of New York, the chairman of a Judicial Conference Committee on the administration of the magistrate system, testify that he personally followed that practice. *See id.,* at 11 ("If any objections come in, . . . I review [the record] and decide it. If no objections come in, I merely sign the magistrate's order."). The Judicial Conference of the United States, which supported the *de novo* standard of review eventually incorporated in § 636(b)(1)(C), opined that in most instances no party would object to the magistrate's recommendation, and the litigation would terminate with the judge's adoption of the magistrate's report. *See* Senate Hearings, at 35, 37. Congress apparently assumed, therefore, that any party who was dissatisfied for any reason with the magistrate's report would file objections, and those objections would trigger district court review. There is no indication that Congress, in enacting § 636(b)(1)(C), intended to require a district judge to review a magistrate's report to which no objections are filed. It did not preclude treating the failure to object as a procedural default, waiving the right to further consideration of any sort. We thus find nothing in the statute or the legislative history that convinces us that Congress intended to forbid a rule such as the one adopted by the Sixth Circuit.

Thomas v. Arn, 474 U.S. at 150-52 (emphasis in original).

The Tenth Circuit also notes, "however, that '[t]he waiver rule as a procedural bar need not be applied when the interests of justice so dictate.'" One Parcel, 73 F.3d at 1060 (quoting Moore v. United States, 950 F.2d 656, 659 (10th Cir.1991)("We join those circuits that have declined to apply the waiver rule to a pro se litigant's failure to object when the magistrate's order does not apprise the pro se litigant of the consequences of a failure to object to findings and recommendations."). Cf. Thomas v. Arn, 474 U.S. at 154 (noting that, while "[a]ny party that desires plenary consideration by the Article III judge of any issue need only ask," a failure to object "does not preclude further review by the district judge, sua sponte or at the request of a party, under a de novo or any other standard"). In One Parcel, the Tenth Circuit notes that the district

judge decides sua sponte to conduct a de novo review despite the objections' lack of specificity, but the Tenth Circuit deems the issues waived on appeal, because waiver advances the interests underlying the waiver rule.  See 73 F.3d at 1060-61 (citing cases from other Courts of Appeals where district courts elect to address merits despite potential application of waiver rule, but Courts of Appeals opt to enforce waiver rule).

Where a party files timely and specific objections to the Magistrate Judge's PFRD, on "dispositive motions, the statute calls for a *de novo* determination, not a *de novo* hearing." United States v. Raddatz, 447 U.S. 667, 674 (1980).  "[I]n providing for a '*de novo* determination' rather than *de novo* hearing, Congress intended to permit whatever reliance a district judge, in the exercise of sound judicial discretion, chose to place on a magistrate judge's proposed findings and recommendations."  United States v. Raddatz, 447 U.S. at 676, (quoting 28 U.S.C. § 636(b) and citing Mathews v. Weber, 423 U.S. 261, 275 (1976)).  The Tenth Circuit requires a "district court to consider relevant evidence of record and not merely review the magistrate judge's recommendation" when conducting a de novo review of a party's timely, specific objections to the magistrate judge's report.  In re Griego, 64 F.3d 580, 583-84 (10th Cir. 1995).  "When objections are made to the magistrate's factual findings based on conflicting testimony or evidence . . . the district court must, at a minimum, listen to a tape recording or read a transcript of the evidentiary hearing."  Gee v. Estes, 829 F.2d 1005, 1008-09 (10th Cir. 1987).

A district court must "clearly indicate that it is conducting a de novo determination" when a party objects to the Magistrate Judge's report "based upon conflicting evidence or testimony." Gee v. Estes, 829 F.2d at 1009.  On the other hand, a district court fails to meet the requirements of 28 U.S.C. § 636(b)(1) when it indicates that it gave "considerable  deference to the magistrate's order."  Ocelot Oil Corp. v. Sparrow Indus., 847 F.2d 1458, 1464 (10th Cir. 1988).  A district court

need not, however, "make any specific findings; the district court must merely conduct a *de novo* review of the record." Garcia v. City of Albuquerque, 232 F.3d 760, 766 (10th Cir.2000). "[T]he district court is presumed to know that de novo review is required. Consequently, a brief order expressly stating the court conducted de novo review is sufficient." Northington v. Marin, 102 F.3d 1564, 1570 (10th Cir. 1996)(citing In re Griego, 64 F.3d at 583-84). "[E]xpress references to de novo review in its order must be taken to mean it properly considered the pertinent portions of the record, absent some clear indication otherwise." Bratcher v. Bray-Doyle Indep. Sch. Dist. No. 42, 8 F.3d 722, 724 (10th Cir. 1993). The Tenth Circuit holds that a district court properly conducts a de novo review of a party's evidentiary objections when the district court's "terse" order contains one sentence for each of the party's "substantive claims" and does "not mention his procedural challenges to the jurisdiction of the magistrate to hear the motion." Garcia v. City of Albuquerque, 232 F.3d at 766. The Tenth Circuit explains that brief district court orders that "merely repeat[ ] the language of § 636(b)(1) to indicate its compliance" are sufficient to demonstrate that the district court conducts a de novo review:

> It is common practice among district judges in this circuit to make such a statement and adopt the magistrate judges' recommended dispositions when they find that magistrate judges have dealt with the issues fully and accurately and that they could add little of value to that analysis. We cannot interpret the district court's statement as establishing that it failed to perform the required de novo review.

In re Griego, 64 F.3d at 584.

Notably, because "Congress intended to permit whatever reliance a district judge, in the exercise of sound judicial discretion, chose to place on a magistrate's proposed findings and recommendations," United States v. Raddatz, 447 U.S. at 676 (emphasis omitted), a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate," 28 U.S.C. § 636(b)(1). See Bratcher v. Bray-Doyle Indep. Sch. Dist. No. 42, 8 F.3d

- 14 -

at 724-25 (holding that the district court's adoption of the Magistrate Judge's "particular reasonable-hour estimates" is consistent with the de novo determination that 28 U.S.C. § 636(b)(1) and United States v. Raddatz require).

Where no party objects to the Magistrate Judge's PFRD, the Court reviews, as a matter of course and in the interests of justice, the Magistrate Judge's recommendations. In Pablo v. Soc. Sec. Admin., No. CIV 11-0132 JB/ACT, 2013 WL 1010401 (D.N.M. February 27, 2013)(Browning, J.), the plaintiff fails to respond to the Magistrate Judge's PFRD, and thus waives his right to appeal the recommendations, but the Court nevertheless conducts a review. See 2013 WL 1010401, at *1, *4. The Court generally does not, however, "review the PFRD de novo, because the parties have not objected thereto, but rather review[s] the recommendations to determine whether they are clearly erroneous, arbitrary, obviously contrary to law, or an abuse of discretion." Pablo v. Soc. Sec. Admin., 2013 WL 1010401, at *4. The Court, thus, does not determine independently what it would do if the issues had come before the Court first, when there is no objection, but rather adopts the PFRD where "'the Court cannot say that the Magistrate Judge's recommendation . . . is clearly erroneous, arbitrary, obviously contrary to law, or an abuse of discretion.'" Pablo v. Soc. Sec. Admin., 2013 WL 1010401, at *3 (quoting Workheiser v. City of Clovis, No. CIV 12–0485 JB/GBW, 2012 WL 6846401, at *3 (D.N.M. December 28, 2012)(Browning, J.). See Alexandre v. Astrue, No. CIV 11-0384 JB/SMV, 2013 WL 1010439, at *4 (D.N.M. February 27, 2013)(Browning, J.)("The Court rather reviewed the findings and recommendations . . . to determine if they are clearly erroneous, arbitrary, obviously contrary to law, or an abuse of discretion. The Court determines that they are not, and will therefore adopt the PFRD."); Trujillo v. Soc. Sec. Admin., No. CIV 12-1125 JB/KBM, 2013 WL 1009050, at *5 (D.N.M. February 28, 2013)(Browning, J.)(adopting the proposed findings and conclusions, and

noting: "The Court did not review the ARD de novo, because Trujillo has not objected to it, but rather reviewed the . . . findings and recommendation to determine if they are clearly erroneous, arbitrary, obviously contrary to law, or an abuse of discretion, which they are not."). This review, which is deferential to the Magistrate Judge's work when there is no objection, nonetheless provides some review in the interest of justice, and seems more consistent with the waiver rule's intent than no review at all or a full-fledged review. Accordingly, the Court considers this standard of review appropriate. See Thomas v. Arn, 474 U.S. at 151 ("There is nothing in those Reports, however, that demonstrates an intent to require the district court to give any more consideration to the magistrate's report than the court considers appropriate."). The Court is reluctant to have no review at all if its name is going at the bottom of the order adopting the Magistrate Judge's PFRD.

## LAW REGARDING STATUTORY CONSTRUCTION

"Courts interpret statutes, no matter the context, based on the traditional tools of statutory construction, not individual policy preferences." Loper Bright Enters. v. Raimondo, 603 U.S. 369, 403 (2024). Traditional tools of statutory construction include: (i) the statute's plain language, see Coriz v. Rodriguez, 347 F. Supp. 3d 707, 716 (D.N.M. 2018)(Browning, J.)(citing Nat'l Ass'n of Mfrs. v. Dep't of Def., 583 U.S. 109, 127 (2018)(quoting BedRoc Ltd., LLC v. United States, 541 U.S. 176, 177 (2004)("The inquiry begins with the statutory text, and ends there as the text is unambiguous."))); (ii) the court's duty to "'give effect . . . to every clause and word of a statute,'" United States v. Harry, No. CR 10-1915 JB, 2014 WL 6065677 (D.N.M. Oct. 14, 2014)(unpublished)(Browning J.)(quoting Bennett v. Spear, 520 U.S. 154, 173 (1997)); and (iii) the canon of constitutional avoidance, see Clark v. Martinez, 543 U.S. 371, 385 (2005)(stating that the canon is "*a means of choosing between*" two possible constructions of a statute)(italics in the original); United States v. Vigil, No. CR 10-2310 JB, 2013 WL 3270995 (D.N.M. June 3,

2013)(unpublished)(Browning, J.)(noting that the canon of construction requires courts to interpret statutes "in a manner that avoids constitutional problems").  Accordingly, the Court beings with the words Congress uses.

### 1.       Plain Language.

When interpreting statutes, the Court must start with the language.  See, e.g., Been v. O.K. Industries, Inc., 495 F.3d 1217, 1227 (10th Cir. 2007)("We review issues of statutory construction de novo, 'interpret[ing] the words of the statute in light of the purposes Congress sought to serve.'" (quoting Wright v. Fed. Bureau of Prisons, 451 F.3d 1231, 1233–34 (10th Cir.2006))).  "It is well established that 'when the statute's language is plain, the sole function of the courts -- at least where the disposition required by the text is not absurd -- is to enforce it according to its terms.'" Lamie v. U.S. Trustee, 540 U.S. 526, 534 (2004)(quoting Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A., 530 U.S. 1, 6 (2000)).  "Courts indulge 'a strong presumption that Congress expresses its intent through the language it chooses.  Therefore, when the terms of a statute are clear and unambiguous, our inquiry ends and we should stick to our duty of enforcing the terms of the statute as Congress has drafted it.'"   United Kingdom Ministry of Defence v. Trimble Navigation Ltd., 422 F.3d 165, 171 (4th Cir. 2005)(quoting Sigmon Coal Co. v. Apfel, 226 F.3d 291, 305 (4th Cir. 2000)).  See Public Lands Council v. Babbitt, 167 F.3d 1287, 1314 (10th Cir. 1999)(Seymour, C.J.)("In examining . . . language, we assume that the words chosen by Congress are employed in their ordinary sense and accurately express Congress' [ ] legislative purpose.").  See, e.g., United States v. Janzad, No. CR 23-0346 JB, 2024 WL 3552404, at *9-24 (D.N.M. July 26, 2024)(unpublished)(Browning, J.); United States v. Delorme, No. CR 19-2322 JB, 2023 WL 8020262, at *17-20 (D.N.M. Nov. 17, 2023)(unpublished)(Browning, J.); United States v. Teston, No. CR 22-1400 JB, 2023 WL 3390968, at *8-16 (D.N.M. May 5,

2023)(unpublished)(Browning, J.).

### 2.    Canon Against Surplusage.

The Court must read a statute to give effect to every word that Congress uses and not presume a phrase is surplusage. See Castanon-Nava v. U.S. Dep't of Homeland Sec., 161 F.4th 1048, 1061 (7th Cir. 2025)("Castanon-Nava")(referring to rule of statutory construction that courts must avoid a superfluous reading as a "cardinal rule[]"). Courts must resist interpretations that "would render another provision superfluous." Bilski v. Kappos, 561 U.S. 593, 608 (2010). This rule holds true "even when Congress enacted the provisions at different times," Bilski v. Kappos, 561 U.S. at 608; and the rule is "'strongest when an interpretation would render superfluous another part of the same statutory scheme,'" United States v. Molina Healthcare of New Mexico, Inc., No. CIV 16-1148 JB/KK, 2024 WL 4002950 (D.N.M. Aug. 30, 2024)(Browning, J.)(unpublished)(quoting Marx v. Gen. Revenue Corp., 568 U.S. 371, 386 (2013)). The canon against surplusage does not mean, however, that redundancy is unusual in specific contexts. See Marx v. Gen. Revenue Corp., 568 U.S. at 385 (stating that "redundancy is 'hardly unusual' in statutes addressing costs" (quoting Microsoft Corp. v. I4I Ltd. P'ship, 564 U.S. 91, 107 (2011))).

### 3.    Constitutional Avoidance.

When a court faces two equally plausible interpretations of a statute, it must read the statute to avoid the Constitutional issue. See Jennings, 583 U.S. at 286 (stating that a court "may shun an interpretation that raises serious constitutional doubts" under the constitutional-avoidance canon). This canon reflects the judiciary's obligation to construe statutes in a manner "best reflecting congressional will" and that "avoids invalidation." Zadvydas v. Davis, 533 U.S. 678, 689 (2001)("Zadvydas")(citing Almendarez–Torres v. United States, 523 U.S. 224, 238 (1998)). In the immigration context, the Supreme Court has "read significant limitations into [] immigration

statutes in order to avoid their constitutional invalidation." Zadvydas, 533 U.S. at 689. "[A] court relying on [the avoidance] canon still must *interpret* the statue, not rewrite it." Jennings, 583 U.S. at 286 (emphasis in the original).

<strong><u>LAW REGARDING THE WRIT OF HABEAS CORPUS</u></strong>

Courts are most familiar with the writ of habeas corpus and its statutory authorization under 28 U.S.C. § 2241. Courts have less occasion to consider, however, habeas petitions that seek relief other than release from unlawful detention. Upon review of relevant case law, tension exists between the Supreme Court's description of habeas as a flexible and "equitable remedy," Schlup v. Delo, 513 U.S. 298, 319 (1995), and the Supreme Court's more traditional understanding that courts generally do not use habeas to "order relief that neither terminates custody, accelerates the future date of release from custody, nor reduces the level of custody," Wilkinson v. Dotson, 544 U.S. 74, 86 (2005)(Scalia, J., concurring). Resolving that tension requires careful attention to the historical development of the writ, its modern statutory framework, and the Constitutional principles that define its scope. Accordingly, the Court examines: (i) the history of the writ at common law and under the federal habeas statutes, including the "finality era," Thuraissigiam, 591 U.S. at 120; and (ii) modern Supreme Court guidance on the scope of the writ, including its relationship to the Suspension Clause. Gerald L. Neuman, Habeas Corpus, Executive Detention, and the Removal of Aliens, 98 Colum. L. Rev. 961, 1015 (1998)("Neuman"). Through this framework, the Court concludes that habeas is an "adaptable remedy," Boumediene v. Bush, 553 U.S. 723, 779 (2008)("Boumediene"), and, while historical practice informs the scope of habeas relief, it does not confine the writ to be used to release from custody in every instance; rather, in limited and extraordinary circumstances, habeas may afford relief "as law and justice require," 28 U.S.C. § 2243, consistent with its Constitutional function and historical purpose, see Schneckloth

v. Bustamonte, 412 U.S. 218, 256 (1973)(Powell, J., concurring)("No one would now suggest that this Court be imprisoned by every particular of habeas corpus as it existed in the late 18th and 19th centuries.").

**1.      Habeas Corpus: The Great Wit.**

The history of the writ of habeas corpus are "well-established."  Neuman at 970.[5] "The writ originated in England as a vehicle for bringing a person before a court in order to facilitate proceedings in which his presence was required."  Neuman at 970.  The "Great Writ" evolved and achieves "its celebrity in the constitutional struggles" in the seventeenth century as a remedy against Political arrests by the King's council and minister."  Neuman at 971.  During this period, habeas affords that individuals the King arrests are not detained "on executive fiat rather than on legally recognized grounds . . . and that prisoners would not languish in pretrial detention when they should be bailed out."  Neuman at 971.  Accordingly, the writ of habeas corpus acquires an association with principle of due process that "individuals should be imprisoned only in accordance with the law of the land."  Neuman at 971.  "This understanding of due process includes both the guarantee of traditional procedures and the broader notion of the rule of law, that the grounds of detention must be provided by statute or common law."  Neuman at 971.  The framers of the United States Constitution enshrine the Great Writ in the Constitution stating: "The privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."  U.S. Const. art I, § 9, cl. 2.  See I.N.S. v. St. Cyr, 533 U.S. 289,

---

[5] See, e.g., William F. Duker, A Constitutional History of Habeas Corpus 12-94 (1980); 9 W.S. Holdsworth, A History of English Law 104-25 (3d ed. 1944); Rollin C. Hurd, A Treatise on the Right of Personal Liberty and on the Writ of Habeas Corpus and the Practice Connected With It: With a View of the Law of Extradition of Fugitives 73-104 (Albany, W.C. Little & Co. 1858); Daniel John Meador, Habeas Corpus and Magna Charta: Dualism of Power and Liberty 3-38 (1966); R.J. Sharpe, The Law of Habeas Corpus 1-19 (1976)(study from English and Commonwealth perspective).

301 (2001)("St. Cyr")(stating that "the absolute minimum, the Suspension Clause protects the writ 'as it existed in 1789'" (quoting Felker v. Turpin, 518 U.S. 651, 663-64 (1996))).  The Suspension Clause does not create the writ, but Chief Justice Marshall interprets the Constitution as obligating Congress to create "this great constitutional privilege."  Neuman at 974.[6]  Chief Justice Marshall concludes Congress creates the writ in the First Judiciary Act of 1789.  See Neuman at 974.

### a.    The Core of Habeas Petitions, Remedying Unlawful Detention.

The writ of habeas corpus has long functioned as a judicial mechanism for testing the lawfulness of detention.[7]  From its origins in English common law through its development in

---

[6] In Ex parte Bollman, 8 U.S. 75 (1807) Chief Justice Marshall states:

> Acting under the immediate influence of this injunction, they must have felt, with peculiar force, the obligation of providing efficient means by which this great constitutional privilege should receive life and activity; for if the means be not in existence, the privilege itself would be lost, although no law for its suspension should be enacted.  Under the impression of this obligation, they give, to all the courts, the power of awarding writs of habeas corpus.

8 U.S. at 95.  Justice Scalia embraces Ex parte Bollman for the proposition that the Suspension Clause does not have effect without legislation and that history provides context as to what right the Suspension Clause enshrines.  See St. Cyr, 533 U.S. at 340-41 (Scalia, J., dissenting)(stating that there "no more reason for us to believe, than there was for the Marshall Court to believe, that the Suspension Clause means anything other than what it says" (referring to Ex parte Bollman, 8 U.S. at 95)).

[7] There is a historical debate whether State courts possess authority to issue writs of habeas corpus directing the release of federal prisoners.  See Neuman at 974.  Neuman ultimately concludes that historical practice does not support the view that the Suspension Clause preserves state judicial power over federal detention.  See Neuman at 975 ("I will not pursue the hypothesis that the Suspension Clause was intended to preserve state judicial power over federal detention and has been systematically violated for over a century.").  A related historical caution bears emphasis: the standards governing the writ's issuance as a safeguard against unlawful executive detention differ from the doctrinal standards governing habeas as a form of postconviction collateral review.  See Neuman at 962 ("They are conflating the standards for the issuance of the writ as a remedy for unlawful executive detention with the standards for its use as a means of postconviction relief.").  Conflating these distinct historical functions risks obscuring the evolution of habeas jurisprudence in different procedural contexts.

American jurisprudence, habeas serves as a means by which courts inquire into whether the United States has lawful authority to restrain an individual's liberty.[8]  Historical practice does not confine the concept of "lawfulness," however, to a single category of legal defect.  Neuman at 984 n.126 (discussing the shift of habeas petitions from "isolated constitutional violations by individual officers or judges" to "the constitutionality of statutes").  Historically, petitioners invoke habeas to challenge detention on multiple grounds, including: (i) allegations that the custodian acts without statutory authority, see Ex parte D'Olivera, 7 F. Cas. 853 (C.C.D. Mass. 1813)(holding that a justice of the peace detains deserting sailors "without color of jurisdiction," because neither the common law nor a statute authorizes detainment); see also Thuraissigiam, 591 U.S. at 172 (Sotomayor, J., dissenting); (ii) allegations that an act of Congress is unconstitutional, see Ex parte Siebold, 100 U.S. 371, 374 (1879)("The question is whether a party imprisoned . . . upon conviction of a crime created by and indictable under an unconstitutional act of Congress, maya be discharged on . . . on habeas corpus."); or (iii) that the conditions or consequences of

---

[8] Neuman notes that the 1789 Judiciary Act does not define the "standards" for habeas relief, but Chief Justice Marshall describes the standards as those known to common law.  Neuman at 981-82.  Furthermore, in Ex parte Watkins, 28 U.S. 193 (1830), Chief Justice Marshall describes the writ:

> The writ of habeas corpus is a high prerogative writ, known to the common law, the great object of which is the liberation of those who may be imprisoned without sufficient cause.  It is in the nature of a writ of error, to examine the legality of the commitment.  The English judges, being originally under the influence of the crown, neglected to issue this writ where the government entertained suspicions which could not be sustained by evidence; and the writ when issued was sometimes disregarded or evaded, and great individual oppression was suffered in consequence of delays in bringing prisoners to trial.  To remedy this evil the celebrated habeas corpus act of the 31st of Charles II. was enacted, for the purpose of securing the benefits for which the writ was given.  This statute may be referred to as describing the cases in which relief is, in England, afforded by this writ to a person detained in custody.  It enforces the common law.

Ex parte Watkins, 28 U.S. at 202.

confinement rendered continued detainment unlawful, see Johnson v. Avery, 393 U.S. 483, 485 (1969)(acceptation a petitioner's "motion for law books and a typewriter" as a petition for a writ of habeas corpus, before invaliding prison regulations).  Thus, habeas operates as an adaptable and equitable vehicle through which detained individuals may test the legality of their restraint. Although the historical inquiry into lawfulness takes varied forms, the traditional remedy associated with habeas remains comparatively focused: release from custody, accelerated release, or relief directly affecting the fact or duration of confinement.  See Preiser v. Rodriguez, 411 U.S. 475, 498 (1973)("But none of the state prisoners in those cases was challenging the fact or duration of his physical confinement itself, and one was seeking immediate release or a speedier release from that confinement -- the heart of habeas corpus.").

b.      **The Finality Era.**

The "finality era" reveals the breadth of the Great Writ and the durability of the lawfulness inquiry.  The body of case law following the Immigration Act of 1891 represents the "finality era," because, during this period, Congress makes "certain immigration decisions 'final.'" Thuraissigiam, 591 U.S. at 128.  See Neuman at 1008 ("Dissatisfaction with the courts' performance led to congressional efforts to confer finality on the decisions of the executive officials.").  The 1891 provision contains sweeping language stating: "'All decisions made by the inspection officers or their assistants toughing the right of any alien to land, when adverse to such right, shall be final unless appeal be taken to the superintendent of immigration, whose action shall be subject to review by the Secretary of the Treasury."  Neuman at 1008 (quoting Act of March 3, 1891, ch. 551, § 8, 26 Stat. 1084, 1085).  In Nishimura Ekiu v. United States, 142 U.S. 651 (1892)("Nishimura"), the Supreme Court upholds the provisions, while preserving the writ of habeas corpus "to ascertain whether the restrain is lawful."  142 U.S. at 660.  Thereafter, courts

begin to give immigration officers "findings of fact" conclusiveness while assuring that the "procedures set out in the 1891 act had been followed."  Thuraissigiam, 591 U.S. at 131-33.  See Neuman at 1010 (stating the Supreme "Court went on to confirm that the immigration statutes did authorize the exclusion of person likely to become a public charge, that the inspector had been properly appointed, and that the procedures followed were in accordance with the statute").

Justice Gray, in Nishimura, pronounces the often-quoted statement that "the decisions of executive or administrative officers, acting within powers expressly conferred by congress, are due process of law."  142 U.S. at 661.  See Thuraissigiam, 591 U.S. at 130 (quoting Nishimura); Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 212 (1953)("Mezei").  As early as 1903, however, the Supreme Court begins to question that pronouncement.  See Yamataya v. Fisher, 189 U.S. 86, 100-01 (1903)("But this court has never held . . . that administrative officers, when executing the provisions of a statute involving the liberty of persons, may disregard the fundamental principles that inhere in 'due process of law.'").  The writ of habeas corpus is the vehicle by which due process reemerges in exclusion and deportation detention.  See Kwock Jan Fat v. White, 253 U.S. 454, 464 (1920)(finding due process violation in officer's omission of favorable evidence from record for administrative appeal).  For example, in Chin Yow v. United States, 208 U.S. 8 (1908), the Supreme Court observes that, as between "persons alleging themselves to be citizens . . . on one side, and the conclusiveness of the commissioner's fiat, on the other, when one or the other must give way, the latter must yield."  208 U.S. at 12.  Moreover, the Supreme Court continues, stating that the United States cannot imprison an alien at the border "without the process of law to which is given a right."  Chin Yow v. United States, 208 U.S. at 13. See Thuraissigiam, 591 U.S. at 156 (Breyer, J., concurring)(noting that throughout the "finality era," the Supreme Court address procedural claims "that fundamentally under mined the efficacy

- 24 -

of the process prescribed by law"). Although the Court reads the historical jurisprudence as confirming that the petitioners traditionally invoke habeas to challenge unlawful detention on both factual and procedural grounds -- even where Congress narrowly circumscribes review -- the Court must address Mezei and the United States ex rel. Knauff v. Shaughnessy, 338 U.S. 537 (1950)("Knauff"), which continue to shape the modern understanding of when aliens may invoke the Great Writ to assert due process rights.

Knauff involves an alien challenging her exclusion detention, without due process, through a habeas petition. See 338 U.S. at 539. Congress authorizes the Attorney General to order "the exclusion of aliens without a hearing." Knauff, 338 U.S. at 540 (citing 22 U.S.C. § 223). The petitioner argues that Congress' authorization is unconstitutional and, furthermore, that the regulations the Attorney General creates from Congress' act are also unconstitutional. See Knauf, 338 U.S. at 542 ("Petitioner contends that the 1941 Act and the regulations thereunder are void to the extent that they contain unconstitutional delegations of legislative power."). The Supreme Court rejects the argument that the statute is unconstitutional, stating that "[w]hen Congress prescribes a procedure concerning the admissibility of aliens, it is not dealing alone with a legislative power. It is implementing an inherent executive power," and, consequentially, "[w]hatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned." Knauff, 338 U.S. at 542-44. Although the Supreme Court does not entertain the petitioner's challenge to Congressional authority, it scrutinizes whether the Attorney General's regulations are within the authority Congress grants. Knauff, 338 U.S. at 544 ("We find no substantial merit to petitioner's contention that the regulations were not 'reasonable' as they were required to be by the 1941 Act."). What emerges from the Supreme Court's analysis is a doctrinal asymmetry. While historical jurisprudence forecloses an excludable alien from invoking the Due

- 25 -

Process Clause to challenge Congress' legislative choices, the same alien nevertheless may invoke habeas corpus to test the Executives's implementation of those choices. This tension invites closer examination. Before addressing the asymmetry, the Court turns to Mezei, which is understood as extending Knauff, for further insight. See Neuman at 1017 ("In Mezei, the Majority extended Knauff.").

In Mezei, the Supreme Court considers whether the United States may detain for exclusion an alien indefinitely, because no country will accept him. See 345 U.S. at 207. The facts are remarkably different from Knauff, because of the potential length of detention, and because the respondent lives in the United States for decades before the United States detains him while he attempts to reenter the country. See Mezei, 345 U.S. at 213 ("Neither respondent's harborage on Ellis Island nor his prior residence here transforms this into something other an exclusion proceeding."). As to the length of detention, Justice Clark concludes that the "continued exclusion [does not] deprive him of any statutory or constitutional right," and, moreover, "an alien in respondent's position is no more ours than theirs." Mezei, 345 U.S. at 215-16. Regarding the time respondent spends in the United States, the Supreme Court sees no distinction between him and arriving aliens, because the respondent "simply left the United States and remained behind the Iron Curtain for 19 months." Mezei, 345 U.S. at 214. Accordingly, the Due Process Clause tolerates exclusion proceedings rather than deportation proceedings.

Now that the Court considers Mezei, it returns to the doctrinal asymmetry the Court observes in Knauff with respect to how the Supreme Court treats the statute and regulations. Even where the Supreme Court declines to permit direct due process challenges to Congress' legislative judgments concerning arriving aliens, it nevertheless allows the writ of habeas corpus to function as a vehicle for testing the lawfulness of Executive implementation. See Knauff, 338 U.S. at 542-

44. The Due Process Clause requires no more process than Congress elects to provide at the border, yet habeas persists -- even in its most constrained form -- as a means for detainees to assert that the Executive exceeds the authority Congress confers. For that reason, the Supreme Court tests whether the regulations in Knauff are reasonable. In areas of policy where Congress vests the Executive with discretion over factual determinations, judicial review is correspondingly limited, with courts intervening only when the Constitution mandates oversight, such as arbitrary or capricious determinations. Mezei illustrates that limitation, because the Supreme Court recognizes the issues of national security in the midst of the Cold War. Osorio-Martinez v. Att'y Gen. United States of Am., 893 F.3d 153, 174 (3d Cir. 2018)("Osorio-Martinez")(stating that "this case stands in stark contrast to the key precedents we relied on in Castro [Knauff and Mezei]-- two Cold War-era decisions about aliens detained on Ellis Island at the threshold of entry"). For questions of law, however, the Supreme Court preserves habeas as a mechanism through which the judiciary fulfills its Constitutional duty to say what the law is. See St. Cyr, 533 U.S. at 304-05 ("In sum, even assuming that the Suspension Clause protects only the writ as it existed in 1789, there is substantial evidence to support the proposition that pure questions of law like the one raised by the respondent in this case could have been answered in 1789 by a common-law judge with power to issue the writ of habeas corpus."). Read together, these decisions indicates that habeas review functions less as a vehicle for expanding individual rights in this context than as a structural safeguard ensuring that Executive detention remains subject to judicial determination of legal authority. Regardless of the level of deference afforded to the political branches or the factual postures of the case, the Great Writ endures as a safeguard against unchecked governmental detention.

That the Great Writ endures is without dispute.  The Court now turns to the more difficult question -- whether habeas retains the contours that the Framers enshrine in the Suspension Clause and that the Judiciary Act of 1789 codifies.

### 2.        The Writ of Habeas Corpus Modern Parameters.

The Supreme Court "has been careful not to foreclose the possibility that the protections of the Suspension Clause have expanded along with post-1789 developments that define the present scope of the writ."  Boumediene, 553 U.S. at 746.  See Thuraissigiam, 591 U.S. at 152 (Breyer, J., concurring)("Habeas corpus, as we have said, is an 'adaptable remedy,' and the 'precise application and scope' of the review it guarantees may change 'depending upon the circumstances.'" (quoting Boumediene, 553 U.S. at 779; see id., at 813 (Roberts, C.J., dissenting))).  Indeed, the Supreme Court goes to great lengths to avoid answering what the writ's scope is under the modern habeas statute.  See Thurissigiam, 591 U.S. at 126 ("But respondent does not ask us to hold that the Suspension Clause guarantees the writ as it might have evolved since the adoption of the Constitution.  On the contrary, as noted at the outset of this discussion, he rests his argument on 'the writ as it existed in 1789.'" (quoting Brief for Respondent 26, n.12.)); Bell v. Wolfish, 441 U.S. 520, 526 n.6 (1979)("Thus, we leave to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement, as distinct from the fact or length of the confinement itself."); Preiser v. Rodriguez, 411 U.S. at 499 ("But we need not in this case explore the appropriate limits of habeas corpus as an alternative remedy to a proper action under § 1983.  That question is not before us.").  What remains clear, notwithstanding its doctrinal evolution, is that habeas corpus continues to reflect its historical core.

### LAW REGARDING § 2241 CLAIMS

"At its historical core, the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest." St. Cyr, 533 U.S. at 301.   See Gonzalez-Alarcon v. Macias, 884 F.3d 1266, 1276 (10th Cir. 2018)("Gonzalez-Alarcon").  Habeas corpus jurisdiction, moreover, is not easily revoked.  See St. Cyr, 533 U.S. at 298 (stating that there is a "longstanding rule requiring a clear statement of congressional intent to repeal habeas jurisdiction")(citing Ex parte Yerger, 75 U.S. 85, 102 (1869)("We are not at liberty to except from [habeas corpus jurisdiction] any cases not plainly excepted by law.")(alteration in St. Cyr).  Relief is available under § 2241 only where a petitioner's detention violates federal law.  See 28 U.S.C. § 2241(c)(3) (instructing that courts must determine whether petitioner "is in custody in violation of the Constitution or laws or treaties of the United States").   The habeas corpus writ, however, encompasses more than just "challenges to the jurisdiction of the custodian, but encompassed detentions based on errors of law, including the erroneous application or interpretation of statutes." St. Cyr, 533 U.S. at 303.  See Gonzalez-Alarcon, 884 F.3d at 1278 ("Congress has provided that 'habeas corpus may be granted' by a federal court and that the court shall 'dispose of the matter as law and justice require.'")(quoting 28 U.S.C. §§ 2241, 2243).  Upon invoking habeas jurisdiction, the "typical remedy" is release. Munaf v. Geren, 553 U.S. 674, 693 (2008)(citing Preiser v. Rodriguez, 411 U.S. 475, 484 (1973)("[T]he traditional function of the writ is to secure release from illegal custody.")).

"Challenges to immigration detention are properly brought directly through habeas." Soberanes v. Comfort, 388 F.3d 1305, 1310 (10th Cir. 2004)("Soberanes")(citing Zadvydas, 533 U.S. at 687-88).  The exhaustion of available administrative remedies, however, is a prerequisite for § 2241 habeas relief, even though the statute itself does not expressly contain such a requirement.  See Garza v. Davis, 596 F.3d 1198, 1203 (10th Cir. 2010).  A petitioner's

administrative exhaustion deficiencies do not affect habeas jurisdiction over challenges to immigration detention. See Soberanes, 388 F.3d at 1311 ("And the exhaustion deficiencies we have noted in other respects do not affect habeas jurisdiction over such claims.")(citing Arango Marquez v. INS, 346 F.3d 892, 896 (9th Cir.2003)).

"'Generally, a habeas petition cannot be used to substitute for direct appeal.'" Soberanes, 388 F.3d at 1309 (quoting Latu, 375 F.3d at 1012). However, "[c]ourts have carved out an exception to the exhaustion requirement for constitutional challenges to the immigration laws, because the BIA has no jurisdiction to review such claims." Soberanes, 388 F.3d at 1310 (citing Akinwunmi, 194 F.3d at 1341). "[W]here Congress has not clearly required exhaustion, sound judicial discretion governs." McCarthy, 503 U.S. at 144. In the absence of a statutory exhaustion mandate, courts retain discretion to require or excuse exhaustion based on competing institutional and individual interests. See McCarthy, 503 U.S. at 144. The Tenth Circuit does not provide a framework for evaluating the exhaustion requirement's competing interests, however, the United States Court of Appeals for the Second Circuit states:

> [I]f an exhaustion requirement is judicially imposed instead of statutorily imposed, a number of exceptions apply that allow courts to excuse a party's failure to exhaust administrative remedies. Specifically, exhaustion of administrative remedies may not be required when '(1) available remedies provide no genuine opportunity for adequate relief; (2) irreparable injury may occur without immediate judicial relief; (3) administrative appeal would be futile; and (4) in certain instances a plaintiff has raised a substantial constitutional question.'"

Beharry v. Ashcroft, 329 F.3d 51, 62 (2d Cir. 2003)("Beharry"), as amended (July 24, 2003)(quoting Able v. United States, 88 F.3d 1280, 1288 (2d Cir. 1996)). In the Court's view, these factors reflect the pragmatic approach the Supreme Court discusses in McCarthy. See Bowen v. City of New York, 476 U.S. 467, 484 (1986)("Finally, application of the exhaustion doctrine is 'intensely practical.'" (quoting Mathews v. Eldridge, 424 U.S., at 331, n.11)).

When considering exhaustion requirements, a court must remain mindful that the concept

of exhaustion is distinct from the concept of procedural bar.  See Latu v. Ashcroft, 375 F.3d 1012,

1017 (10th Cir. 2004)("Latu")("The government has apparently confused the concept of

exhaustion of administrative remedies with the concept of procedural bar.").  Section 1252(d)

states that "a court may review a final order of removal only if . . . the alien has exhausted all

administrative remedies available to the aliens as of right . . . ."  8 U.S.C. § 1252(d).  A habeas

petition is a "judicial remedy," however, and not an administrative remedy.  Latu, 375 F.3d at

1017.  Accordingly, procedural bar is the correct concept when considering habeas petitions.  See

Latu, 375 F.3d (stating that, generally, "a habeas petition cannot be used to substitute for direct

appeal").  Section 1252 limits Courts of Appeals jurisdiction to "whether the petitioner is (i) an

alien (ii) deportable (iii) by reason of a criminal offense listed in the statute."  Latu, 375 F.3d at

1017.  When a petitioner files a habeas petition in district court asserting Constitutional challenges

outside the three jurisdictional facts that the statute enumerates, no procedural bar attaches,

because the petitioner lacks any avenue to raise those claims on direct appeal.  See Latu, 375 F.3d

at 1017 ("Because Mr. Latu . . . admit[s] the jurisdictional fact that strips the court of jurisdiction

. . . he has not failed to seek an available judicial remedy, and he is not procedurally barred from

habeas review in the district court.").

**LAW REGARDING 8 U.S.C. § 1252's JURISDICTION STRIPPING PROVISIONS**

Section 1252 is titled: "Judicial review of orders of removal."  8 U.S.C. § 1252.  Section

1252(b) states the requirements judicial review of removal orders.  See 8 U.S.C. § 1252(b).

Section 1252(e) specifically addresses judicial review of § 1225(b)(1) orders.  See 8 U.S.C.

§ 1252(e).  Finally, § 1252(g) provides the Attorney General exclusive jurisdiction "to commence

proceedings, adjudicate cases, or execute removal orders against any alien under this chapter."  8

U.S.C. § 1252(g).  In sum, § 1252's provisions create a jurisdictional scheme that narrowly prescribes when courts may review removal orders and expedited removal proceedings, while reserving to the Attorney General broad discretion over the commencement, adjudication, and execution of removal actions.

1.    **8 U.S.C. § 1252(b)(9): Consolidation of Questions for Judicial Review.**

> Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section.  Except as otherwise provided in this section, no court shall have jurisdiction, by habeas corpus under section 2241 of Title 28 or any other habeas corpus provision, by section 1361 or 1651 of such title, or by any other provision of law (statutory or nonstatutory), to review such an order or such questions of law or fact.

8 U.S.C. § 1252(b)(9).  The Tenth Circuit states that § 1252(b)(9) does not apply in circumstances where a petitioner challenges their detention and not "review of an order of removal." Ochieng v. Mukasey, 520 F.3d 1110, 1115 (10th Cir. 2008)(citing Singh v. Gonzales, 499 F.3d 969, 978 (9th Cir.2007)("Singh")).    See Gonzalez-Alarcon, 884 F.3d at 1274 ("Several courts have acknowledged that § 1252 does not bar habeas relief as to claims that are independent of a removal order."); Madu v. U.S. Att'y Gen., 470 F.3d 1362, 1366 (11th Cir. 2006)(stating that a "petitioner who contests the very existence of an order of removal does not seek 'review of an order of removal' within the meaning of the REAL ID Act"); Kumarasamy v. Att'y Gen., 453 F.3d 169, 172 (3d Cir. 2006) (stating an alien challenging the legality of removal because he allegedly never received notice of his removal order is "not seeking review of an order of removal").  In Singh, the Court of Appeals for the Ninth Circuit asserts that "[b]y virtue of their explicit language, both §§ 1252(a)(5) and 1252(b)(9) apply only to those claims seeking judicial review of orders of removal."  499 F.3d at 978.

Section 1252(b)(9) does not "channel" review of prolonged detentions to Courts of Appeals. See Aguilar v. U.S. Immigr. & Customs Enf't Div. of Dep't of Homeland Sec., 510 F.3d 1, 11 (1st Cir. 2007)("Aguilar")(stating that §1252(b)(9) "is a judicial channeling provision, not a claim-barring one"). In Jennings, the Supreme Court implies that § 1252(b)(9) covers, although not compressively, actions "[seeking] review of an order of removal; . . . challenging the decision to detain them in the first place or to seek removal; and . . . challenging any part of the process by which their removability will be determined." Jennings, 583 U.S. at 294. In making this implication, the Supreme Court "eschewed 'uncritical literalism' leading to results that 'no sensible person could have intended.'" Jennings, 583 U.S. at 293-94 (quoting Gobeille v. Liberty Mut. Ins. Co., 577 U.S. 312, 319 (2016)). Uncritical literalism, according to the Supreme Court, is reading "capacious phrases like 'arising from'" in an extreme way to allow "prolonged detention [to be] effectively unreviewable." Jennings, 583 U.S. at 293. Accordingly, the Court concludes § 1252(b)(9) does not channel claims challenging the legality or the duration of detention to Courts of Appeals. See Aguilar, 510 F.3d at 11 ("In line with this prescription, we have held that district courts retain jurisdiction over challenges to the legality of detention in the immigration context.")(citing Hernández v. Gonzales, 424 F.3d 42, 42 (1st Cir.2005)(holding that detention claims are independent of removal proceedings and, thus, not barred by section 1252(b)(9)).

### 2.   8 U.S.C. § 1252(e)(3): Challenges on Validity of the System.

In general, regarding challenges on validity of the system:

> Judicial review of determinations under section 1225(b) of this title and its implementation is available in an action instituted in the United States District Court for the District of Columbia, but shall be limited to determinations of -- (i) whether such section, or any regulation issued to implement such section, is constitutional; or (ii) whether such a regulation, or a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement such section, is not consistent with applicable provisions of this subchapter or is otherwise in violation of law.

8 U.S.C. § 1252(e)(3).  Section 1252(e)(3) "sets forth the process for bringing a constitutional challenge to § 1225(b) or its implementing regulations."  Vaupel v. Ortiz, 244 F. App'x 892, 895 (10th Cir. 2007).  See Make the Rd. New York v. Noem, No. 25-5320, 2025 WL 3563313, at *16 (D.C. Cir. Nov. 22, 2025)("Make the Rd. II")("These '[c]hallenges on validity of the system' may contest either the constitutionality of the statute or whether a regulation, policy, or directive is inconsistent with the law or Constitution.")(alterations in the original)(quoting § 1252(e)(3)(A)).  Accordingly, the Court concludes § 1252(e)(3) channels systemic challenges to the Constitutionality or legality of § 1225(b) and its implementation into a single forum.  By contrast, challenges that do not raise systemic attacks on § 1225(b), or its implementing, authorities remain within this Court's habeas jurisdiction when they concern an individual petitioner's detention and the legality of that detention.

### 3.    8 U.S.C. § 1252(g): Exclusive Jurisdiction.

> Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

8 U.S.C. § 1252(g).  "The provision applies only to three discrete actions that the Attorney General may take: her "decision or action" to "*commence* proceedings, *adjudicate* cases, or *execute* removal orders."  Reno, 525 U.S. at 482 (quoting 8 U.S.C. § 1252(g)(italics in Reno, but not in § 12252(g))).  See Jennings, 583 U.S. at 294 (stating that "arising from" in § 1252(g) refers to "just those three specific actions themselves").  With Reno as its guide, the Tenth Circuit explains that Congress directs § 1252(g) at "'a particular evil: attempts to impose judicial constraints upon prosecutorial discretion.'"  Aguilar-Alvarez v. Holder, 528 F. App'x 862 (10th Cir. 2013)(quoting

Reno, 525 U.S. at 485 n.9).   The Tenth Circuit recognizes, moreover, that Reno does not limit § 1252(g) exclusively to discretionary decisions, and, therefore, courts must determine whether a claim "arises from" one of the three actions that the statute specifies.  Namgyal Tsering v. U.S. Immigr. & Customs Enf't, 403 F. App'x 339, *3 (10th Cir. 2010)("Namgyal Tsering")(stating the Reno does not "'explicitly state that the provision applies only to review of discretionary decisions by the Attorney General in these areas and not to review of non-discretionary decisions.'" (quoting Foster v. Townsley, 243 F.3d 210, 214 (5th Cir. 2001))).   Accordingly, the Tenth Circuit undertakes to determine if the claims before it "'arise from' actions over which § 1252(g) precludes judicial review.'"  Namgyal Tsering, 403 F. App'x at *3 (quoting 8 U.S.C. § 1252(g)).

In undertaking that inquiry, the Tenth Circuit adopts the United States Court of Appeals for the Fifth Circuit's approach, stating claims fall within § 1252(g) when they are connected directly and immediately to a decision or action to commence proceedings, adjudicate cases, or execute removal orders.  See Namgyal Tsering, 403 F. App'x at *3 ("We agree with the Fifth Circuit that 'claims that clearly are included within the definition of "arising from" . . . [are] those claims connected directly and immediately with a "decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders."'"(quoting Humphries v. Various Federal USINS Employees, 164 F.3d 936, 943 (5th Cir.1999)("Humphries")(alterations in original))).  Humphries illustrates the spectrum of claims that the phrase "arising from" captures. 164 F.3d at 943.  On one end are claims with only a weak, remote, or tenuous connection to the specified actions, which fall outside § 1252(g).  See Humphries, 164 F.3d at 943 (stating that "claims with no more than a weak, remote, or tenuous connection to a 'decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders'" are on one end of the spectrum)(quoting 8 U.S.C. § 1252(g)).  On the other end are claims "directly and

immediately" connected to those actions, which the statute bars from judicial review. Humphries, 164 F.3d at 943. Applying that framework, the Fifth Circuit holds that claims alleging involuntary servitude and mistreatment during detention do not arise from the Attorney General's decision to commence or execute removal proceedings, because the injury occurs before the proceeding commences, see Humphries, 164 F.3d at 944, while a claim of retaliatory exclusion "bears more than a cursory" relationship to the decision to exclude the petitioner and therefore falls within § 1252(g)'s jurisdictional bar, Humphries, 164 F.3d at 945.

Using this framework, the Tenth Circuit in Namgyal Tsering concludes that the petitioner's claims are "directly and immediately connected" to the execution of his removal order. 403 F. App'x at *3. In Namgyal Tsering, petitioner Namgyal Tsering alleges that "ICE submitted a request for travel documents for Mr. Tsering to the Nepal Embassy and included in its request a false Nepali passport that portrayed Mr. Tsering as a Nepali citizen." 403 F. App'x at *3 (internal quotations omitted). The Tenth Circuit determines Tsering's Substantive and Procedural Due process claims are connected directly and immediately "to the execution of his removal order, because these travel documents allowed for Mr. Tsering's removal to Nepal." Namgyal Tsering, 403 F. App'x at *3. Accordingly, the Tenth Circuit concludes those claims are subject to § 1252(g)'s limitation on judicial review. See Namgyal Tsering, 403 F. App'x at *3.

### LAW REGARDING 8 U.S.C. § 1225

Before jumping to § 1225(b)(2), it is important to zoom to 30,000 feet or more, and look at the United States and § 1225 as a whole. The United States is the third-largest country in terms of land mass, and it has an approximately 5,525-mile border with Canada, see U.S. Department of Homeland Security, Considerations for United States -- Canada Border Traffic Disruption Management, at 2 (2012), and 1,954-mile border with Mexico, U.S. Customs and Border

Protection, Smart Wall Map, https://www.cbp.gov/border-security/along-us-borders/smart-wall-map (last visited Jan. 1, 2026).  Other entry points are Puerto Rico, the United States Virgin Islands, Guam, and other island territories.  See U.S. Department of the Interior, Insular Areas of the United States and Freely Associated States (last visited Jan. 1, 2026), https://www.doi.gov/library/internet/insular.[9]  In addition, aliens may seek entry into the United States in many ways, including stowing away in vehicles, and at many places, like the waters of the Rio Grande or the Arizona deserts.  See Fact Sheet, Modes of Entry for the Unauthorized migrant Population, Pew Research Center (May 22, 2006), https://www.pewresearch.org/race-and-ethnicity/2006/05/22/modes-of-entry-for-the-unauthorized-migrant-population/.

Each day the United States Customs and Border Protection ("CBP") must process over a million individuals.  U.S. Customs and Border Protection, On a Typical Day in Fiscal Year 2024, CVP . . ., ("2024 CBP Statistics"), https://www.cbp.gov/newsroom/stats/typical-day-fy2024 (last visited Jan. 8, 2025)(stating that CBP processes "1,150,387 passengers and pedestrians" on a typical day).[10]  That figure encompasses "4,267 nationwide enforcement encounters between ports of entry" each day and "3,682 nationwide enforcement encounters at ports of entry" each day.

---

[9] Other notable United States territories include the American Samoa and the Commonwealth of the Norther Mariana Islands.  See U.S. Department of the Interior, Insular Areas of the United States and Freely Associated States://www.doi.gov/library/internet/insular (last visited Jan. 1, 2026), https.

[10] The CBP does not just process individuals.  On a typical day, CBP processes "3.8 million de minimis shipments"; "88,582 truck, rail, and sea containers"; and "270,800 incoming privately owned vehicle."  2024 CBP Statistics.  De minimis shipments are articles free of duty and of any tax imposed on or by reason of importation, because the retail value in the country of shipment does not exceed $800.00.  See U.S. Custom and Boarder Protection, Section 321 Programs, the Trade Facilitation and Trade Enforcement Act, Trade, https://www.cbp.gov/trade/trade-enforcement/tftea/section-321-programs (last visited Jan. 28, 2026)(citing 19 U.S.C. § 1321).

2024 CBP Statistics.[11]  Extrapolating these numbers mean that, in 2024, CBP encounters over 400 million passengers and pedestrians, and, of those, there are almost three million enforcement "encounters," or 0.69% of the arriving people, where the individual is not a citizen or does not have a lawful reason for entering the country.

In contrast to the CBP, which conducts screening at a scale involving hundreds of millions of arriving individuals, the Enforcement and Removal Operations ("ERO"), within the United States Immigration and Customs Enforcement ("ICE"), operates in an enforcement environment with lower volume.[12]  In 2024, ICE makes approximately 179,282 arrests, of which the ERO makes "113,431" administrative arrests, including "33,243" "at-large" arrests.  2024 ICE Report at 2-3.[13]  The difference in volume drives the practical reality between inspections and removal determinations.  The scale and immediacy of inspection and admission determinations justify rapid, on-the-spot judgments that may be based on incomplete information.  Mandatory removal

---

[11] "Enforcement encounters" include U.S. Border Patrol ("USBP") Title 8 Apprehensions, Office of Field Operations ("OFO") Title 8 Inadmissibles, and Title 42 Expulsions, and this pharse does not include citizens and individuals CBP admit through other lawful means.  See CBP, Nationwide Encounters Fiscal Year 2025, https://www.cbp.gov/newsroom/stats/nationwide-encounters-fy2025 (last visited Jan. 9, 2025).

[12] The Homeland Security Act of 2002 "created ICE by merging the investigative and interior enforcement elements of the former U.S. Customs Service and the Immigration and Naturalization Service."  ICE, Annual Report Fiscal Year 2024, at 8 (2024)("2024 ICE Report").  Within ICE, the ERO's mission is to protect "the homeland by arresting and removing noncitizens who undermine the safety of U.S. communities and the integrity of U.S. immigration laws . . . .  [A]nd its primary areas of focus are interior enforcement operations, management of the agency's detained and non-detained populations, and removal efforts."  2024 ICE Report at 9.

[13] Administrative arrests occur when the ERO arrests an alien for a violation of the INA with or without a criminal history.  See 2024 ICE Report at 15.  At-large arrests, which are a subset of administrative arrests, occur when the ERO arrests an alien "within the community."  2024 ICE Report at 15.  In contrast to at-large arrests, "custodial arrests" occur when law enforcement transfers custody of an alien in jail or prison to the ERO.  2024 ICE Report at 15.

and deportation decisions, by contrast, carry greater consequence, and therefore lack the same justification for summary determinations.

Courts often are quick to criticize Congress -- the most important political branch in our democratic government -- for the way it writes laws.  Given the magnitude of writing a statute that governs the inspection of every citizen and alien's entry into the United States, the Court approaches the task of interpreting Congress' work with an appreciation for the task's extraordinary complexity.  Congress does not write §§ 1225 and 1226 against a small or static backdrop.  They reflect Congress' effort to regulate admission decisions across vast borders, innumerable entry points, and an enormous volume of daily inspections.

### 1.    History of 8 U.S.C. § 1225.

In 1996, Congress passes the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, 110 Stat. 3009-546 ("IIRIRA"), which amends the Immigration and Nationality Act, 66 Stat. 166 ("INA").  Reno, 525 U.S. at 473.  The legislative history indicates that, in enacting IIRIRA, Congress seeks to "strengthen and tighten" immigration laws, addressing two interrelated concerns.  Arevalo v. Ashcroft, 344 F.3d 1, 4 (1st Cir. 2003).  First, Congress identifies a structural inequity in the pre-1996 regime where aliens who avoid ports of entry and enter the United States unlawfully receive more extensive procedural protections in deportation proceedings than those who present themselves for inspection through lawful channels.  See Hing Sum v. Holder, 602 F.3d 1092, 1100 (9th Cir. 2010)("Hing Sum")(discussing that the IIRIRA eliminates the "'entry doctrine'" where aliens who enter the United States "without inspection could take advantage of the greater procedural and substantive rights affording in deportation proceedings, while aliens who presented themselves at a port of entry for inspection are subject to more summary exclusion proceeding").  Second, Congress confronts a problem of administrative scale.  See Am. Immigr.

Laws. Ass'n v. Reno, 199 F.3d 1352, 1354 (D.C. Cir. 2000)("Am. Immigr. Laws. Ass'n").  By 1996, immigration officers are conducting inspections in the tens of millions annually, yet existing law permits broad opportunities to contest admissibility determinations through hearings, producing delay and strain on limited adjudicatory resources.  See Am. Immigr. Laws. Ass'n, 199 F.3d at 1354-55.[14]  Congress enacts the IIRIRA to correct both the inequity in procedural treatment and the practical burden that the inspection system imposes by amending the INA to eliminate its definition of "entry" and by adding to § 1225 expedited removal proceedings.

### a. Applicants for Admission.

The IIRIRA eliminates a distinction between aliens who are applicants for admission and aliens present in the United States.  See Succar v. Ashcroft, 394 F.3d 8, 12 (1st Cir. 2005)("Succar")(stating that aliens are either "(a) applicants for admission and (b) non-

---

[14] The INA defines an immigration officer as "any employee or class of employees of the Service or of the United States designated by the Attorney General, individually or by regulation, to perform the functions of an immigration officer specified by this chapter or any section of this title."  8 U.S.C. §1101(a)(18).  The Code of Federal Regulations defines an "immigration officer" as:

> [E]mployees of the Department of Homeland Security, including senior or supervisory officers of such employees, designated as immigration officers authorized to exercise the powers and duties of such officer as specified by the Act and this chapter I: aircraft pilot, airplane pilot, asylum officer, refugee corps officer, Border Patrol agent, contact representative, deportation officer, detention enforcement officer, detention officer, fingerprint specialist, forensic document analyst, general attorney (except with respect to CBP, only to the extent that the attorney is performing any immigration function), helicopter pilot, immigration agent (investigations), immigration enforcement agent, immigration information officer, immigration inspector, immigration officer, immigration services officer, investigator, intelligence agent, intelligence officer, investigative assistant, special agent, other officer or employee of the Department of Homeland Security or of the United States as designated by the Secretary of Homeland Security as provided in 8 C.F.R. § 2.1.

8 C.F.R. § 1.2

citizens present in the United States who had previously made an entry into the country either with, or without, an inspection"). For admission and removal, lawful admission -- not entry -- is now the defining concept. See 1 Ira J. Kurzban, Immigration Law Sourcebook 73 (18th ed. 2022)("Kurzban"). Entry is less important with Congress' enactment of the IIRIRA, in which Congress strikes the definition for "entry" from the INA and replaces entry with a definition of who is an applicant for admission. Kurzban, supra, at 73. By eliminating the definition of "entry," and replacing "entry" with the terms "admission" and "admitted," Congress "re-characterize[s] aliens who are present in the United States, but who have not been inspected and admitted" as "applicants for admission." Succar, 394 F.3d at 13. Congress defines admission as the "lawful entry of the alien into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A).

The re-characterization is important, because, before the IIRIRA, only "applicants for admission" are subject to "exclusion proceedings," but aliens present in the country without an inspection are subject to "deportation proceedings." Succar, 394 F.3d at 12-13. See Landon v. Plasencia, 459 U.S. 21, 25 (1982)("The deportation hearing is the usual means of proceeding against an alien already physically in the United States, and the exclusion hearing is the usual means of proceeding against an alien outside the United States seeking admission."). Aliens subject to deportation proceedings are given more procedural protections than those subject to exclusion proceedings. See, e.g., Landon v. Plasencia, 459 U.S. 21, 25-26 (1982)(discussing the differences in the two proceedings, including the right of appeal for deportation proceedings but not in exclusion proceeding). Specifically, deportable aliens are "entitled [to] a hearing before a special inquiry officer in which the individual had the right to be represented, to examine the government's evidence, and to present evidence on his or her behalf." Make The Rd. New York

v. Wolf, 962 F.3d 612, 618 (D.C. Cir. 2020)("Make the Road").  The distinction that immigration law historically draws between "deportation proceedings," which concern the removal of aliens already within the United States, and "exclusion proceedings," which concern the prevention of entry, reflect the long-recognized principle that "the Due Process Clause applies to all 'persons' within the United States, including aliens, regardless of whether their presence is lawful, unlawful, temporary, or permanent."  Zadvydas, 533 U.S. at 693 (quoting U.S. Const. amend. XIV, § 1, and citing Plyler v. Doe, 457 U.S. 202, 210 (1982)); Mathews v. Diaz, 426 U.S. 67, 77 (1976); Kwong Hai Chew v. Colding, 344 U.S. 590, 596-598, and n.5 (1953); Yick Wo v. Hopkins, 118 U.S. 356, 369 (1886)).  With IIRIRA's enactment, Congress eliminates the dual system of deportation and exclusion proceedings, and replaces the dual system with the universal "removal proceedings," under which immigration officers process all aliens who are applicants for admission.  Succar, 394 F.3d at 13.

Within the removal proceedings' current umbrella, Congress designates certain aliens as subject to "expedited" removal and other aliens subject to removal under § 1229a, "the usual removal process."  Thuraissigiam, 591 U.S. at 108-09.  Similar to the previous "deportation proceedings," "[t]he usual removal process involves an evidentiary hearing before an immigration judge, and at that hearing an alien may attempt to show that he or she should not be removed."  Thuraissigiam, 591 U.S. at 108.  Under IIRIRA's expedited removal provision, immigration officers "shall order the alien removed" if the immigration officer determines that the alien is inadmissible, "because she does not have a valid entry document or other suitable travel document, or because she has obtained a visa through misrepresentation."  Make the Road, 962 F.3d at 619 (citing 8 U.S.C. § 1225(b)(1)(A)(i)).  Under the expedited removal processes, there is no hearing and no opportunity for the alien to present evidence.  See Make the Road, 962 F.3d at 619 (stating

that, after the immigration officers' determination, "all that stands between that individual and removal is a paper review by the officer's supervisor").   Aliens applying for asylum or claim a fear of prosecution are an exception to expedited removal proceedings.  See Thuraissigiam, 591 U.S. at 109 ("If an applicant 'indicates either an intention to apply for asylum' or 'a fear of persecution,' the immigration officer 'shall refer the alien for an interview by an asylum officer.'")(quoting  8  U.S.C.  §§ 1225(b)(1)(A)(i)-(ii)).    Based  on  the  asylum  officer's determination, an arriving alien either receives "'full consideration of his asylum claim in a standard removal hearing," Thuraissigiam, 591 U.S. at 110 (quoting 8 C.F.R. § 208.30(f)); see 8 U.S.C. § 1225(b)(1)(B)(ii)); or the expedited removal proceedings of 8 U.S.C. § 1225(b)(1)), see Thuraissigiam, 591 U.S. at 110 (stating that "all that an alien must show to avoid expedited removal is a 'credible fear'")(quoting 8 U.S.C. § 1158(b)(1)(A)).

### b.    Expedited Removal

Thus, with IIRIRA's passage, Congress closes the procedural anomaly of the "entry doctrine," Hing Sum, 602 F.3d at 1100, and gives immigration officers the tools to process the "million[s of] primary inspections" occurring at the border, Am. Immigr. Laws. Ass'n, 199 F.3d at 1355.  Congress passes the IIRIRA with the expedited removal provisions to address the practical reality that large volumes of "arriving" aliens are overwhelming the usual removal processes. Am. Immigr. Laws. Ass'n, 199 F.3d at 1355.  Congress therefore empowers immigration officers to resolve straightforward inadmissibility determinations quickly where the alien "indisputably" has no authorization to be admitted into the United States.  H.R. Conf. Rep. No.. 104–828, at 209 (1996)("House Report")(stating that the "purpose of the provisions [paragraph (b)(1)] is to expedite the removal from the United States of aliens who indisputably have no authorization to be admitted to the United States . . . .").

Furthermore, "[n]ew paragraph (b)(2) provides that an alien determined to be inadmissible by an immigration officer (other than an alien subject to removal under paragraph (b)(1), or an alien crewman or stowaway) shall be referred for a hearing before an immigration judge under new section 240." House Report at 209. The language "other than an alien subject to removal under paragraph (b)(1)" in § 1225(b)(2)(A) is significant. House Report at 209. Section 1225(b)(1) authorizes immigration officers to conduct expedited removal for specified categories of arriving aliens whom the officer determines to be inadmissible for reasons including fraud or misrepresentation, see 8 U.S.C. § 1182(a)(6)(C), or a lack of valid entry documents, see 8 U.S.C. § 1182(a)(7). Where the immigration officer makes such a determination, the immigration officer may order removal without further hearing or review, and impose the attendant statutory consequences, including a bar on reentry. See 8 U.S.C. § 1182(a)(9)(A)(i) (stating that any "alien who has been ordered removed under section 1225(b)(1) of this title . . . who again seeks admission within 5 years of the date of such removal . . . is inadmissible").

### 2.   **Structure of 8 U.S.C. § 1225.**

In interpreting a Congressional statute, the plain language that Congress writes is the most important, but the statute's structure can help the Court interpret the statute's words. Congress titles § 1225: "Inspection by immigration officers; expedited removal of inadmissible arriving aliens; referral for hearing." 8 U.S.C. § 1225.[15] Thus, from the title, the reader can surmise that

---

[15] The United States Code contains titles Congress codifies as "positive law," which Congress enacts as a whole, and titles Congress does not codify, which the Office of the Law Revision Counsel of the House of Representatives of the United States compiles from various congressional enactments. See United States v. DeLeon, 406 F. Supp. 3d 1129, 1170 n.17 (D.N.M. 2019)(Browning, J.)("DeLeon")(citing 1 U.S.C. § 204(a); 2 U.S.C. §§ 285, 285b). The term positive law has both a general meaning and a specialized meaning in the context of the United States Code. See Office of the Law Revision Counsel United States Code, The Term "Positive Law," in Positive Law Codification, ("Positive Law") https://uscode.house.gov/codification /term_positive_law.htm (last visited Jan. 28, 2026). In the United States Code context positive law

they are about: (i) inspection; (ii) expedited removal of arriving aliens; and (iii) referral for hearings. The Court should be slow to read a lot more into § 1225 that what the title details.

Section 1225 has four subparts: (i) "Inspection," 8 U.S.C. § 1225(a); (ii) "Inspection of applicants for admission," 8 U.S.C. § 1225(b); (iii) "Removal of aliens inadmissible on security and related grounds," 8 U.S.C. § 1225(c); and (iv) "Authority related to inspections," 8 U.S.C. § 1225(d). The Court views § 1225's organization as reflecting a statutory design to address immigration officer's inspections, the expedited removal process, and the process of removing an alien after a hearing. Each subpart addresses a discrete component of the inspection process, moving from examination to summary removal determinations and then to the ancillary powers necessary to carry out those functions.

---

refers specifically to Code titles that Congress enacts as complete statutory titles through the of a codification bill that repeals prior enactments and restates them in organized form. See Positive Law. Titles Congress enacts piece by piece are non-positive-law titles, which are editorial compilations of statutes assembled by the Office of the Law Revision Counsel. See Positive Law. Although Congress does not enact non-positive-law titles themselves, Congress does enact the underlying statutes they contain. See Positive Law. Thus, all provisions in the U.S. Code are positive law in the general sense, but only some titles are positive law in the technical codification sense. Titles Congress codifies are authoritative expositions of the law whereas uncodified titles are prima facie evidence of the law. See DeLeon, 406 F. Supp. 3d at 1170 n.7 (citing 1 U.S.C. § 204(a)).

Congress codifies § 1225's heading -- including subheadings -- in September, 1996. See Omnibus Consolidated Appropriations Act of 1997, PL 104-208, September 30, 1996, 110 Stat 3009. Congress, thus, enacts 8 U.S.C. § 1225's heading, which is a permissible guide when construing ambiguous statutory text. See Immigration & Naturalization Serv. v. Nat'l Ctr. for Immigrants' Rights, Inc., 502 U.S. 183, 189 (1991)("[W]e have stated that the title of a statute or section can aid in resolving an ambiguity in the legislation's text."); Mead Corp. v. Tilley, 490 U.S. 714, 723 (1989)(resolving ambiguity of 29 U.S.C.§ 1344 by looking at its title); Brotherhood of R.R. Trainmen v. Baltimore & Ohio R.R., 331 U.S. 519, 528-29 (1947)("[H]eadings and titles are not meant to take the place of the detailed provisions of the text. . . . For interpretive purposes, they are of use only when they shed light on some ambiguous word or phrase. They are but tools available for the resolution of a doubt."); S. Furniture Leasing, Inc. v. YRC, Inc., 989 F.3d 1141, 1150 (10th Cir. 2021)("To be sure, 'the title of a statute or section can aid in resolving an ambiguity in the legislation's text.'")(quoting Immigration & Naturalization Serv. v. Nat'l Ctr. for Immigrants' Rights, Inc., 502 U.S. at 189).

### a.    8 U.S.C. § 1225(a): Inspection.

As the title of § 1225 promises, Congress labels the first section "Inspection." 8 U.S.C. § 1225(a). The Court does not quickly move past the word "Inspection." 8 U.S.C. § 1225(a). "Inspection" denotes the "act of inspection," or "a checking or testing of an individual against established standards," Inspection, Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/inspection. (last visited on Jan. 17, 2026), and to "inspect" means "to view closely in critical appraisal: look over" or "to examine officially," Inspecting, Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/inspecting. (last visited on Jan. 17, 2026). Inspection's ordinary meaning implies an individualized encounter between an immigration officer and a single alien -- often an officer face-to-face with an alien for evaluation purposes. The word "inspection" is difficult to reconcile with mass or abstract enforcement. In addition to focusing on the words that the statute uses, it is also important to note what words § 1225 does not use. Section 1225 does not speak in terms of "arrest" or "apprehension." Those concepts are present in the INA, but their absence from § 1225's title and text indicates that Congress places those powers elsewhere, and § 1225 is in a distinct procedural posture -- often face-to-face inspection and examination at the threshold of entry.

Section 1225(a) gives the definition for five inspection terms that the statute uses. Section 1225(a)(1)'s opening clause is foundational to the statute's operation, and Congress emphasizes its breadth through deliberate phrasing. Section 1225(a)(1) defines aliens who are "treated as applicant[s] for admission." 8 U.S.C. § 1225(a)(1). For purposes of this chapter, immigration officers treat aliens as applicants for admission if they are:

> An alien present in the United States who has not been admitted or who
> arrives in the United States (whether or not at a designated port of arrival and

including an alien who is brought to the United States after having been interdicted in international or United States waters) shall be deemed for purposes of this chapter an applicant for admission.

8 U.S.C. § 1225(a)(1).  Notably, an alien is an "applicant for admission" if the alien is "present in the United States" and is "not admitted."  8 U.S.C. § 1225(a)(1).  The definition also covers aliens "who arrive[] in the United States" regardless whether they arrive at a designated port of entry.  8 U.S.C. § 1225(a)(1).  With this scope, Congress indicates that § 1225 treats almost all aliens are as "applicants for admission."  It is hard to image how Congress could have written § 1225(a)(1) more broadly.

In § 1225(a)(1), the United States is passive.  The United States does not have to do anything -- such as effecting a stop -- to impose the status of "applicant for admission" upon an alien.  8 U.S.C. § 1225(a)(1).  An alien "present" in the United States who has not been admitted or who arrives in the United States is, by law, an applicant for admission.  At the same time, § 1225(a) indicates that the aliens whom the United States treats as "applicants for admission" has subgroups.  8 U.S.C. § 1225(a)(2).  For stowaways, who are aliens "present in the United States who [have] not been admitted" or who are aliens "who arrive[] in the United States," and thus an applicant for admission, the statutes quickly states they are "not eligible to apply for admission or to be admitted."  8 U.S.C. § 1225(a)(2) (brackets added).  Moreover, § 1225(a)(2) states "[i]n no case may a stowaway be considered an applicant for admission or [be considered] eligible for a hearing under section 1229a."  8 U.S.C. § 1225(a)(2).  Section 1225(a)(3), titled "Inspection," states all "aliens (including alien crewmen) who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States shall be inspected by immigration officers."  8 U.S.C. § 1225(a)(3).  The statute use's of "or otherwise seeking admission" suggests that aliens who are treated as applicant for admission are not coterminous with aliens who are

- 47 -

"seeking admission."  8 U.S.C. § 1225(a)(3).  Thus, § 1225(a) suggest that not all applicants for admission can apply for admission or are seeking admission.  The Court notes that § 1225(a) continues by defining "Withdrawal of application for admission" and "Statements."  8 U.S.C. §§ 1225(a)(4)-(5).[16]    Although  § 1225  does  not  define  "admission"  or  "admitted," § 1101(a)(13)(A) defines those terms as, "with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by an immigration officer."  8 U.S.C. § 1101(a)(13)(A).

Section 1225(a) frames § 1225's scope by situating the section within an inspection-based posture.  Congress specifies which aliens are subject to inspection -- those seeking admission or readmission -- and identifies those who are not, including stowaways.  The provision further contemplates that an applicant for admission may withdraw the application and "depart immediately" from the United States, underscoring the section's focus on entry-stage judgments. 8 U.S.C. § 1225(a)(4).  By anchoring § 1225 in inspection concepts that Congress defines, it signals that an inspection at the threshold of entry triggers the powers and procedures that follow. Section 1225(a) thus presupposes an alien whom the United States has not admitted, but is applying for admission, free to abandon the inspection process and depart without restraint.

### b.    8 U.S.C. § 1225(b): Inspection of Applicants for Admission.

Congress titles § 1225(b): "Inspection of applicants for admission."  8 U.S.C. § 1225(b). [17] In providing the process for inspecting "applicants for admission," Congress begins with

---

[16] Section 1225 defines the withdrawal of application for admission by stating an "alien applying for admission may, in the discretion of the Attorney General and at any time, be permitted to withdraw the application for admission and depart immediately from the United States."  8 U.S.C. § 1225(a)(4).

[17] Federal law makes entering the United States without inspection a misdemeanor.  See 8 U.S.C. § 1325.  See United States v. Vencomo-Reyes, No. CR 11-2563 JB, 2011 WL 6013546,

subparagraph (b)(1), which governs the inspection of "aliens arriving in the United States and certain other aliens who have not been admitted or paroled."  8 U.S.C. § 1225(b)(1).  Section 1225(b)(1) is the process for the "expedited" removal that Congress mentions in the title, even though the word "expedited" appears nowhere in subparagraph (b)(1).  Congress allows § 1225(b)(1) to apply to "certain other aliens," and subparagraph § 1225(b)(2) governs the inspection of "other aliens."  8 U.S.C. § 1225(b)(2).  As the Court discusses below, all aliens are run through § 1225 (b)(1) first, and if an alien is an "arriving alien" or a "certain other alien" in § 1225(b)(1)(A)(iii), the alien never becomes an "other alien" in § 1225(b)(2).  8 U.S.C. § 1225(b)(2)(ii) ("Subsection (A) shall not apply to an alien -- (ii) to whom paragraph (1) applies . . . .").  Section 1225(b)'s remaining provisions establish enforcement and review mechanisms, including authorization for State attorneys general to bring civil actions for harms arising from detention or removal under subparagraphs (b)(1) and (b)(2), see 8 U.S.C. § 1225(b)(3), as well as procedures for challenging determinations that immigration officers make, see 8 U.S.C. § 1225(b)(4).  The heart of this dispute, in part, concerns the relationship between § 1225(b)(1) and § 1225(b)(2), and, given its significance, the Court describes these provisions in greater detail.

Section 1225(b)(1)'s title, "Inspection of aliens arriving in the United States and certain other aliens who have not been admitted or paroled," indicates Congress intends that immigration officers apply the following provision to two groups of aliens.  8 U.S.C. § 1225(b)(1).  The two groups of aliens are "aliens arriving in the United States"[18] and "certain other aliens."  8 U.S.C.

---

*10 n.8 (D.N.M. Nov. 28, 2011)(Browning, J.)(stating that under "federal immigration law, it is not a felony to be in the United States illegally.  Although it is a misdemeanor the first time an individual enters the Unted States without inspection" (citing 8 U.S.C. § 1325(a))).

[18] The Department of Homeland Security defines an "arriving alien" as:

§ 1225(b)(1).   Congress, after defining the class of applicants for admission subject to § 1225(b)(1), establishes a framework for the "screening" of arriving aliens, including procedures for asylum interviews and limitations on judicial review.  8 U.S.C. §§ 1225(b)(1)(A)-(C).  Again, language is important.

### i.       Screening of Arriving Aliens.

Congress says "screening" -- not arrest, not apprehension, and not custody.  8 U.S.C. § 1225(b)(1)(A).  Merriam-Webster defines "screen" to mean "to examine methodically in order to separate into different groups," "to select or eliminate by a screening process," or "to test or examine for the presence of something," reinforcing that § 1225(b)(1)'s use primarily is at a port of entry, at the border, or at an immigration office where an immigration officer must methodically separate inadmissible aliens from individuals whom Congress permits lawful entry.  Screen, Merriam-Webster.com        Dictionary,        Merriam-Webster,        https://www.merriam-webster.com/dictionary/screen. (last visited on Jan. 18, 2026).  See Jennings, 583 U.S. at 285 ("Every day, immigration officials must determine whether to admit or remove the many aliens who have arrived at an official 'port of entry' . . . or who have been apprehended trying to enter the country at an unauthorized location.").  The process is about screening -- inspection driven -- and not about the arrest or apprehension of aliens.  Furthermore, screening suggests that immigration officers often begins the screening and inspection process in the presence of the alien, after the alien presents to the immigration officer to verify entry documents.

---

Arriving alien means an applicant for admission coming or attempting to come into the United States at a port-of-entry, or an alien seeking transit through the United States at a port-of-entry, or an alien interdicted in international or United States waters and brought into the United States by any means, whether or not to a designated port-of-entry, and regardless of the means of transport.

8 C.F.R. § 1.2.

### ii.    "Arriving Aliens" are the Default Group.

As the Court observes above, § 1225(b)(1) applies to two groups of aliens, and § 1225(b)(1)(A) further divides the groups into subgroups.  See 8 U.S.C. § 1225(b)(1)(A).  Section 1225(b)(1)(A)(i) states: "If an immigration officer determines that an alien . . . who is arriving in the United States or [] [certain other aliens] in clause (iii) is inadmissible under 1182(a)(6)(C) or 1182(a)(7) of this title . . . the officer shall order the alien removed from the United States without further hearing or review . . . ."  8 U.S.C. § 1225(b)(1)(A)(i).  Certain other aliens include:

> An alien . . . who has not been admitted or paroled into the United States, and who has not affirmatively shown, to the satisfaction of an immigration officer, that the alien has been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility under this subparagraph.

8 U.S.C. § 1225(b)(1)(A)(iii)(II).  Taken together, these provisions identify the universe of aliens subject to expedited removal following inspection, characterized by removal "without further hearing or review."  8 U.S.C. § 1225(b)(1)(A)(i).

Section 1225(b)(1)(A)(i) is the general rule, applying to aliens "arriving in the United States," but also to "certain other aliens" that Congress describes in "clause (iii)."  8 U.S.C. § 1225(b)(1)(A)(i).  Although Congress applies expedited removal to all aliens arriving or to whom clause (iii) is applicable, Congress pauses expedited proceedings for aliens claiming asylum until an asylum officer can make a determination under subparagraph (B).  See 8 U.S.C. § 1225(b)(1)(A)(i)-(ii).  The final provision, or the "Designation Provision," allows the Attorney General, now the Secretary of Homeland Security, Awe v. Napolitano, 494 F. App'x 860, 863 (10th

Cir. 2012),[19] to make the general rule for arriving aliens, of expedited removal, applicable to other groups, see Make the Road, 962 F.3d at 619.

### (I).    Certain Other Aliens: Designation Groups.

Section 1225(b)(1)(A)(i) applies to aliens inadmissible for fraud or misrepresentation, or lack of documentation.   See 8 U.S.C. § 1225(b)(1)(A)(i) (referencing inadmissibility under §§ 1182(a)(6)(C) or 1182(a)(7)).   Fraud, misrepresentation, and lack of documentation constitute only two of several inadmissibility grounds, however.   In § 1182(a) Congress enumerates other grounds, which include, among others, health-related grounds, criminal grounds, and security-related grounds.   See 8 U.S.C. § 1182(a)(1)-(10).   Read in this context, the Court reads § 1225(b)(2) as broader than § 1225(b)(1); § 1225(b)(2) governs the inspection and processing of applicants for admission who fall outside the narrow subset subject to expedited removal under § 1225(b)(1), which includes those inadmissible on grounds other than fraud or lack of documentation.   See 8 U.S.C. § 1225(b)(2) (governing the inspection of "other aliens").

### (II).    Certain Other Aliens: Physical Presence.

Section 1225(b)(1) removes from expedited removal a second category of aliens.   See 8 U.S.C. § 1225(b)(1)(A)(iii)(II).   Section 1225(b)(1)(A)(iii)(II) limits immigration officers' application of expedited removal to "certain other aliens," whom the United States has not admitted or paroled into the United States, and who does not show continuous physical presence in the country for the two-year period immediately preceding the inadmissibility determination.   8

---

[19] The statute's reference to the Attorney General reflects prior administrative structure. See Awe v. Napolitano, 494 F. App'x 863 n.3. Congress transfers authority to commence removal proceedings and adjudicate naturalization applications to the Secretary of Homeland Security in 2002, effective March 1, 2003.  See Ajlani v. Chertoff, 545 F.3d 229, 231 n.2 (2d Cir. 2008); Batalova v. Ashcroft, 355 F.3d 1246, 1248 n.1 (10th Cir. 2004).  Accordingly, references to the "Attorney General" in § 1225 now means the Secretary of Homeland Security.

U.S.C. § 1225(b)(1)(A)(iii)(II).    By negative implication, Congress excludes from expedited removal admitted aliens, paroled aliens, and aliens who can demonstrate two years of continuous physical presence, even if they remain classified as applicants for admission under § 1225(a)(1). See 8 U.S.C. § 1225(b)(1)(A)(iii)(II).    The physical-presence limitation thus gives operative content to Congress' decision to treat certain non-admitted aliens present inside the United States as applicants for admission for inspection purposes.    See 8 U.S.C. § 1225(a)(1) (treating as an applicant for admission both an arriving alien and an "alien present in the United States who has not been admitted").

Reading § 1225 to encompass a subset of aliens present in the United States accords not only with the statute's text, but also with Supreme Court guidance.    In Jennings, the Court implicitly recognizes this structure.    See 583 U.S. at 297.    Justice Alito describes § 1225(b) as applying "primarily to aliens seeking entry into the United States." Jennings, 583 U.S. at 297.    The modifier "primarily" implies that § 1225(b) also reaches some aliens who are not seeking entry. Aliens physically present within our borders, whom the United States has not admitted, are not "seeking entry," but instead are "seeking admission."  8 U.S.C. § 1225(b)(2)(A) (referring to an "alien seeking admission").    Justice Alito's further statement that "§ 1226 applies to aliens already present in the United States" creates no tension; both propositions coexist comfortably under the Court's reading of § 1225(b), which recognizes overlapping statutory categories rather than mutually exclusive ones.

The aliens whom § 1225(b)(1)(A)(iii)(II) covers  includes, for example, aliens whose inspection at a port of entry is "deferred" by an immigration officer, and whom the officer temporarily permits the alien to enter the United States pending further inspection, see 8 C.F.R. § 235.2 ("Parole for deferred inspection."), as well as certain previously admitted aliens whose

status reverts to that of an applicant for admission upon the commission of specified offenses, see 8 U.S.C. § 1101(a)(13)(C) (stating that a lawfully admitted alien "shall not be regarded as seeking an admission . . . unless the alien. . . . has committed an offense identified in section 1182(a)(2)). Congress authorizes expedited removal only where the applicant for admission cannot demonstrate two years of continuous physical presence.  See 8 U.S.C. § 1225(b)(1)(A)(iii)(II).  If an alien can demonstrate two years of physical presence, they are then subject to the usual removal proceedings under § 1229a, however, the alien remains an applicant for admission.  See 8 U.S.C. § 1225(b)(2) (stating that an applicant for admission "shall be detained for a proceeding under section 1229a").

### (III).    Certain Other Aliens: Paroled.

At the same time, Congress distinguishes "parole into the United States," under 8 U.S.C. § 1182(d)(5)(A), from "conditional parole" under § 1226(a), which authorizes release from immigration custody pending removal proceedings, 8 U.S.C. § 1226(a)(2)(B).  Conditional parole does not confer entry, does not alter an alien's status as an applicant for admission, and does not suspend the United States' pursuit of removal; conditional parole is similar to bail in the criminal context.  See Cruz-Miguel v. Holder, 650 F.3d 189 (2d Cir. 2011)(stating that "akin to bail release in criminal cases, conditional parole merely permits an alien to remain at liberty based upon a determination that he poses no risk of danger or flight *while his removal is actively sought*")(emphasis in the original).  The distinction between parole and conditional parole carries concrete statutory consequences.  Aliens "paroled into the United States" are not subject to expedited removal under § 1225(b)(1).  See 8 U.S.C. § 1225(b)(1)(A)(iii)(II).[20]  They may also seek adjustment of their immigration status under § 1255(a).  See 8 U.S.C. § 1255(a) (stating that

---

[20] The Court notes that persons who enter without inspection and are applicants for admission can qualify for parole under § 1182, see U.S.C. § 1182(d)(5)(A), or conditional parole under § 1226(a), see 8 U.S.C. § 1226(a)(2)(B).

"[t]he status of an alien who was inspected and admitted or paroled into the United States . . . may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe"). Legislative history confirms the distinction between parole and conditional parole. See Ortega-Cervantes v. Gonzales, 501 F.3d 1111 (9th Cir. 2007)(discussing the 1960 amendment to 1255(a)). In the 1960s, when Congress amends § 1255(a) to extend eligibility for adjustment of immigration status to paroled aliens, it did so with reference to parole granted under 8 U.S.C. § 1182(d), not to aliens who had entered without inspection and were later released from custody under the statutory precursor to § 1226(a). S.Rep. No. 86–1651 (1960), as reprinted in 1960 U.S.C.C.A.N. 3124, 3124-25, 3137 (extending § 1255 to "aliens paroled into the United States," but excluding those who "entered the United States surreptitiously"). This history indicates that Congress does not understand conditional parole for aliens who entered without inspection to be the same form of parole contemplated in § 1255 or in § 1225(b)'s exclusion from expedited removal.

Section 1225(b)(1), though textually narrower than § 1225(b)(2), performs the operational work within § 1225's inspection framework. § 1225(b)(1) governs the inspection of "arriving" aliens and "certain other aliens," including aliens present in the United States who have not been admitted or paroled, and who cannot demonstrate two years of continuous physical presence. 8 U.S.C. § 1225(b)(1)(A)(i)-(iii). By contrast, § 1225(b)(2) applies to the residual category of "other aliens" who are applicants for admission but fall outside the expedited-removal criteria and are therefore placed into the usual removal proceedings under § 1229a. 8 U.S.C. § 1225(b)(2). The scale of these provisions illustrates their functional roles. In 2024, CBP conducts over 416 million inspections at the border, see 2024 CBP Statistic, while approximately 255,000 aliens file I-485 applications, from within the United States, to adjust status to lawful permeant residence, see

Number of I-485 Applications to Register Permanent Residence or Adjust Status By Category, Case Status, and USCIS Field Office or Service Center Location January 1, 2024 - March 31, 2024, https://view.officeapps.live.com/op/view.aspx?src=https%3A%2F%2Fwww.uscis.gov%2Fsites%2Fdefault%2Ffiles%2Fdocument%2Fdata%2Fi485_performancedata_fy2025_q1.xlsx&wdOrigin=BROWSELINK (last visited Jan. 16, 2025).[21]  Roughly, these figures indicate that the overwhelming majority of admissibility determination occur in § 1225(b)(1)'s inspection context -- over ninety-nine percent -- while only a small fraction of applicants for admission proceed through the more cumbersome pathway in § 1225(b)(2).  In theory, § 1225(b)(2) covers more categories of aliens; in practical operation, however, the United States processes most aliens through § 1225(b)(1), and § 1225(b)(2) functions as a narrow backstop.  This structure reflects Congress' intentional division between summary inspection-based determinations near the point of entry and interior inspections where the reliability of rapid admissibility determinations is suspect.

### iii.    "Arriving" Aliens in § 1225(b)(1).

Congress' words are important.  Section 1225 repeatedly focuses the reader on the word "arrive" -- "arriving aliens" in the title; aliens who "arrive" in applicants for admission; and "certain other aliens" immigration officers are to treat as if they are arriving.  Merriam-Webster defines "arrive" as an intransitive verb meaning "to reach a destination" or "to make an appearance: to come up on the scene."  Arrive, Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/arrive.  (last visited on Jan. 18, 2026).

---

[21] A foreign national, who is already present in the United States, generally fills out Form I-485 to attain lawful permanent resident status.  See Alicia Ward, United States Lawful Permanent Residents: 2023, United States Department of Homeland Security at 2 (Sep. 9, 2024)("LPR Statistics").  Foreign nationals who live abroad or seek to enter the United States through a port of entry do not use Form I-485.  See LPR Statistics at 2.

Congress envisions § 1225(b)(1) as generally applying to aliens who present at a port of entry upon reaching their destination -- the United States. See 8 U.S.C. § 1225(b)(1)(A)(i) (stating the general rule of inspection). These provisions are about applicants for admission who are seeking lawful entry, and that can occur at the border or on the interior when an alien arrives at an immigration office for deferred inspection or when an alien files Form I-485 to change their immigration status. That Congress allows the Attorney General to extend this framework to "certain other aliens" present in the United States does not change Congress' intent that § 1225 is primarily about inspection for lawful entry; the extension confirms it. 8 U.S.C. § 1225(b)(1)(A)(iii). Removing any doubt, Congress repeatedly employs the present participle "arriving."

Congress' use of the present participle "arriving" as an adjective modifying the noun "alien" is significant, because, in traditional grammatical terms, the present participle signals an imperfect or continuous aspect rather than a completed action. See P. Peters, The Cambridge Guide to English Usage 409 (2004)(explaining particles "create different aspects for the verb" either "imperfect" or "perfect"). Unlike the past participle, which ordinarily conveys a completed or passive state, the present participle is active and describes an action that is ongoing or in progress. See P. Peters, The Cambridge Guide to English Usage 409. By choosing the active, imperfect form "arriving alien," Congress signals that § 1225(b)(1) applies to aliens who are in the process of inspection and arrival, and not to those whose entry is completed long ago and whose presence in the United States is no longer properly understood as "arriving."

The textual distinction between "arriving" aliens and aliens present in the interior of the country reflects a longstanding principle of immigration law's relationship with the Due Process Clause. See Zadvydas, 533 U.S. 695 ("The distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law."). As

Justice Scalia explains, the Due Process distinction "makes perfect sense: with regard to the question of what procedures are necessary to prevent entry, as opposed to what procedures are necessary to eject a person already in the United States." Zadvydas, 533 U.S. at 704 (Scalia, J., dissenting). That procedural observation applies with full force here, as the statutory language reflects our nation's understanding of immigration law. Applicants for admission, by presenting themselves for inspection, subject themselves to the United States immigration system. An alien who does not seek admission through inspection is in a different procedural posture than an alien who has started the process of lawful entry. That Congress makes stowaways, who attempt to enter without submitting to lawful inspection, not eligible to apply for admission under § 1225 is confirmation enough of the difference in procedural posture.

### iv.        Section 1225(b)(2): "Other Aliens".

After § 1225(b)(1) carries all of that water -- dividing applicants for admission into subgroups, specifying who is subject to expedited removal, and describing how certain aliens can seek asylum  -- it is only then that § 1225(b)(2) comes over the horizon for consideration. Section 1225(b)(2) "serves as a catchall provision that applies to all applicants for admission not covered by § 1225(b)(1)." Jennings, 583 U.S. at 287. Congress entitles this provision "Inspection of other aliens" and labels § 1225(b)(2)(A) the rule "In general." Like § 1225(b)(1), it applies only to applicants for admission, but it governs a broader universe of aliens. See Jennings, 583 U.S. at 287 ("Section 1225(b)(2) is broader."). Section 1225(b)(2) addresses the inspection of "other aliens" that § 1225(b)(1) does not cover. 8 U.S.C. § 1225(b)(2). Congress is mindful, however, to distinguish this group of "other aliens" in § 1225(b)(2) from the "certain other aliens" in § 1225(b)(1)(A)(iii).

"In general . . . an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for proceedings under section 1229a of this title."  8 U.S.C. § 1225(b)(2)(A).[22]  Section 1225(b) establishes two removal pathways that operate following an

---

[22] Section 1229 is titled "Initiation of removal proceedings" and sets forth the regular removal process of § 1229a.  8 U.S.C. § 1229.  Under §§ 1229 and 1229a, the United States charges an alien with removability, serves the alien with a notice to appear, brings the alien before an immigration judge, permits the alien to present evidence and argument, and affords the alien Board of Immigration Appeals review and, ultimately, allows Courts of Appeals review.  See United States v. Gonzalez-Fierro, 949 F.3d 512, 519 (10th Cir. 2020).  Section 1229a provides for "usual removal proceedings," Thuraissigiam, 591 U.S. at 108-09 (discussing the usual removal proceedings from the expedited proceedings), which differ from the expedited removal process that § 1225(b)(1) describes.  See 8 U.S.C. § 1229(a)(b)(4) (discussing the alien's "rights in the proceeding" compared with the immigration officers' determination without further hearings).

Section 1229a is the "sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States," unless "otherwise specified in this chapter," including the "Expedited removal of aliens convicted of committing aggravated felonies," under 8 U.S.C. § 1228.  8 U.S.C. § 1229a(a)(3).  Although 1229a is the exclusive procedure for removal proceedings, § 1229a does not mention "detention. 8 U.S.C. § 1229a.  Section 1229 presupposes detention.  See 8 U.S.C. § 1229(a)(2)(B) (stating that "[i]n the case of an alien not in detention, a written notice shall not be required under this paragraph if the alien has failed to provide the address required under paragraph (1)(F)").  Accordingly, the power to detain aliens during those removal proceedings must come from outside those sections.  Indeed, the Supreme Court, in Jennings, all but confirms the authority to detain aliens civil during these proceedings comes from §§ 1225 and 1226.  See 583 U.S. 289 ("In sum, U.S. immigration law authorizes the Government to detain certain aliens seeking admission into the country under §§ 1225(b)(1) and (b)(2).  It also authorizes the Government to detain certain aliens already in the country pending the outcome of removal proceedings under §§ 1226(a) and (c).").

The United States' power to detain aliens that covers arriving aliens and "certain other aliens" is in § 1231, which is titled "Detention and removal of aliens ordered removed."  8 U.S.C. § 1231.  Section 1225(b)(1) provides for "expedited removal."  8 U.S.C. § 1225(b)(1).  When an "the officer [] order[s] the alien removed from the United States," 8 U.S.C. § 1225(b)(1)(A), a "removal period" starts in § 1231.  8 U.S.C. § 1231(a)(1)(B)(i).  Section 1231(a)(1) states that, "when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days (in this section referred to as the "removal period")."  8 U.S.C. § 1231(a)(1)(A).  Section 1231(a)(2) then discusses "Detention" and states, "In general, [d]uring the removal period, the Attorney General shall detain the alien."  8 U.S.C. § 1231(a)(2)(A).

As the Court discusses later, § 1226 governs apprehension and detentions of aliens.  Section 1226 authorizes arrest upon warrant, and permits release on bond or conditional parole unless mandatory detention applies.  See 8 U.S.C. § 1226(a), (c).  By regulation, when the United

- 59 -

immigration officer's inspection of an applicant for admission and which apply to three classes of aliens. The first pathway, in § 1225(b)(1), provides that, if an immigration officer determines that an alien "arriving in the United States" or "certain other aliens" present in the country are inadmissible, the officer orders removal without further hearing or review. 8 U.S.C. § 1225(b)(1)(A)(i). The second pathway, in § 1225(b)(2), provides that immigration officers detain and remove "other aliens" under § 1229a's ordinary procedures. 8 U.S.C. § 1225(b)(2)(A). Within this framework, § 1225(b) contemplates four classes of aliens or noncitizens: arriving aliens, see 8 U.S.C. § 1225(b)(1)(A)(i); applicants for admission present in the United States but for less than two years, see 8 U.S.C. § 1225(b)(1)(A)(iii); applicants for admission present in the United States for longer than two years but are seeking admission, see 8 U.S.C. § 1225(b)(2)(A), and a residual category of other aliens, including crewmen and stowaways, whom are not eligible to apply for admission, see 8 U.S.C. § 1225(b)(2)(B).

The statute's language reflects an inspection-centered posture. An immigration officer's inspection of an alien in the posture of seeking admission triggers both § 1225(b)'s removal pathways -- expedited removal under § 1225(b)(1) and the usual removal under § 1225(b)(2) -- and the pathways operate as alternative outcomes of the inspection process. Further confirming the inspection posture, § 1225(a)(2) specifies that stowaways are not eligible to apply for

---

States detains an alien under § 1226(a), the alien receives an initial bond hearing before an immigration judge. See 8 C.F.R. §§ 236.1(d)(1), 1236.1(d)(1). The removal proceedings that the alien receives, however, are pursuant to § 1229a.

Section 1225(b), by contrast, establishes expedited removal. Aliens subject to § 1225(b)(1) may be ordered removed "without further hearing or review," save for the limited credible-fear process. 8 U.S.C. § 1225(b)(1)(A). Under § 1225(b)(2), aliens the United States detains "for a removal proceeding" proceed under § 1229a just like those that the United States detains under § 1226. A key difference between the United States detaining an alien under § 1225(b)(2) and § 1226 is not the ultimate process the alien receives during their § 1229a proceedings, but the initial bond hearing that applies only to § 1226 by regulation.

admission, and § 1225(b)(2)(B)(iii) correspondingly excludes stowaways from detention for non-expedited removal proceedings.  From this statutory pairing, i.e. the relationship between § 1225(b)(1) and § 1225(b)(2), the Court sees Congress' intent as tying the concept of an "applicant for admission" to inspection rather than to a freestanding status untethered from the inspection context.

That understanding aligns with §1101's statutory definition of "admission," which defines the term as "lawful entry . . . after inspection and authorization by an immigration officer."  8 U.S.C. § 1101(a)(13)(A).  The relationship between "applicant for admission" and lawful inspection also accords with § 1225(a)'s provision permitting an applicant for admission to withdraw an application for admission and depart immediately from the United States, reflecting Congress' expectation that the inspection process occurs at the threshold of entry and that aliens who do not wish to submit to that process may simply leave.  8 U.S.C. § 1225(a)(4).  Outside of that inspection framework, § 1225 provides no independent scheme for detaining aliens; it instead contemplates either inspection leading to admission or removal, or immediate departure in lieu of inspection.  The remaining § 1225 sections serve to reinforce that Congress is concerned with the inspection of applicants for admission at the border.

**v.   Section 1225(b)(2)(A): An Alien Seeking Admission.**

Congress' words matter.  Section 1225 establishes an inspection-based regime governing the treatment of arriving aliens and aliens present in the country.  See 8 U.S.C. § 1225(a)(1).  Within that framework, § 1225(b)(2) operates as an exception to the "expedited" removal under § 1225(b)(1), providing aliens the usual removal proceeding, under § 1229a, only when three conditions are met: (i) the alien is an applicant for admission; (ii) the alien is "seeking admission"; and (iii) the examining immigration officer determines that the alien is not clearly and beyond

doubt entitled to be admitted.  8 U.S.C. § 1225(b)(2)(A).  Section 1225(b)(2)(A) distinguishes between the legal status of being an applicant for admission and the act of seeking admission.

Congress uses the phrase "seeking admission" only sparingly in § 1225 and always with precision.  Cf., 8 U.S.C. § 1225(a)(2) (providing that stowaways are not "eligible to apply for admission or to be admitted").  The phrase first appears in the inspection clause: "All aliens (including alien crewmen) who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States shall be inspected by immigration officers."  8 U.S.C. § 1225(a)(3).  The phrase appears again in the statements provision: "An applicant for admission may be required to state under oath any information sought by an immigration officer regarding the purposes and intentions of the applicant in seeking admission to the United States."  8 U.S.C. § 1225(a)(5). And it appears a third time in § 1225(b)(2)(A). That the phrase is absent from the section otherwise is no coincidence.  In the inspection clause, Congress' use of "or" confirms that being an applicant for admission is not coterminous with seeking admission; the section treats them as related but distinct concepts.  8 U.S.C. § 1225(a)(3).  In the statement clause, Congress uses "seeking admission" to describe purposeful acts by the applicant for admission, linking the phrase to conduct rather than status.  8 U.S.C. § 1225(a)(5).  When Congress then employs the same phrase again in § 1225(b)(2)(A), it again does so such that the phrase helps readers understand applicants for admission.  The Court sees no reason to treat the insertion as accidental or redundant.

Ordinary meaning confirms the point.  "Seek" means "to go in search of," "to ask for," or "to request." Seek, Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/seek.  (last visited on Jan. 19, 2026).  "Seek" denotes action directed toward a goal, and not a static label.  "Admission" or "admitted" means "the lawful entry of the

alien into the United States after inspection and authorization by an immigration officer."  8 U.S.C. § 1101(a)(13)(A).  With those definitions in mind, "seeking admission" naturally refers to the act of "asking for" or "requesting" lawful entry through inspection or authorization.  The phrase therefore narrows the broader universe of "applicants for admission," which encompasses everyone present in the United States, who has not been admitted, and arriving aliens.  8 U.S.C. § 1225(a)(1).  Although the phrase "seeking admission" narrows the class of aliens to whom § 1225(b)(2) applies, it would be mistaken to read the provision as limited exclusively to physical border encounters. An alien may seek lawful entry at a port of entry, but an alien may also seek lawful admission from within the United States through statutory mechanisms such as an application for adjustment of status on Form I-485 or other congressionally authorized procedures for obtaining lawful admission.

Congress' drafting is methodical.  Section 1225(b)(1) governs arriving aliens and designated "certain other aliens."  8 U.S.C. § 1225(b)(1).  The use of "certain other aliens" in §§ 1225(b)(1) and 1225(b)(1)(A)(iii) is careful craftsmanship by Congress to aid readers in not confusing those aliens with the "other aliens" it describes in § 1225(b)(2).  Congress is careful, because it does not want applicants for admission receiving removal proceedings under § 1229a when expedited proceeding are appropriate.  Reading "seeking admission" to do real work preserves that purpose and the section's structure.  Reading the phrase as surplusage would collapse it.  See Castañon-Nava, 2025 WL 3552514 *9 (stating the presumption against reading a phrase as superfluous is 'strongest when an interpretation would render superfluous another part of the same statutory scheme')(quoting Marx v. Gen. Rev. Corp., 568 U.S. 371, 386 (2013)).

The structure of § 1225 confirms this reading.  Section 1225(b)(1) sets forth the general rule governing inspections of applicants for admission.  See 8 U.S.C. § 1225(b)(1)(A).  Section

1225(b)(2) then appears on the horizon as a residual provision, applying only to "other" applicants for admission that § 1225(b)(1) does not cover. See Jennings, 583 U.S. at 287 (describing § 1225(b)(2) as the "catchall provision that applies to all applicants for admission not covered by § 1225(b)(1)"). This sequencing reflects a familiar statutory pattern. Congress states the general rule first and then follows it with the exceptions to the general rule. Reading § 1225(b)(2) to govern all applicants for admission, without qualification, inverts the statutory pattern, allowing the residual provision to swallow the general rule. Statutory interpretation does not permit such an inversion.

### c.    8 U.S.C. § 1225(c).

Section 1225(c) covers the removal of inadmissible aliens based on security and related grounds, including removal without further hearing, the Attorney General's review of a removal order, and submission of a statement and information for the attorney general to consider. See 8 U.S.C. §§ 1225(c)(1)-(3). Subparagraph (c)(1) states that, if an immigration officer "suspects that an arriving alien may be inadmissible under . . . section 1182(a)(3) of this title," the immigration officer shall "order the alien removed." 8 U.S.C. § 1225(c)(1). The specific subparagraphs that § 1225(c)(1) contemplates are subparagraphs §§ 1182(a)(3)(A)-(C). See 8 U.S.C. § 1225(c)(1).

Section 1182(a)(3) covers the class of aliens who are "ineligible for visas or admission" for security related reasons. 8 U.S. C. § 1182(a)(3). Subparagraph 1182(a)(3)(A) is the general rule that applies to any alien who "seeks to enter" the United States for nefarious purposes, including espionage and attempting to overthrow the government. 8 U.S. C. § 1182(a)(3)(A). Similarly, subparagraph 1182(a)(3)(B), which applies to terrorist activities, contemplates an alien engaging in terrorist activity "after entry" into the United States. 8 U.S.C.§ 1182(a)(3)(B)(i)(II). Finally, subparagraph 1182(a)(3)(C) applies generally to aliens "whose entry or proposed activities

in the United States . . . would have potentially serious adverse foreign policy consequences." 8 U.S.C. § 1182(a)(3)(C)(i).

###### d.      8 U.S.C. § 1225(d).

Section 1225(d) provides immigration officers with "[a]uthority relation to inspection." 8 U.S.C. § 1225(d). The authority that Congress gives is the authority to search conveyances, or vehicles,[23] order detention and delivery of arriving aliens, administer oaths and consider evidence, and to issue subpoenas. See 8 U.S.C. § 1225(d)(1)-(4). The authority to search vehicles allows immigration officers to "board and search any vessel, aircraft, railway car, or other conveyance or vehicle in which they believe aliens are being brought into the United States." 8 U.S.C. § 1225(d)(1). The authority to detain allows immigration officers to order anyone "bringing an alien . . . to the United States" to detain the alien "on the vessel or at the airport of arrival, and to deliver the alien to an immigration officer for inspection or to a medical officer examination." 8 U.S.C. § 1225(d)(2)(A)-(B). Section 1225(d)(3) relates to immigration officers' ability to administer oaths and take evidence "touching the privilege of any alien . . . to enter, reenter, transit through, or reside in the United States." 8 U.S.C. § 1225(d)(3). Finally, the subpoena authority allows immigration officers to require "the attendance and testimony of witnesses . . . and the production of books, papers, and documents relating to the privilege of any person to enter, reenter, reside in, or pass through the United States or concerning any matter which is material and relevant to the enforcement of this chapter." 8 U.S.C. § 1225(d)(4).

---

[23] The Merriam-Webster Dictionary defines "conveyance" as "a means or way of conveying: such as . . . a means of transport: vehicle." Conveyance, Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/conveyance. (last visited on Jan. 14, 2026).

Section 1225(d) reinforces that § 1225's scheme operates in an inspection-based posture. Congress entitles this subsection "Authority relating to inspection," and Congress frames the powers it confers around identifying, examining, and processing individuals at or near the point of entry.  8 U.S.C. §§ 1225(d)(1)-(4).  The authority to board and search vessels, aircraft, and other conveyances reflects a focus on intercepting and examining aliens who are arriving or are at the threshold of entry.  See 8 U.S.C. § 1225(d)(1).  Further reinforcing the threshold character of the statute, §§ 1225(d)(2)(A)-(B) limits the immigration officers' authority to direct carriers to detain aliens on vessels or at airports of arrival, and to deliver those aliens for inspection, underscoring that the provision operates in the context of entry screening.  See 8 U.S.C. §§ 1225(d)(2)(A)-(B).

The remaining inspection authorities follow a similar theme.  Congress authorizes immigration officers to administer oaths and to take evidence concerning an alien's privilege to enter, to reenter, to transit through, or to reside in the United States, and to issue subpoenas for testimony and documents relating to that privilege.  See 8 U.S.C. § 1225(d)(3)(4).  These provisions contemplate fact finding and adjudicative functions tied to determining admissibility and entry status, and not generalized deportation or removal functions.  Read in context, § 1225(d) supplies the operational tools necessary for immigration officials to conduct inspections and to make entry determinations, further confirming that Congress does not envision § 1225's detention and removal mechanisms apart from the inspection of an arriving applicant for admission inspect.

By contrast, § 1226 speaks in remarkably different terms.  Section 1226 governs the "Apprehension and detention of aliens."  8 U.S.C. § 1226.  This section employs language associated with warrants, see 8 U.S.C. § 1226(a); work authorization, see 8 U.S.C. § 1226(a)(3); and the prior convictions, see 8 U.S.C. § 1226(c)(E)(ii).  In the Court's view, the contrast between the inspection-focused terminology of § 1225 and the more ordinary, post-entry language of

- 66 -

§ 1226 reflects Congress' considered judgment that different procedures are appropriate for preventing entry than for removing individuals who have already entered and established presence. Thuraissigiam, 591 U.S. at 103 (discussing the "century-old rule regarding the due process rights of an alien seeking initial entry" and an alien who has "'effected an entry'")(quoting Zadvydas, 533 U.S. at 693).

Looking at existing case law reflects that different courts have taken different approaches to the interpretation of § 1225. The Seventh Circuit in Castanon-Nava, addresses whether the United States is likely to succeed on the merits in its argument that § 1225(b)(2)(A) allows the detention of any noncitizen who is unlawfully present in the interior of the United States. 161 F.4th at 1060. Looking to § 1225(b)(2)(A)'s language, the Seventh Circuit contemplates what it means to be "seeking admission." 1 61 F.4th at 1061. Despite the United States' argument that an "applicant for admission" is synonymous with a person "seeking admission," the Seventh Circuit holds that unlawful noncitizens are only seeking admission when they are at the border. 161 F.4th at 1061. The Seventh Circuit offer two main arguments to support that conclusion.

First, the Seventh Circuit believes that if the United States' interpretation of seeking admission is adopted, it would render § 1225(b)(2)(A)'s use of the phrase "seeking admission" superfluous. 161 F.4th at 1061. Second, the Seventh Circuit notes that "the difference in treatment between a noncitizen at the border and one already in the United States fits within the broader context of our immigration law. Indeed, 'the distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law.'" 161 F.4th at 1061-62 (citing Zadvydas,, 533 U.S. at 693). The Seventh Circuit therefore concludes that the United States is not likely to succeed on the merits of their arguments that those individuals, whom

ICE arrests without a warrant on the interior of the country, are subject to mandatory detention under § 1225(b)(2)(A). 161 F.4th at 1062.

By contrast, in Singh v. Noem, No. CIV 25-1110 JB/KK, 2026 WL 146005 (D.N.M. Jan. 20, 2026)("Singh") the Court begins by looking at § 1225 as a whole.  See Singh, 2026 WL 146005, at * 33.  Section 1225(b)(1) applies to "applicants for admission" who "arrive" in the United States, or who have been in the United States continuously for less than two years, whereas Section 1225(b)(2) applies to "other aliens" that are applicants for admission seeking admission. Singh, 2026 WL 146005, at * 33.  The Court understands § 1225(b)(1) to be the default provision for § 1225, and that the majority of aliens whom the United States properly holds under § 1225 will fall within its scope; "that is, aliens qualifying as applicants for admission who either arrive at the border, and are inadmissible because of fraud, misrepresentation, or lack of valid documentation, or aliens who are present in the country continuously for less than two years immediately before the date of the determination of inadmissibility, and are inadmissible because of fraud, misrepresentation, or lack of valid documentation."  Singh, 2026 WL 146005, at * 34. Turning then to § 1225(b)(2), the Court concludes that this provision is a "catchall provision." Singh, 2026 WL 146005, at * 34 (citing Jennings, 583 U.S. at 287).  Section 1225(b)(2) is not, however, a catchall such that it covers every applicant for admission; instead it only covers applicants for admission who seek admission, such as applying to achieve some legal status.  See Singh, 2026 WL 146005, at * 34.  In reaching this conclusion, the Court rejects the United States' argument that all applicants for admission are seeking admission, because "[t]reating these phrases synonymously is contrary to the presumption that Congress intends different words or phrases to be accorded different meanings."  Singh, 2026 WL 146005, at *35.  The Court also rejects, however, the argument that "seeking admission" must only apply to aliens arriving at the border,

because this conclusion equates the phrase "seeking admission" with an "arriving alien," which is also contrary to the presumption that Congress intends different words or phrases to be accorded different meanings. Singh, 2026 WL 146005, at *35. The Court therefore reads § 1225(b)(2) to afford meaning to both the phrase "applicant for admission" and "seeking admission" by concluding that seeking admission requires some affirmative action on the part of the applicant for admission. See Singh, 2026 WL 146005, at *35.

Finally, the Fifth Circuit in Buenrostro-Mendez v. Bondi, No. 25-20496, 2026 WL 323330, at *1 (5th Cir. February 6, 2026)("Buenrostro"), contemplates what the phrase "seeking admission" means in § 1225(b)(2)(A). 2026 WL 323330, at *1. In Buenrostro, both petitioners are citizens of Mexico who enter the United States illegally. See 2026 WL 323330, at *3. DHS encounters each petitioner in 2025, and, upon inspection, immigration officers determine that each petitioner in inadmissible as an alien present in the United States without having been admitted or paroled. See 2026 WL 323330, at *3. DHS commences removal proceedings under § 1229a against both petitioners, directing that the United States detain them under § 1225(b)(2)(A) for the duration of the proceedings. See 2026 WL 323330, at *3. Both petitioners seek bond hearings before an immigration judge, but both immigration judges conclude that the petitioners are ineligible for a bond hearing under § 1225(b)(2). See 2026 WL 323330, at *3. As a result of the immigration judge's ruling, the petitioners file habeas petitions seeking release from detention or a bond hearing under § 1226(a). The district court judges in both cases grant the habeas petitions and order a bond hearing. See 2026 WL 323330, at *3.

In a two to one decision, the Fifth Circuit holds that neither petitioner is entitled a bond hearing and are instead properly detained under § 1225(b)(2)(A). See 2026 WL 323330, at *10. Although the petitioners argue that they are not subject to § 1225(b)(2)(A) detention, because

"seeking admission" refers only to those aliens who are submitting themselves for inspection by an immigration officer, and the United States detained the petitioners in the United States' interior, the Fifth Circuit rejects this argument by concluding that those aliens who are applicants for admission are always seeking admission. 2026 WL 323330, at *4. The Fifth Circuit offers several reasons to support that conclusion.

First, the Fifth Circuit holds that the ordinary meaning of the language in § 1225(b)(2)(A) supports its conclusion that applicants for admission are seeking admission. See 2026 WL 323330, at *4. The Fifth Circuit asserts that there is no material disjunction -- by terms of the statute of the English language -- between the concept of applying for something and seeking something. See 2026 WL 323330, at *4. "When a person applies for something, they are necessarily seeking it." 2026 WL 323330, at *4. "Just as an applicant to a college seeks admission, an applicant for admission to the United States is 'seeking admission' to the same, regardless whether the person actively engages in further affirmative acts to gain admission." 2026 WL 323330, at *4. The Fifth Circuit therefore holds that the everyday meaning of § 1225(b)(2)(A)'s terms confirms that an applicant for admission is not independent from seeking admission. See 2026 WL 323330, at *4.

Second, the Fifth Circuit points to § 1225(a)(3) which specifies that "[a]ll aliens (including crewman) who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States shall be inspected by immigration officers." See 2026 WL 323330, at *5. "The use of 'or otherwise' suggests that 'applicants for admission' are a subset of those 'seeking admission.'" See 2026 WL 323330, at *5. As another textual hook, the Fifth Circuit points to § 1225(a)(5) as reinforcing the proposition that applicants for admission are seeking admission. See 2026 WL 323330, at *6. Section 1225(a)(5) states: "An applicant for admission may be required to state under oath any information sought by an immigration officer regarding

the purposes and intentions of the applicant in seeking admission to the United States . . . ." 8 U.S.C. § 1225(a)(5).  The Fifth Circuit concludes that § 1225(a)(5)'s language "strongly suggests that those who are applicants for admission are seeking admission."  2026 WL 323330, at *6.

Third, the Fifth Circuit notes that if Congress had intended an alien seeking admission to mean an arriving alien, it would have used the word arriving alien.  See 2026 WL 323330, at *6. Congress did not hesitate to use the arriving alien language elsewhere in §§ 1225(a)(2), (c)(1), and (d)(2).  See 2026 WL 323330, at *6.

Fourth, the Fifth Circuit cites Jennings as support for its conclusion that those who are applicants for admission are seeking admission.  See Buenrostro, 2026 WL 323330, at *8. In Jennings, according to the Fifth Circuit, the Supreme Court explains that "§ 1225(b) applies to aliens seeking entry into the United States ('applicants for admission' in the language of the statute)."  2026 WL 323330, at *6 (citing Jennings, 583 U.S. at 297).  The Fifth Circuit states:

> That language supports the government's contention that 'applicants for admission' are according to the statute seeking entry or admission. And it suggests that when the Supreme Court described § 1225 as applying to aliens 'seeking admission,' it understood that to mean aliens who, like the petitioners here, are present in the United States without admission.

2026 WL 323330, at *8. Accordingly, the Fifth Circuit in Buenrostro holds that applicants for admission are seeking admission.

### 3.     Due Process.

The courts cannot interpret the INA and the role § 1225 plays in its statutory scheme apart from the Constitutional principles that historically govern the relationship between due process and the sovereign authority to admit or exclude noncitizens.  See Thuraissigiam, 591 U.S. at 139-140.  The Court is mindful, however, to differentiate between due process the statute requires and Constitutional Due Process.  See Rodriguez v. Marin, 909 F.3d 252 (9th Cir. 2018)(stating that the

Supreme Court, in <u>Jennings</u>, "chose to answer only the question whether the statutory text itself included a limit on prolonged detention or a requirement of individual bond hearings . . . . The Court then remanded the constitutional issues to our court").  Below, the Court details the law regarding: (i) Constitutional Due Process, (ii) immigration law and due process, and (iii) how those bodies of law shape courts' statutory interpretations of the INA.

### a.      The Due Process Clause.

The Fifth Amendment to the United States Constitution states that the government shall not deprive any person "of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. V, § 1.  The Due Process Clause encompasses two distinct forms of protection: (i) procedural due process, which requires the government to employ fair procedures when depriving a person of a protected interest; and (ii) substantive due process, which guarantees that the government cannot deprive a person of a protected interest for certain reasons.  <u>See</u> <u>Reid v. Pautler</u>, 36 F. Supp. 3d 1067, 1136 (D.N.M. 2014)(Browning, J.)(citing <u>Cty. of Sacramento v. Lewis</u>, 523 U.S. 833, 845-46 (1998)).  "Under either form of protection, however, a person must have a protected interest in either life, liberty, or property."  <u>Chavez-Rodriguez v. City of Santa Fe</u>, 2008 WL 5992271, at *6 (D.N.M. Oct. 9, 2008)(Browning, J.).

### i.      Procedural Due Process.

The Tenth Circuit prescribes a two-step inquiry in determining whether the defendant violates an individual's procedural due process rights: (i) "[d]id the individual possess a protected property [or liberty] interest to which due process protection was applicable?"; and (ii) "[w]as the individual afforded an appropriate level of process?"  <u>Camuglia v. City of Albuquerque</u>, 448 F.3d 1214, 1219 (10th Cir. 2006)(quoting <u>Clark v. City of Draper</u>, 168 F.3d 1185, 1189 (10th Cir. 1999)).  "[T]o determine whether due process requirements apply in the first place, we must

look not to the 'weight' but to the nature of the interest at stake." Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 570-71 (1972). "'Liberty' and 'property' are broad and majestic terms. They are among the '(g)reat (constitutional) concepts . . . purposely left to gather meaning from experience." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571 (quoting National Mutual Ins. Co. v. Tidewater Transfer Co., 337 U.S. 582, 646 (1949)(Frankfurter, J., dissenting)). The Supreme Court requires "due process protection for deprivations of liberty beyond the sort of formal constraints imposed by the criminal process." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571-72. "Yet, while the Court has eschewed rigid or formalistic limitations on the protection of procedural due process, it has at the same time observed certain boundaries," and "the words 'liberty' and 'property' in the Due Process Clause of the Fourteenth Amendment must be given some meaning." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 572.

Concerning the Fourteenth Amendment's meaning of "liberty", the Supreme Court states the following:

> Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, to establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness of free men. In a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed.

Bd. of Regents of State Colls. v. Roth, 408 U.S. at 572.

"The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 576. These property interests, as already explained, clearly can include "real estate, chattels, or money," but they "may take many forms." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571-76.

Thus, the Court has held that a person receiving welfare benefits under statutory and administrative standards defining eligibility for them has an interest in continued receipt of those benefits that is safeguarded by procedural due process. Goldberg v. Kelly, 397 U.S. 254 . . . [(1970)]. See Flemming v. Nestor, 363 U.S. 603, 611 . . . [(1960)]. Similarly, in the area of employment, the Court has held that a public college professor dismissed from an office held under tenure provisions, Slochower v. Bd. of Education, 350 U.S. 551 . . . [(1956)], and college professors and staff members dismissed during the terms of their contracts, Wieman v. Updegraff, 344 U.S. 183 . . . [(1952)], have interests in continued employment that are safeguarded by due process.

Bd. of Regents of State Colls. v. Roth, 408 U.S. at 576-77.

"To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577. "Such an interest arises not from the Due Process Clause of the Constitution itself, but is created by independent sources such as a state or federal statute, a municipal charter or ordinance, or an implied or express contract." Teigen v. Renfrow, 511 F.3d at 1079. See Paul v. Davis, 424 U.S. 693, 710 (1976)("[Liberty and property] interests attain . . . constitutional status by virtue of the fact that they have been initially recognized and protected by state law."). "Property interests, of course, are not created by the Constitution. Rather they are created, and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577. See Farthing v. City of Shawnee, 39 F.3d 1131, 1135 (10th Cir. 1994)("Rather, property interests, which are the subject of the present litigation, 'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'")(quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577)).

"[O]nce it is determined that the Due Process Clause applies, the question remains what

process is due." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985)(citing Morrissey

v. Brewer, 408 U.S. 471, 481 (1972)). "An essential principle of due process is that a deprivation

of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the

nature of the case." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542. "[D]ue process is

flexible and calls for such procedural protections as the particular situation demands." Mathews

v. Eldridge, 424 U.S. at 334. The Supreme Court explains that

> the root requirement of the Due Process Clause [is] that an individual be given an
> opportunity for a hearing before he is deprived of any significant property interest.
> This principle requires some kind of a hearing prior to the discharge of an employee
> who has a constitutionally protected property interest in his employment.
>
> . . . .
>
> [T]he pretermination hearing, though necessary, need not be elaborate. We have
> pointed out that [t]he formality and procedural requisites for the hearing can vary,
> depending upon the importance of the interests involved and the nature of the
> subsequent proceedings. In general, something less than a full evidentiary hearing
> is sufficient prior to adverse administrative action.

Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542, 545 (footnote omitted).

> The United States Court of Appeals for the Second Circuit states:

> The Supreme Court . . . explained that procedural due process is a flexible standard
> that can vary in different circumstances depending on "'the private interest that will
> be affected by the official action'" as compared to "the Government's asserted
> interest, 'including the function involved' and the burdens the Government would
> face in providing greater process." Hamdi v. Rumsfeld, 542 U.S. 507, [529] . . .
> (2004)(quoting Mathews v. Eldridge, 424 U.S. at 335). A court must carefully
> balance these competing concerns, analyzing "'the risk of an erroneous
> deprivation' of the private interest if the process were reduced and the 'probable
> value, if any, of additional or substitute safeguards.'" Id. (quoting Mathews v.
> Eldridge, 424 U.S. at 335. . . .).

United States v. Abuhamra, 389 F.3d 309, 318 (2d Cir. 2004). See Black v. Decker, 103 F.4th

133, 148 (2d Cir. 2024)(stating that Mathews v. Eldridge 'remains a flexible test,' and takes

account of individual circumstances" (quoting Rodriguez Diaz v. Garland, 53 F.4th 1189, 1206

(9th Cir. 2022))).  The required hearing depends on: (i) the private interest at stake; (ii) the risk of erroneous deprivation given the procedures the government already guarantees, and whether additional procedural safeguards prove valuable; and (iii) the government's interest and the burdens that additional procedures might impose.  See Mathews v. Eldridge, 424 U.S. at 335.  For example, "[w]here . . . the state must act quickly, a meaningful post-deprivation hearing is adequate."  Clark v. City of Draper, 168 F.3d at 1189.  See Spielman v. Hildebrand, 873 F.2d 1377, 1385 (10th Cir. 1989)(concluding that removal of a child from parents' custody requires pre-deprivation hearing "except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event").

The Court has considered procedural due process violations.  See, e.g., A.M. through Youngers v. N.M. Dep't of Health, No. CIV 13-0692 JB/WPL, 2015 WL 13668431, at *37-43 (D.N.M. Dec. 7, 2015)(Browning, J.)("Youngers").  For example, in Youngers, the Court concludes that the New Mexico Department of Health violates due process when it affords a woman with developmental disabilities no process before depriving her of medical care, conditions of reasonable care, safety, and nonrestrictive confinement, because it affords her no process for deprivation.  See Youngers, 2015 WL 13668431, at *37-43.  The Court also concludes a municipality does not deny due process to tenured city employee when the city fired him, because the city affords him a hearing.  See Salazar v. City of Albuquerque, 776 F. Supp. 2d 1217, 1239 (D.N.M. 2011)(Browning, J.)("A citizen is entitled to process and is not necessarily guaranteed a win.").  See also Duprey v. Twelfth Judicial Dist. Court, 760 F. Supp. 2d at 1215 (denying due process claims where a State employee "got her opportunity to be heard at a complex grievance hearing, with an attorney and with an opportunity to question witnesses, and make opening and closing arguments to a panel of decision-makers"); Camuglia v. City of Albuquerque, 375 F. Supp.

2d at 1299, aff'd 448 F.3d at 1220-21 ("[I]t cannot be denied that the City, acting through its inspectors, may close a restaurant to protect the health of patrons and workers without first providing a hearing to the restaurant owner.").

### ii.    **Substantive Due Process.**

There are two substantive due process claims: (i) where the plaintiff alleges that the government infringes upon a fundamental right, see Washington v. Glucksberg, 521 U.S. 702, 721-22 (1997)("Glucksberg"); and (ii) where the plaintiff alleges that a government action deprives arbitrarily the plaintiff of life, liberty, or property, in a manner that shocks the judicial conscience, see Rochin v. California, 342 U.S. 165, 172 (1952)(concluding that a sheriff's application of stomach pumping to force an arrestee to vomit shocked the conscience). The Tenth Circuit "appl[ies] the fundamental-rights approach when the plaintiff challenges legislative action, and the shocks-the-conscience approach when the plaintiff seeks relief for tortious executive action." Halley v. Huckaby, 902 F.3d 1136, 1153 (10th Cir. 2018). But see Seegmiller v. LaVerkin City, 528 F.3d 762, 768 (10th Cir. 2008)(Tymkovich, C.J.)(explaining that "there is no hard-and-fast rule requiring lower courts to analyze substantive due process cases under only the fundamental rights or shocks the conscience standards"). But see also Dawson v. Bd. of Cty. Comm'rs, 732 F. App'x 624, 636 (10th Cir. 2018)(Tymkovich, C.J., concurring)(noting that, "though our circuit has sometimes repeated Seegmiller's 'both tests work' dicta, we do not follow it. Instead, we follow a simple binary approach" which applies the fundamental rights test to legislative actions and the shocks-the-conscience test to executive actions)(quoting, see, e.g., Leatherwood v. Allbaugh, 861 F.3d 1034, 1046 n.11 (10th Cir. 2017)(explaining both tests could be used in case about revocation of a defendant's suspended sentence)).

The fundamental rights approach proceeds in three steps. See Abdi v. Wray, 942 F.3d at

1028. First, the court must evaluate whether a fundamental right is at issue either: (i) "because the Supreme Court or the Tenth Circuit has already determined that it exists"; or (ii) "because the right claimed to have been infringed by the government is one that is objectively among those 'deeply rooted in this Nation's history and tradition' and 'implicit in the concept of ordered liberty' such that it is 'fundamental.'" Abdi v. Wray, 942 F.3d at 1028 (quoting Glucksberg, 521 U.S. at 720-21). Second, the court determines whether the right at issue "has been infringed through either total prohibition or 'direct and substantial' interference." Abdi v. Wray, 942 F.3d at 1028 (quoting Zablocki v. Redhail, 434 U.S. 374, 387 (1978)). Third, if the right is fundamental, the Court must determine whether the government action at issue satisfies strict scrutiny. See Abdi v. Wray, 942 F.3d at 1028 (noting that the government must "me[e]t its burden to show that the law . . . is narrowly tailored to achieve a compelling governmental purpose"). If the right is not fundamental, however, the Court applies rational basis review. See Reno v. Flores, 507 U.S. 292, 305 (1993)(explaining that strict scrutiny is requires "only when fundamental rights are involved").

"Whether the conduct shocks the conscience is an objective test, based on the circumstances, rather than a subjective test based on the government actor's knowledge." Pena v. Greffet, 922 F. Supp. 2d at 1227 (citing James v. Chavez, 830 F. Supp. 2d 1208, 1276 (D.N.M. 2011)(Browning, J.)(concluding that the use of deadly force does not shock the conscience even if the suspect does not have an intent to harm the officer, because the officer "had sufficient facts before him to conclude that there was a threat of serious physical harm" and the "courts must evaluate a [government actor's] conduct objectively"), aff'd, 511 F. App'x 742 (10th Cir. 2013)(unpublished)). For Executive action to shock the conscience, that action must be more than mere negligence. E.g., Moore v. Guthrie, 438 F.3d 1036, 1040 (10th Cir. 2006)("Moore"). Indeed, even a reckless official's or the action of one bent on injuring a person do not necessarily

shock the judicial conscience.  Moore, 438 F.3d at 1040.  "'Conduct that shocks the judicial conscience' is 'deliberate government action that is arbitrary and unrestrained by the established principles of private right and distributive justice.'"  Hernandez v. Ridley, 734 F.3d 1254, 1261 (10th Cir.2013)("Hernandez")(quoting Seegmiller v. LaVerkin City, 528 F.3d 762, 767 (10th Cir.2008)).  "To show a defendant's conduct is conscience shocking, a plaintiff must prove a government actor arbitrarily abused his authority or 'employed it as an instrument of oppression.'"  Hernandez, 734 F.3d at 1261 (quoting Williams v. Berney, 519 F.3d 1216, 1220 (10th Cir.2008)).  "The behavior complained of must be egregious and outrageous."  Hernandez, 734 F.3d at 1261.  See Cnty. of Sacramento v. Lewis, 523 U.S. 833, 847 (1998)(stating that Rochin v. California, 342 U.S. 165 (1952) set the "benchmark" of executive abuse of power at "conduct 'that shocks the conscience' and violates the 'decencies of civilized conduct'")(quoting Rochin v. California, 342 U.S. at 172-173); Breithaupt v. Abram, 352 U.S. 432, 435 (1957)("We set aside the conviction because such conduct 'shocked the conscience' and was so 'brutal' and 'offensive' that it did not comport with traditional ideas of fair play and decency.")(quoting Rochin v. California, 342 U.S. at 174).

### b.    Due Process and Immigration Law.

"[T]he power to admit or exclude aliens is a sovereign prerogative."  Landon, 459 U.S. at 32 (citing as examples United States ex rel. Knauff v. Shaughnessy, 338 U.S. 537, 542 (1950), and Nishimura Ekiu v. United States, 142 U.S. 651, 659-60 (1892)).  See Thuraissigiam, 591 U.S. at 139 (stating the sovereign's prerogative is a "fundamental proposition").  The United States' plenary power to admit or exclude aliens is no longer plenary once an alien enters the country, see Landon, 459 U.S. at 32 ("Once an alien gains admission to our country and begins to develop the ties that go with permanent residence his constitutional status changes accordingly."), because the

Due Process Clause applies to "all persons," Zadvydas, 533 U.S. at 693.  In 1886, the Supreme Court says:

> The fourteenth amendment to the constitution is not confined to the protection of citizens.  It says: "Nor shall any state deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."  These provisions are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality; and the equal protection of the laws is a pledge of the protection of equal laws.

Yick Wo v. Hopkins, 118 U.S. at 369 (quoting U.S. Const. amend. XIV, § 1).  Yick Wo v. Hopkins deals with California detaining Chinese aliens without due process of law.  118 U.S. at 368-369.  Accordingly, whether an alien is "within" the United States is a determination with Constitutional significance.  See Leng May Ma v. Barber, 357 U.S. 185, 188 (1958)("Leng May Ma")(stating that the Court recognizes "additional rights and privileges" for alien "within the United States after an entry, irrespective of its legality").  Immigration law balances the United States' prerogative to admit or exclude with the constraints the Due Process Clauses places on United States by distinguishing between aliens who are "on the threshold of initial entry," Mezei, 345 U.S. at 212, and those who gain a "foothold" or effect entry in the United States, see Kaplan v. Tod, 267 U.S. 228, 258 (1925)("Kaplan").  Congress legislates against this settled Constitutional background of aliens at the threshold of entry and those who effect an entry.

### i.      On the Threshold of Entry.

"The entry-doctrine fiction has always determined when and under what circumstances due process applies in proceedings."  Kurzban, supra, chapter 3, § 1.H, at 80.  Although IIRIRA ends the traditional distinction between exclusion and deportation proceedings, the entry doctrine endures regarding whether someone has Constitutional rights if they are in the United States, even if the United States has not admitted the alien.  See Kurzban, supra, chapter 3, § 1.H, at 80.  For

more than a century, the Supreme Court recognizes that an alien seeking entry "requests a privilege," Landon, 459 U.S. at 32, and possesses only those procedural protections which Congress chooses to provide, because the power to admit or exclude aliens is a core sovereign prerogative, see Knauff, 338 U.S. at 544 ("Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned."). The United States' power over aliens on the "threshold of entry" does not change because an alien sets foot on United States' soil. Thuraissigiam, 591 U.S at 140 (stating that, even if the alien makes his way "25 yards into U.S. territory," he is treated as an applicant for admission "'on the threshold'" of entry)(quoting Mezei, 345 U.S. at 212). Nor does the power change because an alien is "paroled elsewhere in the country for years pending removal"; they, too, are "'treated for due process purposes 'as if stopped at the border.'" Thuraissigiam, 591 U.S at 139 (quoting Mezei, 345 U.S. at 215). Thus, the sovereign's prerogative endures for any alien stopped at the border or "detained shortly after unlawful entry" despite circumstances that might suggest the alien effects an entry. Kaplan, 267 U.S. at 257-58 (stating that, "in theory of law," an alien is inadmissible, but immigration officers permit the aliens to reside in the United States for nine years, nonetheless remains "at the boundary line" and for purposes of due process has "gained no foothold in the United States" for purposes of due process). See Leng May Ma 357 U.S. at 188-90 (1958)(stating that an alien "paroled" into the United States pending admissibility has not effected an "entry"). Aliens, whom the United States treats as "at the boundary line," receive less Constitutional Due Process protections than an alien who effects an entry without first encountering the United States.

### ii.      Effected Entry.

By contrast, once an alien effects entry and develops a presence within the United States, removal implicates greater Constitutional protections. See Landon, 459 U.S. at 34 ("Our cases

have frequently suggested that a continuously present resident alien is entitled to a fair hearing when threatened with deportation.").  Whether an alien effects entry is not purely a question of presence in the country or temporal conditions; the question goes to the connection and the relationship between the United States and the alien.  See United States v. Verdugo–Urquidez, 494 U.S. 259, 271 (1990)(stating in dicta that "aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country"); Kwong Hai Chew v. Colding, 344 U.S. 590, 596 n.5, (1953)("The Bill of Rights is a futile authority for the alien seeking admission for the first time to these shores.  But once an alien lawfully enters and resides in this country he becomes invested with the rights guaranteed by the Constitution to all people within our borders."); Yamataya v. Fisher, 189 U.S. 86, 100-01 (1903)(withholding judgment on question "whether an alien can rightfully invoke the due process clause of the Constitution who has entered the country clandestinely, and who has been here for too brief a period to have become, in any real sense, a part of our population, before his right to remain is disputed").

For example, in Osorio-Martinez v. Attorney General of the United States, 893 F.3d 153 (3d Cir. 2018)("Osorio-Martinez"), the United States Court of Appeals for the Third Circuit considers two classes of aliens subject to expedited removal under § 1225(b) and the related jurisdiction-stripping provision in § 1252.  See Osorio-Martinez, 893 F.3d at 162-63.  The first class consists of aliens "apprehended within hours of entering the country," Osorio-Martinez, 893 F.3d at 166, while the second class consists of aliens physically present in the United States who qualify for Special Immigrant Juvenile status under 8 U.S.C. § 1101(a)(27)(J).  See Osorio-Martinez, 893 F.3d at 163.  In Castro v. Department of Homeland Security, 835 F.3d 422 (3d Cir. 2016)("Castro"), the Third Circuit addresses the first class and holds that § 1225 does not

violate the Constitution, reasoning that the petitioners' claims are "based on physical presence alone," and the claims arise in the context of aliens seeking initial entry or whom are apprehended immediately after entry.  Osorio-Martinez, 893 F.3d at 166 (citing Castro, 835 F.3d at 448).  See Castro, 835 F.3d at 448 (stating that "most of the cases cited above did not involve aliens who were seeking initial entry to the country or who were apprehended immediately after entry.").  By contrast, in Osorio-Martinez, the Third Circuit holds that § 1252's jurisdiction-stripping clause is unconstitutional as applied to the second class of aliens, concluding that those aliens have "significant ties to this country" sufficient to trigger greater constitutional protection.  Osorio-Martinez, 893 F.3d at 167.  The Third Circuit thus reaffirms the longstanding distinction between aliens at or near the threshold of entry, and those who have effected entry, and establish presence within the United States for purposes of due process analysis.

Because the Constitution distinguishes between aliens who effect an entry and those who remain at the threshold of entry, an alien who enters the United States may, in certain circumstances, receive greater procedural protections than an alien seeking initial admission.  The Supreme Court has repeatedly explained that, for aliens at the threshold of entry, the Constitution requires no procedural process beyond that which Congress has provided by statute to govern their application.  See Mezei, 345 U.S. at 212 ("'Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned.'")(quoting Knauff, 338 U.S. at 544).[24]

---

[24] While the Supreme Court has said that Constitutional Due Process aliens is all the process that Congress gives, that does not seem like sound Constitutional analysis for several reasons.  First, the Constitution exists before any immigration statute, so the Constitution provided some protection to aliens before Congress passes the first immigration statute in 1798.  See 1 Stat. 570, 1 Stat. 577, and 1 Stat. 596.  The question is what Due Process required before the first statute.  Presumably there was some protections for aliens before that statute.  It seems better to decide what the Constitution provided then and provides now then just refer to a statute.

Second, the Court is uncomfortable with the idea that every violation of the statute is a Constitutional violation.  Normally, the Constitution is a floor, and Congress must provide process

The Court undertakes this due process analysis in <u>Singh</u>, and concludes that the Due Process Clause does not afford Singh any greater procedural due process rights than the statute affords, because Singh is an alien subject to the entry-fiction doctrine.  See <u>Singh</u>, 2026 WL 146005, at * 39.  Further, looking to § 1225(b)(2), the Court determines that the statute does not afford Singh the right to any process beyond an initial inspection to determine that the "alien seeking admission is not clearly and beyond a doubt entitled to be admitted." 8 U.S.C. § 1225(b)(2).  This does not mean, however, that Singh does not have any due process protections at all, because the Court determines that all aliens, whether subject to the entry-fiction doctrine or territorial standing, have substantive due process rights beyond what the statute affords.  See <u>Singh</u>, 2026 WL 146005, at * 39.  Continued detention without process may violate "an alien subject to the entry fiction's substantive due process rights if immigration detention becomes punitive."

---

above the floor to be Constitutional.  By describing Due Process to be what the Legislature say it so, the Court is concerned that the Supreme Court is not giving Congress or the lower courts guidance what Due Process is.  In other words, saying that that the rule is that whatever Congress gives is Constitutional Due Process is no guidance at all.

Third, ever since <u>Marbury v. Madison</u>, the Court has insisted that it is the arbitrator of what the Constitution means.  See 5 U.S. 137 (1803). In the immigration area, the Supreme Court gives this power to Congress.  When the lower courts desperately need guidance, the Supreme Court is not to be found.

Fourth, when Congress changes the law, the Constitution changes.  Congress decides what the Constitution means and protects.  Thus, what can happen is that Constitutional protections can go and down.  For the nation and for the federal judiciary; that Constitutional protections can go down is odd.

It seems that the best approach would be for the Supreme Court to decide this whatever Congress says at decide what it does in other areas where the Constitution requires.  In other words, the Supreme Court needs to do what Chief Judge Marshal in <u>Marbury v. Madison</u> claims as its own job.  See 5 U.S. at 177-78.  The Supreme Court needs to decide what the Constitution protects.

Procedural Due Process requires notice and the opportunity to be heard.  Notice probably is not the issue if the United States is detaining the alien; the issue is the hearing.  Likely, the United States is detaining the alien or about to detain the alien.  The issue probably is removal or not removal, and detention if removal.  That probably all the Due Process gives.  It does not require a bond hearing, any partial burden of proof, or any burden of proof on the United States.  It seems that fleshing out what the Constitution minimally requires actually is makes more sense than referring to the statute for Constitutional analysis.

Singh, 2026 WL 146005, at * 39.  The Court concludes, however, that Singh's detention to date, approximately four months, is not so long as to qualify as punitive and therefore is not a violation of his due process rights.  See Singh, 2026 WL 146005, at * 39.

### iii.    Paroled and Conditional Parole.

Consistent with the "effected entry" framework, Congress has long exercised the power to permit an alien's physical presence within the United States while treating that individual, as a matter of law, as remaining at the threshold of entry -- a legal fiction most clearly embodied in the parole doctrine.  "[A] deferred inspection necessarily involves parole into the United States under INA § 212(d)(5)," 8 U.S.C. § 1182(d)(5).  Charles Grodan, Stanley Madman, Yale-Loser, Immigration Law and Procedure, § 8.05 [2][d], at 8-17 ("Gordan").  Parole permits physical ingress to the United States without formal admission; "conceptually, a person remains on the border, lacking the rights that accompany admission."  Gordan, supra, § 8.05[2][d], at 8-17.  Stated another way, parole is not an admission -- either at the border or out of detention.  See Leng May Ma v. Barber, 357 U.S. at 190; 8 U.S.C. § 1282(d)(5).

Congress' parole provisions reinforce the distinction between physical presence and legal entry that runs throughout immigration law.  See Kaplan, 267 U.S. at 257-58.  Section 1182(d) authorizes the Secretary of Homeland Security to "parole into the United States" an alien applying for admission for "urgent humanitarian" or "significant public benefit" reasons, while expressly providing that such parole "shall not be regarded as an admission."  8 U.S.C. § 1182(d)(5)(A).  Parole therefore permits an applicant for admission to reside temporarily within the United States while remaining, in theory of law, at the threshold of entry.  See Kaplan, 267 U.S. at 257-58.  The parole framework, thus, allows the political branches to accommodate humanitarian and

administrative needs without conferring the constitutional and statutory protections that attach to aliens the United States admits or those who establish a presence within the country.

### c.    Statutory Due Process.

In balancing the sovereign's prerogative to admit or exclude with the Due Process Clause's protections of all persons within the United States borders, the Supreme Court issues several opinions, in Zadyvdas, Jennings, and Thuraissigiam, interpreting the INA touching on the issues of due process.  Although the legal questions that the Supreme Court confronts in each of the cases is not the same, the legal discussion is instructive on how to navigate the intersection of immigration law and due process.

### i.    Supreme Court Guidance.

In Zadvydas, the Supreme Court considers whether the immigration detention statute governing post-removal-order custody, see 8 U.S.C. § 1231(a)(6) (1994 ed., Supp. V), authorizes the indefinite detention of aliens whom the United States cannot deport.  See Zadvydas, 533 U.S. at 682.  Both petitioners are lawful permanent residents whom the United States determines are removable based on their criminal convictions.  See 533 U.S. at 684-86.  After the statutory ninety-day removal period expires, the United States can repatriate neither petitioner because no country will accept them.  See 533 U.S. at 684-86.  The United States nevertheless continues to detain them under the post-removal detention statue, despite the ninety-day timeframe that Congress places in §1231(a)(6).  See 533 U.S. at 682.  The petitioners file habeas petitions, under 28 U.S.C. § 2241, arguing that permanent confinement is contrary to the Constitution.  See Zadyvdas, 533 U.S. at 685.

The Supreme Court begins by stating a "statute permitting indefinite detention of an alien would raise a serious constitutional problem."  See Zadyvdas, 533 U.S. at 690.  "The Fifth

Amendment's Due Process Clause forbids the Government to 'depriv[e]' any 'person . . . of . . . liberty . . . without due process of law.'  Freedom from imprisonment -- from government custody, detention, or other forms of physical restraint -- lies at the heart of the liberty that Clause protects." Zadyvdas, 533 U.S. at 690 (quoting the U.S. Const. amend. V, § 1)(alterations in the original). Continuing with its analysis, the Supreme Court states that only a sufficiently strong governmental interest, accompanied by adequate procedural safeguards, can justify civil detention.  See Zadyvdas, 533 U.S. at 690.  Preventing flight and protecting the community can justify limited detention, but the Supreme Court states that indefinite detention without a realistic prospect of removal cannot be Constitutional.  See Zadyvdas, 533 U.S. at 692.  Importantly, the Supreme Court rejects the United States reliance on Mezei, explaining that, once an alien enters the United States, "the legal circumstances change[]," because the Due Process Clause applies to all persons within the United States, regardless of the legality of their presence.  Zadyvdas, 533 U.S. at 693.

To avoid the Constitutional problem, the Supreme Court construes 8 U.S.C. § 1231(a)(6) (1994 ed., Supp. V), to contain an implicit temporal limitation that the statute authorizes detention only for "a period reasonably necessary" to accomplish removal.  Zadyvdas, 533 U.S. at 689.  The Supreme Court adopts a "presumptively reasonable" six-month detention period.  Zadyvdas, 533 U.S. at 700-01.  After six months, if the alien can show that removal is not reasonably foreseeable, continued detention becomes unauthorized unless the United States rebuts that showing.  See Zadyvdas, 533 U.S. at 701.  The Supreme Court thus reaffirms that, while Congress possesses broad authority over immigration, this authority remains subject to Constitutional limits once an alien effects an entry and establishes a presence in the United States.[25]

---

[25] In Zadvydas, the Supreme Court addresses post-removal-order detention as applied to lawful permanent residents who had effected entry into the United States and later lost their admitted status.  See 533 U.S. at 682.  The Court emphasizes that its Due Process analysis rested

In Jennings, the Supreme Court considers whether 8 U.S.C. §§ 1225(b), 1226(a), and 1226(c) implicitly requires periodic bond hearings or impose a temporal limitation on detention. See Jennings, 583 U.S. at 289. Respondent Alejandro Rodriguez, in Jennings, is a lawful permanent resident whom the United States detains under § 1226, because he has several criminal convictions. See Jennings, 583 U.S. at 289-90. The United States Court of Appeals for the Ninth Circuit certifies a class of aliens that the United States detains under 8 U.S.C. § 1225(b), 1226(a), and 1226(c) for longer than six months without providing a hearing justifying the detention, and names Rodriguez as the class representative. See Jennings, 583 U.S. at 290-91. The Ninth Circuit concludes those provision mandate a bond hearing every six months, invoking the Constitutional avoidance canon, because "prolonged detention without adequate procedural protections' authorized by the provisions 'would raise serious constitutional concerns.'" Jennings, 583 U.S. at 289 (quoting Rodriguez v. Robbins, 804 F.3d 1060 (9th Cir. 2015), rev'd sub nom. Jennings, 583 U.S. 281). Justice Alito rejects the Ninth Circuit's use of the Constitutional avoidance canon, holding that the statutory text unambiguously authorizes detention until immigration officers finish considering asylum applications under § 1225(b)(1)(B)(ii) or until removal proceedings conclude under § 1225(b)(2)(A). See Jennings, 583 U.S. at 283. Section 1225(b)(1) and (b)(2) state that

---

on the petitioners' prior entry and presence in the United States, noting that "[o]nce an alien enters the country, the legal circumstance changes," because the Due Process Clause applies to all persons within the United States. Zadvydas, 533 U.S. at 693. The Court acknowledges that "[a]liens who have not yet gained initial admission to this country would present a very different question." Zadvydas, 533 U.S. at 682.

The Supreme Court confronts that unaddressed question in Clark v. Martinez, 543 U.S. 371 (2005)("Clark"). In Clark, the Supreme Court applies Zadvydas' statutory construction to inadmissible aliens whom the United States had never admitted. Clark, 543 U.S. at 373. Writing for the Court, Justice Scalia declines to rest the decision on Constitutional Due Process grounds. See Clark, 543 U.S. at 378. Instead, he reasoned to "give these same words a different meaning for each category [of removable aliens] would be to invent a statute rather than interpret one." Clark, 543 U.S. at 378. Thus, Zadvydas' temporal limitation applies to inadmissible aliens as a matter of statutory interpretation, not because the Due Process Clause independently requires it.

applicants for admission "shall be detained" pending asylum consideration or removal proceedings, and § 1226(c) similarly provides that the United States "shall" take into custody certain criminal aliens and release them from custody "only if" narrow statutory conditions are met. Jennings, 583 U.S. at 283. Because these provisions specify definite termination points and employ mandatory language, the Supreme Court concludes that the statutes are not susceptible to a reading that implicitly imposes periodic bond hearings. See 583 U.S. at 311-12.

In Jennings, the Supreme Court distinguishes Zadvydas, where the Supreme Court previously reads a reasonableness time limit into 8 U.S.C. § 1231(a)(6) (1994 ed., Supp. V), to avoid a Constitutional problem. See Jennings, 583 U.S. at 289-99. Justice Alito focuses on the discretionary language "may be detained" in § 1231(a), and the statute containing no explicit endpoint, creating ambiguity. Jennings, 583 U.S. at 299. By contrast, the detention provisions in § 1225 and § 1226 contain clear commands, and, with defined stopping points, leave no comparable textual uncertainty for the avoidance cannon to resolve. See Jennings, 583 U.S. at 300-01. Accordingly, the Supreme Court reverses the Ninth Circuit's judgment, and disagrees with the Ninth Circuit's statutory interpretation and remands the case for consideration of the detainee's Constitutional claims in the first instance, expressly declining to decide whether prolonged detention under these provisions violates the Due Process Clause. Jennings, 583 U.S. at 312.

The third recent Supreme Court cases analyzing due process and the INA is Thuraissigiam. In Thurissigiam, the Supreme Court considers whether 8 U.S.C. § 1252(e)(2)'s limits on review by federal courts of writ of habeas corpus violates either the Suspension Clause or the Due Process

Clause.  See Thuraissigiam, 591 U.S. at 104.[26]  Respondent Vijayakumar Thuraissigiam is a Sri Lankan national that crosses the United States' border "without inspection or an entry document," and Border Patrol stops him "within 25 yards of the border."  Thuraissigiam, 591 U.S. at 114.  The United States detains him and places him in expedited removal proceedings under § 1225(b)(1).  See Thuraissigiam, 591 U.S. at 114.  Thuraissigiam asserts a fear of returning to Sri Lanka and seeks asylum under § 1225(b)(1)(A)(ii).  See Thuraissigiam, 591 U.S. at 114.  The United States determines Thuraissigiam does not have a credible fear, and an immigration law judge affirms this determination, placing Thuraissigiam back into removal proceeding.  See Thuraissigiam, 591 U.S. at 114.

Thuraissigiam files a petition of a writ of habeas corpus challenging the credible fear determination, but the district court dismisses the petition, because § 1252(a)(2) and (e)(2) remove credible fear determinations from federal courts' jurisdiction under habeas petitions.  See Thuraissigiam, 591 U.S. at 115.  The Ninth Circuit reverses the district court, because the Ninth Circuit concludes that "§ 1252(e)(2) violates the Suspension Clause."  Thuraissigiam, 591 U.S. at 115.  The Ninth Circuit states "that respondent 'has procedural due process rights,' specifically the right 'to expedited removal proceedings that conformed to the dictates of due process.'"

---

[26] "The Suspension Clause provides that '[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it.'"  Thuraissigiam, 591 U.S. at 116 (quoting U. S. Const., Art. I, § 9, cl. 2).  Because section 1252(e)(2) restricts judicial review in habeas proceedings to whether a petition is an alien, whether the United States orders the petitioner removed, or whether the petitioner can prove they some type of lawful permanent residence status, see 8 U.S.C. § 1252(e)(2)(A)-(C), the Ninth Circuit finds the provision violates Thuraissigiam's Constitutional rights.  See Thuraissigiam v. U.S. Dep't of Homeland Sec., 917 F.3d at 1111, n.15.  The Supreme Court reverses the Ninth Circuit's decision, because respondent attempts use of the writ outside its historic role, which in this case is to have the United States make another credible fear determination.  See Thuraissigiam, 591 U.S. at 118.

Thuraissigiam, 591 U.S. at 115 (quoting Thuraissigiam v. U.S. Dep't of Homeland Sec., 917 F.3d 1097 (9th Cir. 2019), rev'd and remanded sub nom. Thuraissigiam, 591 U.S. 103).

Justice Alito, writing for the Court, reverses the Ninth Circuit.  See Thuraissigiam, 591 U.S. at 140.  He first holds that § 1252(e)(2)'s limits on habeas review do not violate the Suspension Clause because the writ, as historically understood at the time of the Founding, does not extend to providing merits review of exclusion decisions.  See Thuraissigiam, 591 U.S. at 118. Turning to due process, the Supreme Court explains that longstanding precedent draws a sharp distinction between aliens who have effected entry and those who seek initial admission.  See Thuraissigiam, 591 U.S. at 138-39.  The Supreme Court reiterates that the Constitution treats an alien whom the United States has not admitted -- whether the United States physically stops them at a port of entry, apprehends them shortly after unlawful entry, or paroles the alien into the country for years -- is, "for due process purposes, as if stopped at the border."  Thuraissigiam, 591 U.S. a 139.  In that posture, the alien "has only those rights regarding admission that Congress has provided by statute."  Thuraissigiam, 591 U.S. at 140. Because Congress specifies the procedures governing credible-fear screening and judicial review of those determinations, the Due Process Clause requires nothing more regarding Thuraissigiam's admission.  See Thuraissigiam, 591 U.S. at 140.  The Supreme Court also emphasizes the structural consequences of adopting the Ninth Circuit's approach.  See Thuraissigiam, 591 U.S. at 139 (stating the rule concerning the United States' plenary power to admit or exclude aliens "would be meaningless if it became inoperative as soon as an arriving alien set foot on U.S. soil").  The Supreme Court thus reaffirms that the political branches retain plenary authority to define the procedures governing admission determinations and that courts may not Constitutionalize additional procedural entitlements in the statue.

Taken together, these cases delineate the Constitutional framework governing immigration detention and admission. Zadvydas establishes that, once an alien effects entry and establishes presence within the United States, indefinite civil detention raises serious due process concerns absent a realistic prospect of removal. See Zadyvdas, 533 U.S. at 690. Jennings clarifies that, where Congress clearly authorizes detention for defined immigration proceedings, courts may not rewrite statutes to impose extra-textual temporal limits, leaving the Constitutional questions -- whether the statute violates the Due Process Clause -- to be addressed directly. See Jennings, 583 U.S. at 311-12. Thuraissigiam confirms that aliens whom the United States has not admitted -- whether at the physical border or in the legal posture of as if at the border -- possess only those procedural rights regarding admission that Congress' written statutes provide. See Thuraissigiam, 591 U.S. at 139.

The distinction between territorial presence and effected entry doctrines resolves any tension among these lines of authority. Physical presence within the United States generally confers standing on aliens to invoke Constitutional protections, but the entry fiction permits Congress to treat certain physically present aliens like those awaiting inspection or paroled for admission processing as legally remaining at the threshold of entry. In that posture, procedural entitlements flow from statute rather than from the Due Process Clause.

## ANALYSIS

The Court carefully reviews the PFRD and the relevant pleadings. In the PFRD, Magistrate Judge Fashing recommends that: (i) the Court find subject-matter jurisdiction over the Petition, see PFRD at 10; (ii) the Court find the Petition is not moot until Ochoa's time to appeal the removal order expires, or if Ochoa timely appeals, the BIA issues a decision on that appeal, see PFRD at 12; (iii) the Court reject the holding of Matter of Yajure Hurtado, see PFRD at 18; (iv) the Court

find the ILJ errors when treating Ochoa as an "applicant for admission" under § 1225(b)(2)(A), PFRD at 19; (v) the Court find that the United States § 1225(b)(2)(A) classification violates Ochoa's due process rights, see PFRD at 19; (vi) the Court exercise judicial discretion, finding that Ochoa does not need to exhaust his administrative remedies before seeking habeas relief, see PFRD at 23; (vii) the Court order Federal Respondents to provide Ochoa with a bond hearing pursuant to § 1226(a), see PFRD at 29; (viii) the Court order that the United States bears the burden at the § 1226(a) bond hearing of proving by clear and convincing evidence that Ochoa is a flight risk or danger to the community, see PFRD at 29; (ix) the Court order Ochoa's immediate release if not given a bond hearing in seven days, see PFRD at 29; and (x) the Court deny Ochoa's request that Federal Respondents be enjoyed from moving him outside of the District of New Mexico, see PFRD at 33.

The Federal Respondents object to the following recommendations: (i) that the Court find subject-matter jurisdiction over the Petition, see Objections at 2; (ii) that the Court find the Petition is not moot until Ochoa's time to appeal the removal order expires, or if Ochoa timely appeals, the BIA issues a decision on that appeal, see Objections at 7 (iii) that the Court find the ILJ errors when treating Ochoa as an "applicant for admission" under § 1225(b)(2)(A), Objections at 8; (iv) that the Court find that the United States § 1225(b)(2)(A) classification violates Ochoa's due process rights, see Objections at 8; (v) that the Court exercise judicial discretion, finding that Ochoa does not need to exhaust his administrative remedies before seeking habeas relief, see Objections at 8; and (viii) that the Court order that the United States bears the burden at the § 1226(a) bond hearing of proving by clear and convincing evidence that Ochoa is a flight risk or danger to the community, see Objections at 11.

After conducting a de novo review, the Court concludes that there are sound reasons in the applicable law and the relevant facts to overrule some and sustain some of the Objections to Magistrate Judge Fashing's PFRD. Accordingly the Court adopts the PFRD's recommendations to which the Federal Respondents do not object and conclude as following to the Objections: (i) the Court has subject-matter jurisdiction to hear Ochoa's habeas petition, where the Federal Respondents argue § 1252 strips the Court of jurisdiction, because Ochoa challenges his detention as unlawful without a final order of removal; (ii) the Federal Respondents do not consent to jurisdiction, where the Federal Respondents make statements "for the sake of argument," because the Court independently determines it retains jurisdiction and the Petition is not moot; (iii) the Federal Respondents may not detain Ochoa under § 1225, where he enters the United States without inspection two decades ago, because he is not an "arriving alien," nor is he "seeking admission"; (iv) the Federal Respondents do not violate Due Process, where the Federal Respondents do not provide Ochoa a bond hearing while detaining him for removal proceedings, because the Court determines the Federal Respondents' conduct is a statutory violation and does not amount to a Constitutional violation; (v) the Court does not dismiss Ochoa's habeas petition for failing to exhaustion his administrative remedies, where the exhaustion requirement is prudential, because requiring exhaustion goes against sound judicial discretion; and (vi) the Court does not shift the burden to the Federal Respondents to prove continued detention is appropriate for Ochoa, because the writ of habeas corpus is for securing a petitioner's release from unlawful detention and because Ochoa does not make the showing necessary to extend the writ at this time.

## I.    THE COURT OVERRULES THE RESPONDENTS' FIRST OBJECTION, CONCLUDING IT HAS SUBJECT-MATTER JURISDICTION TO DECIDE THE ISSUES.

Federal Respondents Object to the PFRD's conclusion that jurisdiction is proper, because they assert that §§ 1252(b)(9), 1252(e)(3), and 1252(g) bar the Court's review of Ochoa's claims. The Court maintains subject-matter jurisdiction to decide Ochoa's claims. First, § 1252(b)(9) does not apply, because Ochoa does not challenge his order of removal. Second, § 1252(e)(3) applies only to challenges on the validity of § 1225(b)(2) and not to a habeas petition challenging an individual's detainment. Finally, § 1252(g) does not bar review of Ochoa's claims, because he is not challenging the Attorney General's decision or action to commence proceedings against him, adjudicate his case, or execute an order of removal against him.

A.    **SECTION 1252(b)(9) DOES NOT CHANNEL OCHOA'S PETITION TO THE TENTH CIRCUIT.**

The Federal Respondents argue that § 1252(b)(9) limits judicial review to Courts of Appeals. See Objections at 4. The Tenth Circuit, however, expressly states that § 1252(b)(9) does not apply in circumstances where a petitioner challenges his or her detention, and does not seek the "review of an order of removal." Ochieng v. Mukasey, 520 F.3d at 1115(citing Singh, 499 F.3d at 978). Here, Ochoa challenges his detention's lawfulness and does not yet have "an order of removal." Accordingly, § 1252(b)(9) does not prohibit the Court from reviewing his claims.

Federal Respondents also argue that § 1252(a)(5) and §1252(b)(9) divest the Court of jurisdiction to review both direct and indirect challenges to removal orders, including decisions to detain for purposes of removal or for proceedings. See Objections at 6. As support, the Federal Respondents cite Delgado v. Quarantillo, 643 F.3d 52 (2d Cir. 2011), contending that "jurisdiction turns on the substance of the relief sought." Objections at 6. The Federal Respondents argue that, because Ochoa's challenge to his detention substantively overlaps with a challenge to his removal, the detention challenge "arises" from the removal proceedings. Objections at 6. The Court does not agree with the Federal Respondents. See Ozturk v. Hyde, 136 F.4th 382, 400 (2d

Cir. 2025)(explaining that the United States "mistaken belief" regarding the overlap between detention and removal challenges "does not make one claim arise out of the other, or necessitate that one claim controls the outcome of the other"). As the United States Court of Appeals for the Second Circuit accurately notes, the Federal Respondents arguments lead "to what *Jennings* called an 'absurd' result." Ozturk v. Hyde, 136 F.4th at 401. Moreover, the Federal Respondents' combined reliance on § 1252(a)(5) and § 1252(b)(9) fails for an additional, independent reason. See Objections at 6. Ochoa is not subject to a final order of removal. See Ozturk v. Hyde, 136 F.4th at 401 ("Section 1252(a)(5) bars district court review 'of an order of removal,' but no order of removal is at issue here." (quoting 8 U.S.C. § 1252(a)(5))). Accordingly, the Court concludes that neither § 1252(b)(9) alone nor in conjunction with § 1252(a)(5) strip the Court of jurisdiction to hear Ochoa's petition.

**B.      SECTION 1252(e)(3) DOES NOT BAR REVIEW OF OCHOA'S PETITION.**

Section 1252(e)(3) does not bar review of Ochoa's petition, because he does not bring a Constitutional challenge to § 1252(b) or to its implementation. See Vaupel v. Ortiz, 244 F. App'x at 895 (stating that § 1252(e)(3) "sets forth the process for bringing a constitutional challenge to § 1225(b) or its implementing regulations"). Section 1252(e)(3) channels to the District Court for the District of Columbia certain systemic challenges to § 1225(b) "and its implementation," including claims that § 1225(b) or an implementing regulation is unconstitutional, or that a written policy directive implementing § 1225(b) violates the law. Make the Rd. II, 2025 WL 3563313, at *16 (citing 18 U.S.C. § 1252(e)(3)(A)(i)-(ii)). The Federal Respondents characterize Ochoa's case as such a challenge, because he disputes the Department of Justice and DHS' written guidance applying § 1225(b) to noncitizens arrested in the interior. See Objections at 3 ("Petitioner thus

seeks judicial review of a written policy or guideline implementing § 1225(b) . . . ."). The Court reads, however, Ochoa's petition differently.

Ochoa seeks individual habeas relief from ongoing detention. This individualized relief is not seeking to redress a written policy or § 1225(b)'s Constitutionality. Ochoa's relief turns on whether § 1225 or § 1226 governs his custody, and whether his continued detention is lawful. That request is not one for the programmatic, nationwide review that § 1252(e)(3) channels to the United States District Courts for the District of Columbia. Moreover, as the Court discusses below, § 1225(b) does not govern Ochoa's detention. Because § 1225(e)(3) concerns judicial review "of determinations under section 1225(b)," § 1225(e)(3) does not preclude judicial review here. 8 U.S.C. § 1252(e)(3). Accordingly, § 1252(e)(3) does not bar the Court's jurisdiction over Ochoa's individual § 2241 petition.

C.    **SECTION 1252(g) DOES NOT DIVEST THE COURT OF JURISDICTION OVER OCHOA'S INDIVIDUAL HABEAS PETITION.**

Section 1252(g) does not deprive the Court of jurisdiction over Ochoa's habeas petition. Congress narrowly confines § 1252(g) to "three discrete actions that the Attorney General may take," namely, the decisions to commence proceedings, adjudicate cases, or execute removal orders. Reno, 525 U.S. at 482. The provision therefore does not sweep in all claims that bear some relationship to commencing proceedings; rather, § 1252(g) targets only those claims that arise directly from the exercise of prosecutorial discretion in undertaking those specific actions.

The Federal Respondents argue that § 1252(g) "categorically bars jurisdiction over 'any cause or claim by or on behalf of an alien *arising from* the decisions or action by the [Secretary of Homeland Security] to *commence proceedings*, adjudicate cases, or execute removal orders against any alien.'" Objections at 3 (quoting 8 U.S.C. § 1252(g) (italics in the Objections)). They contend that Ochoa's detention "clearly 'aris[es] from' the decision to commence removal proceedings

against" him.  Objections at 3 (alterations in the Objections).  This framing, however, reads the "arising from" language more broadly than the Supreme Court and the Tenth Circuit permit.

As the Tenth Circuit explains, Congress enacted § 1252(g) to address "'a particular evil: attempts to impose judicial constraints upon prosecutorial discretion.'"  Aguilar-Alvarez v. Holder, 528 F. App'x at 870 (quoting Reno, 525 U.S. at 485 n.9).  Consistent with that purpose, the Tenth Circuit asks whether a claim is "connected directly and immediately" to one of the enumerated actions; claims that have only a "weak, remote, or tenuous connection" fall outside the statute's reach.  Humphries, 164 F.3d at 943.  Measured against that standard, Ochoa's claim does not "arise from" the Attorney General's decision to commence proceedings against him.  He does not challenge the United States' discretionary decision to commence removal proceedings, nor does he seek to constrain how the Federal Respondents initiate or pursue those proceedings.  Instead, Ochoa posits a question of statutory interpretation that operates independently of the decision to initiate removal, challenging the lawfulness of his detention under § 1225.  Although detention may occur in the broader context of commencing proceedings, that contextual overlap is insufficient to bring the claim within § 1252(g)'s narrow scope.

To be sure, a claim that directly contests the Federal Respondents' ability to initiate the proceedings could fall within § 1252(g), because that claim would have an immediate connection to the decision to commence proceedings.  Ochoa advances no such challenge.  The claim that Ochoa pleads in the Petition is tangentially related to that decision and therefore lies outside the prosecutorial discretion claims which Congress seeks to channel through § 1252(g).  Accordingly, § 1252(g) does not strip the Court of jurisdiction to adjudicate Ochoa's habeas petition.

## II.     THE COURT OVERRULES THE FEDERAL RESPONDENTS' SECOND OBJECTION, CONCLUDING THAT IT HAS JURISDICTION TO HEAR THE PETITION.

The Court retains jurisdiction over Ochoa's petition irrespective of any purported "concession" that the Federal Respondents make. Objections at 7. In their second Objection, the Federal Respondents object "to the implication, if any, that they made a concession about jurisdiction . . . ." Objections at 7. This Objection responds to the PFRD's statement that, "[a]t the November 3 hearing, the parties agreed that the Court would retain jurisdiction over Petitioner's challenge until any order of removal becomes final." PFRD at 12. As discussed above, the Court's subject-matter jurisdiction does not depend on the Federal Respondents' representations at the November hearing. Even if the Court construes those representations as a concession, such a concession carries no legal effect. Subject-matter jurisdiction is elemental; it "cannot be consented to or waived." Firstenberg v. City of Santa Fe, N.M., 696 F.3d 1018, 1022 (10th Cir. 2012). Here, Ochoa brings a habeas petition under 28 U.S.C. § 2241 and invokes federal-question jurisdiction under 28 U.S.C. § 1331. See Petition ¶ 10, at 4. The Court retains subject-matter jurisdiction until Ochoa receives a final order of removal. See Johnson v. Guzman Chavez, 594 U.S. 523, 534-35 (2021)(stating that a removal order is not administratively final for detention purposes until "the BIA has reviewed the order (or the time for seeking the BIA's review has expired)"). The Court already determines that the Federal Respondents' arguments under § 1252 do not divest it of jurisdiction, and the Petition's pre-removal detention challenge does not become moot until Ochoa's time to appeal the removal order has expired, or if Ochoa timely appeals, the BIA issues a decision on that appeal. Accordingly, jurisdiction is proper regardless of the parties' statements, and the Court overrules the Second Objection.

**III. THE COURT OVERRULES THE FEDERAL RESPONDENTS' THIRD OBJECTION, AND CONCLUDES THAT THE GOVERNING DETENTION STATUTE IS § 1226 AND NOT § 1225.**

The Court concludes that § 1225 does not govern Ochoa's detention. The Federal Respondents Object to the PFRD's conclusion that the United States improperly detains Ochoa under § 1225, asserting that "at least three district courts have considered this issue [and] upheld the application of § 1225 in similar circumstances." Objections at 8. They further contend that no due process violation exists, "because the due process clause only prohibits 'the unduly prolonged detention of an alien.'" Objections at 8 (quoting Pena v. Hyde, No. CV 25-11983-NMG, 2025 WL 2108913 (D. Mass. July 28, 2025)(Gorton, J)). The Court agrees that no due process violation is present. It nevertheless concludes that a statutory violation occurs, because the United States lacks authority to detain Ochoa under § 1225(b).

The dispositive question is whether Ochoa is "'seeking admission.'" PFRD at 14 (quoting 8 U.S.C. § 1225(b)(2)(A)). Section 1225(b) governs the "[i]nspection of applicants for admission," 8 U.S.C. § 1225(b), with § 1225(b)(1) generally applying to "arriving" applicants, 8 U.S.C. § 1225(b)(1)(A)(i), and § 1225(b)(2) applying to those applicants § 1225(b)(1) does not cover, see 8 U.S.C. § 1225(b)(2). The PFRD correctly observes that the Supreme Court "explained that '§ 1225(b) applies primarily to alien seeking entry into the United States ("applicants for admission" in the language of the statute).'" PFRD at 14 (quoting Jennings, 583 U.S. at 303). Here, Ochoa is not seeking entry when ICE encounters him. See Petition ¶ 2, at 2 (stating that Ochoa is "performing gardening work in a yard of private property in the City of Sylmar, CA," when ICE detains him). Rather, Ochoa enters the United States nearly two decades earlier and, during that period, engages in no conduct consistent with "seeking admission." Petition ¶ 5, at 2-3. The Federal Respondents rest their argument on the premise that, because Ochoa enters unlawfully, he "cannot be said to have 'effected an entry' and remain[s], similar to an alien detained at a port of entry, 'on the threshold' and subject to § 1225." MTD at 3-4 (quoting Thuraissigiam,

591 U.S. at 140)(brackets in MTD).  This argument overlooks an important limitation: ICE does not detain Ochoa "shortly after unlawful entry," Thuraissigiam, 591 U.S. at 140, and Ochoa is present in the United States for well over two years, rendering § 1225(b)(1)'s provisions governing "certain other aliens" inapplicable, 8 U.S.C. § 1225(b)(1)(A)(iii)(II).  Section 1225(b)(2) "comes over the horizon for consideration" only after determining that § 1225(b)(1) does not apply.  Singh, 2026 WL 146005, at *18.  Having so determined, the Court turns to § 1225(b)(2).

Section 1225(b)(2)(A) provides:

> Subject to subparagraphs (B) and (C), in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title.

8 U.S.C. § 1225(b)(2)(A).  "Section 1225(b)(2)(A) distinguishes between the legal status of being an applicant for admission and the act of seeking admission."  Singh, 2026 WL 146005, at *20.  The Court agrees with the Federal Respondents that Ochoa qualifies as an applicant for admission.  See MTD at 2-3.  The record does not support, however, the conclusion that he is seeking admission.  "The Court disagrees with the Federal Respondents' [implicit] position that every applicant for admission is seeking admission and therefore subject to the scope of § 1225(b)(2)."  Singh, 2026 WL 146005, at *35.  See MTD at 5-6 (discussing the BIA's determination that an alien "'residing in the interior of the United States for almost 3 years . . . [] cannot be considered as 'seeking admission'" (quoting Matter of Yajure Hurtado, 29 I. & N. Dec. 216 (BIA 2025))).

Singh illustrates the distinction between legal status and the act of seeking admission.  There, the petitioner enters without inspection, and ICE detains him after more than two years in the United States.  See Singh, 2026 WL 146005, at *35.  Unlike Ochoa, however, Singh affirmatively applies for asylum, thereby seeking lawful entry.  See 2026 WL 146005, at *35. That application is enough for the Court to conclude Singh is "seeking admission," bringing him within

§ 1225(b)(2)(A)'s scope.  Singh, 2026 WL 146005, at *35.  Ochoa takes no comparable step.

Accordingly, although Ochoa is an applicant for admission, he is not "seeking admission" within

§ 1225(b)(2)(A)'s meaning.  The United States therefore lacks statutory authority to detain him

under § 1225(b), and its continued reliance on that provision constitutes a statutory violation.  For

those reasons, the Court overrules the Federal Respondents' Third Objection.

## IV.    THE COURT OVERRULES THE FEDERAL RESPONDENTS' FOURTH OBJECTION, USING SOUND JUDICIAL DISCRETION TO FIND EXHAUSTION UNNECESSARY UNDER THESE CIRCUMSTANCES.

The Court overrules the Federal Respondents' Fourth Objection.  In these circumstances,

the Court concludes that the prudential exhaustion requirement does not bar Ochoa's claim.  The

question is whether Ochoa's failure to appeal the ILJ's denial of his request for a custody

redetermination to the BIA precludes habeas review.  The PFRD recommends "that the Court

exercise its 'sound judicial discretion,' and find that the Petitioner was not required to exhaust his

administrative remedies before seeking habeas relief." PFRD at 23 (quoting McCarthy, 503 U.S.

at 144).  The Federal Respondents object, asserting that the "PFRD minimizes the importance of

the prudential exhaustion requirement."  Objections at 9.

"'Generally, a habeas petition cannot be used to substitute for direct appeal.'"  Soberanes,

388 F.3d at 1309 (quoting Latu, 375 F.3d at 1012).  However, "[c]ourts have carved out an

exception to the exhaustion requirement for constitutional challenges to the immigration laws,

because the BIA has no jurisdiction to review such claims."  Soberanes, 388 F.3d at 1310 (citing

Akinwunmi, 194 F.3d at 1341).  "[W]here Congress has not clearly required exhaustion, sound

judicial discretion governs."  McCarthy, 503 U.S. at 144.  In the absence of a statutory exhaustion

mandate, courts retain discretion to require or excuse exhaustion based on competing institutional

and individual interests.  See McCarthy, 503 U.S. at 144.  The Tenth Circuit does not provide a

framework for evaluating the exhaustion requirement's competing interests; however, the United

States Court of Appeals for the Second Circuit states:

> [I]f an exhaustion requirement is judicially imposed instead of statutorily imposed, a number of exceptions apply that allow courts to excuse a party's failure to exhaust administrative remedies.  Specifically, exhaustion of administrative remedies may not be required when '(1) available remedies provide no genuine opportunity for adequate relief; (2) irreparable injury may occur without immediate judicial relief; (3) administrative appeal would be futile; and (4) in certain instances a plaintiff has raised a substantial constitutional question.'"

Beharry v. Ashcroft, 329 F.3d 51, 62 (2d Cir. 2003)("Beharry"), as amended (July 24,

2003)(quoting Able v. United States, 88 F.3d 1280, 1288 (2d Cir. 1996)).  In the Court's

view, these factors reflect the pragmatic approach that the Supreme Court discusses in

McCarthy.  See Bowen v. City of New York, 476 U.S. 467, 484 (1986)("Finally, application

of the exhaustion doctrine is 'intensely practical.'" (quoting Mathews v. Eldridge, 424 U.S.,

at 331, n.11)).

Here, the four Beharry circumstances support the Court waiving the exhaustion

requirement for Ochoa.  First, the BIA has no jurisdiction to review Constitutional challenges to

§ 1225 detention without a final order of removal, giving Ochoa no genuine opportunity for

adequate relief.  See Soberanes, 388 F.3d at 1310.  Second, Ochoa suffers irreparable injury,

because, as the Court explains above, § 1226 governs his detention and not § 1225.  Third, the

Court determines an administrative appeal is futile, because the BIA's decision in Matter of Yajure

Hurtado categorically denies relief to noncitizens like Ochoa.  Moreover, DHS' policy of using

§ 1225 past the boarder began in January, 2025, making Ochoa's appeal less viable.  See Make the

Rd. II, 2025 WL 3563313 ("On January 21, 2025, the Acting Secretary of Homeland Security

extended Expedited Removal nationwide to encompass all persons encountered anywhere in the

United States . . . .").  Finally, Ochoa's petition raises substantial Constitutional questions, because

- 103 -

the Federal Respondents position subjects millions of people to detention without bond.  See Buenrostro-Mendez v. Bondi, 166 F.4th at 515 (Douglas, J., dissenting)(stating that the Federal Respondents view "would have required the detention of millions of people").  For these reasons, the Court concludes Ochoa does not need to exhaust his administrative remedies.  Accordingly, the Court overrules the Federal Respondents' Fourth Objection.

**V.     THE COURT SUSTAINS THE FEDERAL RESPONDENTS' FIFTH OBJECTION, CONCLUDING THAT BURDEN SHIFTING AT THE BOND HEARING IS NOT AN APPROPRIATE HABEAS RELIEF.**

The Court sustains the Federal Respondents' Fifth Objection.  In the Fifth Objection, the Federal Respondents "object to the recommendation for burden shifting at the bond hearing." Objections at 11.  The PFRD recommends that the Federal Respondents bear the burden of proof at the bond hearing, see PFRD at 23, and notes that both the United States Code and implementing regulations do not specify which party bears the burden, see PFRD at 24.  The Federal Respondents state, however, that, in "an immigration context, under both § 1225 and § 1226, it is generally the petitioner's burden to show that he is eligible for release or bond."  MTD at 8 (citing 8 C.F.R. § 236.1(c)(8)).  Moreover, the Federal Respondents object to burden shifting, because they argue that neither Matthews v. Eldridge nor the more general balancing test from Diaz-Ceja v. McAleenan, No. CIV 19-00824 NYW, 2019 WL 2774211, at *9 (D. Colo. 2019), warrants burden shifting.  See Objections at 11.  The Court agrees with the Federal Respondents, not because it adopts their application of those balancing tests, but because it concludes that neither framework is appropriate in this context.

Section 1226(a) states that the Attorney General may release an alien on "bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General . . . ," but does not prescribe anything further about the bond hearing.  8 U.S.C. § 1226(a).  Section

1226(c), which requires the Attorney General to take into custody aliens charged with, arrested for, or convicted of certain crimes, discusses the release of these aliens if the release is necessary for certain investigatory or other prosecutorial purposes and the "alien satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding."  8 U.S.C. § 1226(c)(4).  Nothing in the statute indicates, however, that this requirement that the alien demonstrate he or she are not a danger to the community or flight risk before release that § 1226(c)(4) describes for criminal aliens applies to the bond hearing in § 1226(a).

The BIA is responsible for implementing the current structure of the bond hearing under § 1226(a).  See Velasco Lopez v. Decker, 978 F.3d 842, 849 (2d Cir. 2020)("Decker").  Following the IIRIRA's enactment, INS implements new regulations that impose the standard for the initial post-arrest custody determination that immigration officials make.  8 C.F.R. § 236.1(c)(2)-(8).  The regulations establish a presumption of detention and place on the arrested individual the burden of demonstrating, to the arresting officer's satisfaction, that release does not pose a danger to property or persons, and that the individual likely will appear for any future proceedings.  See 8 C.F.R. § 236.1(c)(8).  The regulation applies only to the initial custody determination that the arresting officer makes and not to immigration judges in bond hearings.  See 8 C.F.R. § 236.1(c)(8)("Any officer authorized to issue a warrant of arrest may, in the officer's discretion, release an alien . . . provided that the alien must demonstrate to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding.").  Shortly after INS implements the new regulations, however, the BIA applies the rule in § 236.1(c)(8) for arresting officers, including the presumption for detention, to bond hearings that the immigration judges conduct under § 1226(a).  See, e.g., In Re Adeniji, 22 I. & N.

Dec. 1102, 1113 (BIA 1999)("From the outset, therefore, the regulations under IIRIRA have added as a requirement for ordinary bond determinations under section 236(a) of the Act [1226(a)] that the alien must demonstrate that 'release would not pose a danger to property or persons,' even though section 236(a) does not explicitly contain such a requirement.").

The Court considers whether it has the authority to tell the United States what the bond hearing must be on a habeas petition. The writ of habeas corpus functions as a judicial mechanism for testing the lawfulness of detention. See Peyton v. Rowe, 391 U.S. 54, 63 (1968)("[A] principle aim of the writ is to provide for swift judicial review of alleged unlawful restraints on liberty."). Further, the Supreme Court's traditional understanding of the writ is that courts generally do not use habeas to "order relief that neither terminates custody, accelerates the future date of release from custody, nor reduces the level of custody." Wilkinson v. Dotson, 544 U.S. at 86 (Scalia, J., concurring). The Court acknowledges that the writ is an "adaptable remedy," whose "precise application and scope changed depending upon the circumstances," but the Court understands that the Supreme Court cabins this adaptability within the context of a challenge to illegal confinement. See Boumediene, 553 U.S. at 779-80. See Jones v. Cunningham, 371 U.S. 236, 243 (1963)(explaining that the writ of habeas "now and never has been a static, narrow, formalistic remedy; its scope has grown to achieve its grand purpose -- the protection of individuals against erosion of their right to be free from wrongful restraints upon their liberty" when allowing a habeas challenge to parole conditions which "significantly confine and restrain [petitioner's] freedom").

The Court therefore concludes that a challenge to detention without any hearing, which relegates an alien to mandatory detainment pending removal proceedings, is appropriate under the writ of habeas. By contrast, however, the Court concludes that a challenge to the burden that an alien's § 1226(a) bond hearing imposes -- a challenge to the structure of the available bond hearing

-- is not appropriate under a habeas petition unless the bond hearing's existing structure is so weighed against the alien that the alien has no chance for bond. In other words, if the bond hearing's structure makes it so that no alien has a meaningful chance of success at achieving release, this structure is such a denial of liberty that a challenge to this process is not beyond writ of habeas' expansive reach, because the challenge is to detention and not directly to process. The remedy, in that case, is release and not the Court telling the United States how to do hearings. The Court determines, however, that the § 1226(a) bond hearing's current structure does not qualify as a process so detrimental to the alien's liberty access that an alien may challenge the bond hearing under the writ of habeas, because the writ, in this case's circumstances, does not qualify as a challenge to wrongful detention. The current § 1226(a) bond hearing requires only that an alien prove that he or she is not a flight risk nor a danger to the community before the United States releases the alien on bond. This burden does not present an extensive barrier to an alien seeking release, and, in fact, many aliens receive release on bond during the pendency of their removal proceedings. Accordingly, the Court determines that it should not decide on a habeas petition what the § 1226(a) bond hearing's structure must be, and, as a result, sustains the Federal Respondents' Fifth Objection to Magistrate Judge Fashing's conclusion that the United States must carry the burden by clear-and-convincing evidence that an alien is a flight risk or a danger to the community before denying bond under § 1226(a).

**IT IS ORDERED** that: (i) the Respondents' Objections to the Proposed Findings & Recommendation Disposition, filed November 21, 2025 (Doc. 22), are sustained in part and overruled in part; (ii) the Magistrate Judge Proposed Findings and Recommended Disposition, filed November 7, 2025 (Doc. 21), is adopted in part and rejected in part; (iii) the Verified Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241, filed September 11, 2025 (Doc. 1), is

granted in part, and the Respondents are to provide Petitioner Tomas Alfredo Molina Ochoa with an individualized bond hearing, pursuant to § 1226(a); (iv) the Petition, is denied in part, and the Federal Respondents do not bear the burden of proof at the bond hearing of proving Ochoa's continued detention is proper; (v) the Respondents must provide the bond hearing within seven days of this order or release Ochoa immediately from custody; and (vi) the Petition's request for an injunction prohibiting Ochoa's transfer outside of the District of New Mexico during the pendency of this action is denied.

_____
UNITED STATES DISTIRCT JUDGE

*Counsel:*

Gina Dennis
NuevoBridges Law
Las Cruces, New Mexico

   *Attorneys for the Petitioner*

Todd Blanche
 Acting United States Attorney General
Ryan Ellison
 First Assistant United States Attorney
Peter Haynes
Ryan Posey
 Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

   *Attorneys for Respondents Kristi Noem, Pamela Bondi, Todd Lyons, Mary De Anda-*
    *Ybarra, and George Dedos*

Daniel P. Struck
Jacob B. Lee
Struck Love Acedo, PLC
Chandler, Arizona

   *Attorneys for Respondent George Dedos*

- 108 -